164 P.3d 696

HAWAII VENTURES, LLC, Plaintiff–Appellant/Cross–Appellee,

v.

OTAKA, INC.; Takao Building Co., Ltd., formerly known as Takao Building Development Co., Ltd.; K.K. Kaini Seven, Yukio Takahashi; Hawaiian Waikiki Beach, Inc.; Alaka'i Mechanical Corporation; Hewlett–Packard Company; Hawaii Energy Management Co., LLC., Defendants–Appellees/Cross–Appellants,

and

Business Management Group, Inc.; Beach Snack Express, Inc.; John Does 1–50; Jane Does 1–50; Doe Partnerships 1–50; Doe Corporations 2–50; Doe Entities 1–50; and Doe Governmental Units 1–50, Defendants,

and

ILWU Local 142 AFL–CIO, and Theodore H. Smyth, Trustee, Smyth Family Trusts, Intervenor Defendants–Appellees/Cross–Appellants,

and

Argonaut Insurance Company, Intervenor Defendant–Appellee/Cross–Appellee,

and

Otaka, Inc. and Hawaiian Waikiki Beach, Inc., Counterclaimants–Appellees/Cross–Appellants,

v.

Leucadia National Corporation, Additional Counterclaim Defendant. Patricia Kim Park, Receiver–Appellee/Cross–Appellee.

Hawaii Ventures, LLC, Plaintiff–Appellant/Cross–Appellee,

v.

Otaka, Inc.; Takao Building Co., Ltd., formerly known as Takao Building Development Co., Ltd.; K.K. Kaini Seven, Yukio Takahashi; Hawaiian Waikiki Beach, Inc., Defendants–Appellees/Cross–Appellees/Cross–Appellants,

and

Alaka'i Mechanical Corporation; Hewlett–Packard Company; Business Management Group, Inc.; Beach Snack Express, Inc.; and Hawaii Energy Management Co., LLC., Defendants–Appellees/Cross–Appellees,

and

John Does 1–50; Jane Does 1–50; Doe Partnerships 1–50; Doe Corporations 2–50; Doe Entities 1–50; and Doe Governmental Units 1–50, Defendants,

and

Theodore H. Smyth, Trustee, Smyth Family Trusts, Intervenor Defendants–Appellees/Cross–Appellants/Cross–Appellees,

and

ILWU Local 142 AFL–CIO and Argonaut Insurance Company, Intervenor Defendants–Appellees/Cross–Appellees/Cross–Appellant,

and

Otaka, Inc. and Hawaiian Waikiki Beach, Inc., Counterclaimants–Appellees/Cross–Appellees,

v.

Leucadia National Corporation, Additional Counterclaim Defendant–Appellee/Cross–Appellee. Patricia Kim Park, Receiver–Appellee/Cross–Appellee. Former Employees of Hawaiian Waikiki Beach Hotel, Party In Interest–Appellee/Cross–Appellee/Cross–Appellant.

Nos. 25344, 26820.

Supreme Court of Hawai'i.

May 9, 2007.

Reconsideration Denied June 5, 2007.

Stephen K.C. Mau, Susan Tius, J. Stephen Street (of Rush Moore, LLP), Honolulu, for Hawaii Ventures, LLC.

Sheryl L. Nicholson and Pamela W. Bunn (of Paul Johnson Park & Niles), Honolulu, for Otaka, Inc., Hawaiian Waikiki Beach, Inc., Takao Building Co., Ltd., K.K. Daini Seven, and Yukio Takahashi.

Herbert R. Takahashi, Stanford H. Masui, Danny J. Vasconcellos, and Rebecca L. Covert, Honolulu, for ILWU Local 142, AFL–CIO.

Francis P. Hogan and Mi Yung C. Park (of Ashford & Wriston), Honolulu, for Theodore H. Smyth, Trustee of the Smyth Family Trusts, and Karl V. Willig, Special Litigation Trustee of the Smyth Family Trust.

Robert F. Miller, Honolulu, for Former Employees of Hawaiian Waikiki Beach Hotel.

Ke–Ching Ning and Jill D. Raznov (of Ning, Lilly & Jones) Honolulu, and Jeffrey S. Harris (of Torkildson Katz Fonseca Jaffee Moore & Hetherington), Honolulu, for Receiver Patricia Kim Park.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

Inasmuch as appeal Nos. 25344 and 26820 arise from the same action and present identical relevant facts and similar legal issues, we consolidated these appeals for purposes of disposition, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 3(b) (2007).[1] Both appeals arise out of the circuit court's administration of the foreclosure proceedings of a certain real property, formerly known as the Hawaiian Waikiki Beach Hotel, located at 2570 Kalakaua Avenue, Honolulu, Hawai'i [hereinafter, the Hotel or the Estate].

The parties to appeal No. 25344 are: (1) plaintiff-appellant/cross-appellee Hawaii Ventures, LLC [hereinafter, Hawaii Ventures or the Lender]; (2) intervenor defendant-appel-

---

1. HRAP Rule 3(b) provides in relevant part that "[a]ppeals may be consolidated by order ... of the Hawai'i appellate courts upon the court's own motion[.]"

lee/cross-appellee/cross-appellant International Longshore and Warehouse Union, Local 142, AFL–CIO (ILWU); (3) defendants-appellees/cross-appellees/cross-appellants/counterclaimants-appellees Otaka, Inc. (Otaka) and Hawaiian Waikiki Beach, Inc. (HWB); and (4) defendants-appellees/cross-appellees/cross-appellants Takao Building Co., Ltd., formerly known as Takao Building Development Co., Ltd. (Takao Building), K.K. Daini Seven (K.K. Daini), and Yukio Takahashi [hereinafter, the parties named in (3) and (4) above are collectively referred to as the Otaka Defendants]. In No. 25344, Hawaii Ventures appeals from the Circuit Court of the First Circuit's[2] August 22, 2002 interlocutory order that approved a court-appointed receiver's final report, as well as three other related interlocutory orders. ILWU and the Otaka Defendants cross appeal from the same orders.

During the pendency of appeal No. 25344, the circuit court declined ILWU's requests to stay further proceedings pending the disposition of appeal No. 25344 and resolved all issues in the underlying foreclosure action, resulting in the entry of a final judgment. Thus, in appeal No. 26820, the same parties appeal and cross appeal from the August 24, 2004 second amended final judgment, awarding, *inter alia,* a deficiency on the claim for foreclosure. The parties generally reassert arguments made in appeal No. 25344 and raise additional challenges as a result of rulings made by the circuit court after the filing of the interlocutory appeal in No. 25344. Further, appeal No. 26820 involves two addi-

tional sets of parties, who also cross appeal: (1) intervenor defendant-appellee/cross-appellant/cross-appellee Theodore H. Smyth of the Smyth Family Trusts, which own a substantial portion of land on which the Hotel sits and whose cross appeal was dismissed on June 30, 2005, [hereinafter, Trustee Smyth]; and (2) party in interest-appellee/cross-appellee/cross-appellant Former Employees of the Hawaiian Waikiki Beach Hotel (the Former Employees).[3]

Briefly stated, Hawaii Ventures filed an action against the Otaka Defendants, seeking to foreclose on the mortgaged property, *i.e.,* the Hotel. Eventually, the circuit court appointed receiver-appellee/cross-appellee Patricia Kim Park (Receiver Park or the Receiver) "to manage, protect, care for, preserve, and maintain" the Hotel, pending the foreclosure sale. Approximately ten months later, the Hotel was sold at the foreclosure auction to Hawaii Ventures—the successful bidder, and Receiver Park filed her final report. In light of objections registered by Hawaii Ventures, ILWU (which had intervened on behalf of its 220 Hotel employees during the receivership), and others, the circuit court appointed a special master to review the Receiver's final report. Ultimately, the circuit court approved the final report, as amended by Receiver Park and supplemented in part by the findings of the special master. Thereafter, the circuit court granted a deficiency judgment in favor of Hawaii Ventures and against the Otaka Defendants, directed distribution of the Estate's pro-

---

2. Unless otherwise indicated, the Honorable Karen N. Blondin presided over the underlying proceedings.

3. The Former Employees consist of seventy-eight former bargaining and non-bargaining employees of the Hotel, to wit: William D. Udani, Myrna F. Costa, Mary Ann E. Acio, Jacinta Agonoy, Rosita A. Ancheta, Zosimo A. Arista, Gary C.M. Au, Tomasa E. Balijnasay, Erna M. Baquiel, Nelia C. Bolosan, Cathy B. Caberto, Lydia Cabico, Halario G. Cabiles, Perlita N. Cabuena, Conrado A. Candelario, Erlinda C. Corrales, Po Wu Chan, Patricia M. Ching, Wayne K.Y. Chung, Rosita F. Coloma, Sinforosa S. Corpuz, Deborah J. Davis, Binate Dellatan, Anacleta Domingo, Priscilla Dunaway, Delphina J. Fuller, Segiberto G. Gono, Yung Hee Han, Patti R. Honjiyo, Johnny Y. Iloreta, Richard D. Jaeger, Joseph Kaunamano, Jr., Maile F. Kalapa, Willeda Kepa, Anna Kim, Tina M. Kim, Andres C. Lacar, Leonila G. Lauer, Rosita A. Lazo, Jr., Karl Lindo, Kathleen L. Luka, Keum Ja Lee, Nestor S. Madamba, Anita Z. Magallanes, Gertie P. Magaoay, Laddar C. Mallare, Magdalena S. Manding, Florencia C. Manera, Igoa T. Muller, David Chi Keung Ng, Marcus Ngirturong, Chauncey C. Nicola, III, Dawson B. Von Oelhoffen, Jerry A. Pabro, Egmidia T. Pascua, Leticia T. Pauso, Dominga Peralta, Ana T. Quibeantos, Juanita Ramos, Encarnacion V. Rivera, Robert Rowland, Scott S. Sato, Silveriano Sebastian, Vaimoana T. Sevelo, Mary Pat Soliven, Yun Hie Taniguchi, Setaita T. Taulani, Emilia B. Tupinio, Rosemarie A. Udani, Anecita F. Ugale, Juanita G. Ungos, Longomailea Vaioleti, Judith Versoza, Chung Leong Wong, Dolores A. Yokoi, Kenneth K. Yoshida, Nobuko Yoshida, and Andy S.C. Young.

ceeds, granted the Receiver's and the special master's fees to be paid from the Estate, and discharged Receiver Park.

Both appeals essentially involve the parties' various challenges to actions taken by the circuit court, Receiver Park, and/or the special master. The various contentions are discussed in detail as they pertain to the specific issues raised herein.

For the reasons discussed *infra*, we affirm in part and vacate in part the August 24, 2004 second amended final judgment.

## I. *BACKGROUND*

### A. *Factual Background*

In February 1985, Otaka purchased the Hotel from Holiday Inns, Inc. (Holiday Inns). The Hotel consisted of two buildings, a nine-story fee simple mauka tower and a twenty-four-story leasehold main tower. The main tower was subject to a ground lease from the fee owners, *i.e.*, the Smyth Family Trusts (the Trusts). Thus, with the consent of the Trusts,[4] Holiday Inns-by instrument dated February 4, 1985—assigned its interest as lessee under the lease to Otaka as part of the sales transaction.[5] Otaka, thereafter, began operating the Hotel, which consisted of 715 rooms [6] with a monthly budget of over $1 million and approximately 270 bargaining, non-bargaining, full-time, part-time, and on-call employees employed by HWB—a separate management company, which was also an affiliate of Otaka.

On November 30, 1987, Otaka executed a loan agreement and a promissory note in the principal sum of $60 million in favor of Mitsui Trust and Banking Co., Ltd., Los Angeles Agency and Mitsui Leasing (U.S.A.), Inc. [hereinafter, collectively, Mitsui]. To secure the loan, Otaka granted Mitsui a first mortgage lien and security interest in the Hotel. Takao Building, K.K. Daini, Takahashi,[7] and HWB also executed a guaranty in favor of Mitsui, guaranteeing the performance of the obligations under the loan documents. Subsequently, on June 30, 2000, Mitsui assigned its interest in the loan documents to Hawaii Ventures, a Delaware limited liability company.

On July 18, 2000, Hawaii Ventures notified the Otaka Defendants in writing that the loan was in default and that the amount owing, including accrued interest and default interest, under the loan documents was $85,497,463.37, as of May 30, 2000. Thereafter, on August 9, 2000, Hawaii Ventures filed a complaint to foreclose the Hotel against, *inter alia*, the Otaka Defendants.

### B. *Procedural History*

For present purposes, we summarize the chronology of material events in this complex foreclosure case in the table below (with emphases placed upon certain proceedings significant to the instant consolidated appeal). A more extended recitation of these proceedings is set forth in the discussion section of this opinion as it becomes necessary to the resolution of the issues raised herein.

---

4. The then-existing lease between the Trusts and Holiday Inns prohibited Holiday Inns, as lessee, from assigning or subletting under the lease "without the prior written consent of Lessor." At that time, the trustee for the Trusts was American Trust Company of Hawaii, Inc. [hereinafter, American Trust].

5. Previously, on April 30, 1978, Holiday Inns assigned a part of its interest as lessee under the lease to Waikiki Beach Partners, a Hawai'i limited partnership. As such, Waikiki Beach Partners also assigned its interest as lessee under the lease to Otaka on February 4, 1985.

6. Although the parties, including the Receiver, concede that there were 719 rooms in the Hotel, the fact sheet attached to the commissioner's report revealed a total of 715 rooms—seventy-one in the mauka tower and 644 in the main tower. Nonetheless, the discrepancy in the number of rooms in the Hotel is not material to the disposition of this appeal.

7. Takao Building and K.K. Daini, at all relevant times herein, were corporations existing under and by virtue of the laws of Japan. Takahashi was a resident of Tokyo, Japan.

| DATE | PROCEEDINGS |
|------|-------------|

**08/09/00** — Hawaii Ventures filed its **FORECLOSURE COMPLAINT** against, *inter alia*, the Otaka Defendants.

**08/10/00** — Hawaii Ventures filed an *ex parte* motion for appointment of receiver.[8]
- **08/11/00** — Otaka filed its memorandum in opposition.
- **08/24/00** — The circuit court issued its order **GRANTING** the motion **and APPOINTING RECEIVER PARK** as the receiver to operate the Hotel. The appointment order, which was drafted by Hawaii Ventures and approved by the circuit court, enunciated Receiver Park's specific powers and duties.
- **03/30/01** — The Otaka Defendants filed their motion to modify the order.
- **04/30/01** — The circuit court granted the motion to modify.
- **04/30/01** — *An amended order granting the motion for appointment was issued.*

**08/15/00** — **ILWU** requested **LEAVE TO INTERVENE** to protect the interests and rights of its members-employees under the then-existing collective bargaining agreement.
- **11/08/00** — The circuit court **GRANTED** the motion "for the limited purpose of asserting or protecting any lien or similar property interest in the collateral which is the subject of this foreclosure action."

**08/25/00** — **Trustee Smyth** sought **INTERVENTION** for the limited purpose of protecting the Trusts' interests as fee simple owners and lessors.
- **09/27/00** — The circuit court **GRANTED** the motion.
- Trustee Smyth's involvement in the foreclosure case centered solely upon his assertion of a counterclaim against Hawaii Ventures.

**10/09/00** — **Trustee Smyth** filed his answer to Hawaii Ventures' foreclosure complaint and asserted a **COUNTERCLAIM against Hawaii Ventures.**
- **08/02/02** — The circuit court ultimately granted summary judgment in favor of Hawaii Ventures on the entire counterclaim, *see* 06/18/02 entry *infra*.

**10/24/00** — **Receiver Park** filed a **MOTION** for an order **ESTABLISHING PROCEDURE FOR MONTHLY INTERIM ALLOWANCES** and payment of compensation and reimbursement of costs, wherein she *also requested fees and costs* incurred from *08/24/00 through 09/31/00, totaling $47,904.03* by her and her retained professionals.
- **11/06/00** — Hawaii Ventures filed a statement of no opposition to the motion.
- **11/08/00** — Receiver Park filed a supplemental motion, *revising* her request *through 10/31/00 in the total amount of $83,632.90.*
- **12/01/00** — The circuit court **GRANTED** Receiver Park's motion to establish procedure for monthly interim allowances *AND fees and costs in the sum of $83,632.90.*

**10/25/00** — Hawaii Ventures filed a motion for summary judgment and for interlocutory *decree of foreclosure.*
- **04/16/01** — The circuit court *granted* the motion for summary judgment and *APPOINTED RECEIVER PARK* to also serve as the foreclosure *COMMISSIONER* [hereinafter, Park's dual roles are distinguished by referring to her as "Receiver Park or the Receiver" or "Commissioner Park"].

**11/13/00** — **Trustee Smyth** filed a **COUNTERMOTION for PARTIAL SUMMARY JUDGMENT** on the counterclaim.
- **11/24/00** — Hawaii Ventures filed its memorandum in opposition.
- **04/26/01** — The circuit court issued an order **DENYING** the countermotion.

**05/09/01** — Hawaii Ventures filed a **MOTION FOR INSTRUCTIONS to the Receiver REQUIRING COMPLIANCE with the receivership orders.** Specifically, Hawaii Ventures sought to prohibit the Receiver from paying any monetary obligation (a) arising from the operation of the Hotel on or prior to August 24, 2004 or (b) incurred in the name of or by Otaka and HWB or any officer of either [ (a) and (b) are also referred to as pre-receivership obligations]. Hawaii Ventures also moved for an order compelling Receiver Park to provide Hawaii Ventures with financial information regarding assets and liabilities accrued both before and during the receivership and permit access to the Hotel's books and records for an independent review.
- **05/25/01** — Receiver Park opposed the motion.

8. The Honorable Kevin S.C. Chang presided over this matter. Judge Chang's involvement in the underlying proceedings was limited to his orders granting Hawaii Ventures' motion for appointment of receiver, ILWU's motion to intervene, Hawaii Ventures' motion for summary judgment and for interlocutory decree of foreclosure, and Trustee Smyth's countermotion for partial summary judgment on the counterclaim.

- 07/26/01 The circuit court **GRANTED IN PART and DENIED IN PART** the motion. Specifically, the circuit court denied the request to prohibit payment of any obligations arising before the Receiver was appointed or incurred by the Otaka Defendants. The circuit court granted the request for information insofar as the Receiver was required to provide a statement of all payments made that did not accrue during the receivership.

| | |
|---|---|
| 05/15/01 | **ILWU filed a motion to TREAT SEVERANCE AND VACATION PAY claims AS ADMINISTRATIVE EXPENSES.** |

- 05/25/01 Hawaii Ventures opposed the motion, contending that severance and vacation pay accrued pre-receivership were not liabilities of Receiver Park or payable from the collateral held by the Receiver.
- 09/28/01 The circuit court **GRANTED IN PART AND DENIED IN PART** the motion. The circuit court essentially permitted Receiver Park to pay only those benefits that were attributable to the receivership period.

05/16/01 Hawaii Ventures filed a motion for **CONFIRMATION OF SALE,** indicating that a public auction was held on May 16, 2001 and that the Hotel was sold to Hawaii Ventures, who was the sole bidder, for $80 million.
- 05/25/01 Trustee Smyth filed his statement of no position.
- 06/26/01 The circuit court confirmed the sale (and, in the same order, approved Commissioner Park's report, *see* 05/22/01 entry *infra* ).

05/17/01 **Receiver Park filed a MOTION FOR INSTRUCTIONS as to ILWU's severance and vacation claims.**
- 05/25/01 Hawaii Ventures responded to the motion, contending that these claims should not be liabilities of the Estate. Hawaii Ventures also sought access to the Hotel's accounting books and records for an audit.
- 09/17/01 The circuit court **PERMITTED** Receiver Park to pay only those benefits that were attributable to the receivership period.

05/22/01 Commissioner Park filed her report, recommending the confirmation of sale for the price of $80 million to Hawaii Ventures.
- 06/26/01 The circuit court approved Commissioner Park's report (and also confirmed the sale, *see* 05/16/01 entry *supra* ). Specifically, the circuit court required the closing for the sale to be held "on or before midnight on June 30, 2001."
- 06/30/01 Commissioner Park conveyed, via her "Assignment of Lease," the leasehold interest in the Hotel to HWB 2507 Kalakaua, LLC (HWB Kalakaua), which apparently bought the Hotel from Hawaii Ventures. On this date, the Hotel employees were effectively terminated.
- 07/02/01 HWB Kalakaua executed and recorded a "Real Property Mortgage: Security Agreement, Assignment of Rents; and Financial Statement" in favor of Hawaii Ventures for $80 million.
- The management of the Hotel was assumed by Aston Hotels and Resorts, and the Hotel was renamed the Aston Waikiki Beach Hotel.

07/23/01 Hawaii Ventures filed a *MOTION FOR DISTRIBUTION* of the remaining cash in Receiver Park's account less reasonable reserve for the Receiver to meet expenses and contingencies.
- 08/13/01 The Otaka Defendants opposed the motion.
- 08/13/01 ILWU opposed the motion.
- 08/13/01 Receiver Park responded to the motion, asserting that she had no objection to the release of cash if the amount of excess was based on the court's consideration of her final report, which was forthcoming.
- 08/14/01 Trustee Smyth filed a statement of no position to the motion.
- 11/28/01 The circuit court *DENIED* the motion without prejudice.

08/03/01 (A) ILWU filed a *MOTION TO STAY DISTRIBUTION* of Receiver Park's account inasmuch as it intended to file an appeal from the circuit court's ruling on its motion to treat severance and vacation pay claims as administrative expenses upon the issuance of the written order (*see* 05/15/01 entry *supra* and 10/12/01 entry *infra* ). ILWU informed the circuit court that it had filed (1) an unfair labor practice charge with the National Labor Relations Board (NLRB) against, *inter alia,* Receiver Park on July 16, 2001 and (2) a class grievance on vacation and separation pay against the Hotel on May 3, 2001, and a revised notice of intent to arbitrate the class grievance that clarified the "employer" was both HWB and Receiver Park on July 25, 2001. ILWU also indicated its intention to pursue legal action to compel arbitration.
- 09/17/01 The circuit court *DENIED* the motion.

(B) On the same day, Receiver Park filed a *MOTION FOR INSTRUCTIONS that she NOT ARBITRATE ILWU'S GRIEVANCE* pertaining to severance and vacation pay.
- 08/20/01 ILWU opposed the motion.

- 08/20/01 Hawaii Ventures responded that there was no basis for requiring Receiver Park or the Estate to continue to have to answer to the charges and grievances filed by ILWU.
- 08/23/01 Receiver Park filed her reply memorandum.
- 09/17/01 The circuit court *GRANTED* the motion.
- 10/05/01 ILWU filed a federal action compelling HWB and Otaka to arbitrate the severance and vacation pay issue, *see Int'l Longshore & Warehouse Union, Local 142 v. Hawaiian Waikiki Beach, Inc.,* No. 01–00653 DAE LEK, 2002 WL 32058429 (D.Haw. Dec.13, 2002).

08/14/01 **Receiver Park filed her FINAL REPORT,** indicating that "[c]ash in hand as of the date of appointment was $406,000. As of the end of July 2001, it was $3.77 million." Among other recommendations, Receiver Park proposed payments of a combined total of $310,713.58 to Hotel employees for severance and vacation pay (calculated on ten months of service). The Receiver also requested that she and her professionals be discharged and released from all liabilities.
- 08/29/01 Hawaii Ventures objected to the final report and requested access to the Hotel's books and records for an independent accounting.
- 08/29/01 ILWU filed its position and objections.
- 08/29/01 The Otaka Defendants filed their memorandum regarding the report.
- 09/13/01 **Receiver Park** responded to the parties' objections and **REQUESTED FOR APPOINTMENT OF A SPECIAL MASTER** to review the final report. *See* 09/21/01 entry *infra* for order of appointment of the special master.
- 08/22/03 The circuit court **APPROVED** the final report, as amended by the Special Master's report, and the supplemental final report, as amended. *See* 03/19/02 entry for the Special Master's report and 06/21/02 entry for the Receiver's supplemental final report.

09/21/01 **The circuit court issued an order APPOINTING Benjamin M. Matsubara as the SPECIAL MASTER (the Special Master)** to review objections raised to the Receiver's final report.
- 10/24/01 The circuit court filed a first supplemental order, authorizing the Special Master "to review, investigate, and make recommendation on the issues raised in the . . . [f]inal [r]eport."

10/12/01 ILWU requested leave to file interlocutory appeal from the order granting in part and denying in part its motion to treat severance and vacation pay claims as administrative expenses.
- 12/05/01 The circuit court denied the motion.

10/26/01 ILWU filed its notice of appeal.
- 02/15/02 This court issued an order dismissing the appeal as premature.

11/06/01 The parties filed a stipulation, agreeing to non-participation by Trustee Smyth in proceedings before the Special Master.

11/28/01 **Receiver Park filed an INTERIM FEE APPLICATION,** requesting $55,777.24 in fees, costs, and general excise tax incurred for the month of September 2001.
- 12/11/01 Hawaii Ventures filed its memorandum in opposition to the application.
- 12/24/01 Receiver Park filed a *supplemental memorandum,* in which she amended her application by reducing the requested amount to *$54,021.76.*
- 01/15/02 The circuit court **GRANTED** the fee application, but in the reduced amount of *$51,609.22.*

01/09/02 Receiver Park filed a second interim fee application, requesting $32,540.32 incurred in October 2001.
- 01/28/02 Hawaii Ventures opposed the application.
- The circuit court did not rule on the application due to Receiver Park's filing of the cumulative interim fee application, which included the fees covered in this application. *See* 06/26/02 entry *infra.*

01/14/02 Receiver Park filed a *MOTION FOR INSTRUCTIONS that she NOT DEFEND HWB* against complaint to compel arbitration, filed by ILWU in the federal district court (*see* 08/03/01 entry *supra* ).
- 01/28/02 Hawaii Ventures responded that it had no objection to Receiver Park's motion.
- 01/28/02 The Otaka Defendants opposed the motion.
- 02/01/02 Receiver Park filed her reply memorandum to the Otaka Defendants' memorandum in opposition.
- 02/22/02 The circuit court *GRANTED* the motion.

01/23/02 Receiver Park filed a third interim fee application, requesting $51,178.86 incurred in November 2001.
- The circuit court did not rule on the application due to Receiver Park's filing of the cumulative interim fee application, which included the fees covered in this application. *See* 06/26/02 entry *infra.*

02/05/02 **Trustee Smyth requested LEAVE TO FILE FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**, seeking to join HWB Kalakaua as a counterclaim defendant.
- 02/22/02 Hawaii Ventures opposed the motion.
- 03/05/02 The circuit court held a hearing on the motion, at which time the circuit court *ORALLY DENIED* the motion.
- 03/19/02 The circuit court entered a written order **DENYING** the motion.

03/19/02 **The Special Master filed his REPORT**, generally supporting the Receiver's final report (with some recommended modifications). The Special Master found that Receiver Park had paid out of the Estate a total of $1,359,613.00 in pre-receivership obligations. Out of that sum, the Special Master recommended that $944,205.00 be approved as "necessary" payments to preserve the Estate and $415,408.00 should be deemed a receivable from Otaka and HWB and assigned to Hawaii Ventures.
- 04/08/02 ILWU filed its position statement and objections.
- 04/08/02 Hawaii Ventures responded, arguing that the Special Master failed to address the majority of the issues it raised, including the Receiver's "waste" of the Estate assets in paying pre-receivership obligations.
- 04/08/02 Receiver Park filed her response.
- 04/08/02 The Otaka Defendants objected to the report.
- 05/24/02 The Special Master filed an **ADDENDUM** to his report, *REVISING* his recommendation to reflect that *payments of $964,826.00 should be approved and $394,787.00 should be shown as a receivable.*
- 07/11/02 The circuit court **APPROVED** the report, adopting the Special Master's recommendation as indicated *supra.*

04/03/02 The Special Master filed his APPLICATION FOR FEES, requesting $119,331.48 for himself and his consultants incurred in reviewing the Receiver's final report and preparing the Special Master's report.
- 08/22/02 The circuit court, in the same order that approved Receiver Park's final report, discussed *infra* in 06/21/02 entry, GRANTED fees in the amount of $119,331.48 to the Special Master.

04/26/02 Receiver Park requested INSTRUCTIONS from the circuit court as to whether she may pay the Special Master his requested fees and costs.
- 05/06/02 Hawaii Ventures opposed to paying the Special Master's fees from the Estate.
- 08/22/02 The circuit court, in its order approving the Receiver's final report, discussed *infra* in 06/21/02 entry, PERMITTED Receiver Park to pay $119,331.48 in fees to the Special Master from the Estate.

05/20/02 **Trustee Smyth filed a MOTION TO CONSOLIDATE**, seeking to sever the counterclaim from the instant case and consolidate it with his separate civil complaint for termination of lease, filed on 01/23/02, against HWB Kalakaua and Hawaii Ventures in the circuit court (*Smyth v. HWB 2507 Kalakaua, LLC,* Civil No. 02–1–0199–02 GWBC) [hereinafter, the rescission action].
- 06/10/02 Hawaii Ventures filed a memorandum in opposition.
- 06/18/02 At the hearing, the circuit court indicated that it was "not inclined to grant the motion," but would continue the motion until 07/10/02, the date on which Hawaii Ventures' motion for summary judgment on the counterclaim would be heard. *See* 06/18/02 entry *infra.*
- 08/12/02 The circuit court **DENIED** the motion.

06/17/02 **Former Employees filed a MOTION FOR LEAVE TO SUE Receiver Park** in her capacity as receiver, under the Hawai'i Wage Payment Act (Hawai'i Revised Statutes (HRS) chapter 388) and the Hawai'i Dislocated Workers Act (HRS chapter 394B), for unpaid wages and benefits.
- 07/01/02 ILWU filed its statement of no opposition.
- 07/01/02 Hawaii Ventures filed its memorandum in opposition.
- 07/01/02 Receiver Park filed her memorandum in opposition.
- 07/22/02 The circuit court issued an order **DENYING** the motion.

06/18/02 **Hawaii Ventures filed a MOTION FOR SUMMARY JUDGMENT** on all claims raised in **Trustee Smyth's COUNTERCLAIM.**
- 07/02/02 Trustee Smyth filed his memorandum in opposition.
- 08/02/02 The circuit court **GRANTED** the motion.

06/21/02 **Receiver Park filed a SUPPLEMENTAL FINAL REPORT.**
- 06/28/02 Hawaii Ventures filed its objections.
- 07/15/02 Receiver Park filed *a supplement to her supplemental final report.*
- 08/22/02 The circuit court essentially **APPROVED** the August 14, 2001 final report, as amended by the Special Master's report, and **APPROVED** the supplemental final report, as amended, [hereinafter, reference to the approval of the final report includes the approval of the supplemental final report]. Specifically, the order required Receiver Park to pay (1) $119,331.48 in fees and costs to the Special Master, (2) $358,770.94 in vacation and severance benefits attributable to the receivership period to the Hotel employees, and (3) $2,060,622 to HWB Kalakaua. However, the circuit court denied the Receiver's request to be discharged.

06/23/02 Commissioner Park filed a motion for fees and costs.
- 08/27/02 The circuit court granted the motion.
- Commissioner Park was eventually discharged from her duties and responsibilities after the filing of a final accounting and distribution statement. *See* 02/10/03 and 06/09/03 entries *infra.*

06/26/02 **Receiver Park filed a CUMULATIVE INTERIM FEE APPLICATION** for the months of *October 2001 through May 2002 in the amount of $231,358.63.*
- 07/08/02 Hawaii Ventures opposed the motion.
- 10/16/02 The circuit court **GRANTED IN PART AND DENIED IN PART** the application, awarding $175,939.00.

07/11/02 The circuit court entered an **order APPROVING the Special Master's report,** as amended by his addendum.

08/22/02 The circuit court entered an **order APPROVING Receiver Park's final report.**

09/23/02 Hawaii Ventures filed AN INTERLOCUTORY APPEAL, challenging four orders: (1) the 09/17/01 order regarding Receiver Park's motion for instructions as to payments for employee severance and vacation pay; (2) the 09/28/01 order granting in part and denying in part ILWU's motion to treat severance and vacation pay as administrative expenses; (3) the 07/11/02 order approving the Special Master's report; and (4) the 08/22/02 order approving the Receiver's final report.
- 10/07/02 ILWU and the Otaka Defendants cross appealed from the same four orders, plus six additional, yet unrelated, interlocutory orders.
- This court docketed the appeal as supreme court **case No. 25344.** However, on January 13, 2003, this court limited the cross-appeals to the same four orders from which Hawaii Ventures appealed, pursuant to *Forgay v. Conrad,* 47 U.S. 201, 204–05 (1848) (providing an exception to the finality requirement for appeals and allowing an appellant to immediately appeal a judgment for execution upon property).

11/01/02 **The Special Master filed an APPLICATION FOR ADDITIONAL FEES,** requesting fees *in the amount of $40,533.79* incurred in connection with responses to his report and the events leading up to and resulting from the circuit court's hearing concerning his report.
- 11/08/02 Hawaii Ventures objected, maintaining, *inter alia,* that the services provided by the Special Master did not benefit the Estate.
- 05/12/03 The circuit court, in its order regarding the Receiver's final motion for instructions, discussed *infra* in 02/10/03 entry, **GRANTED** the Special Master's additional fees *in the amount of $35,804.84* and *DISCHARGED the Special Master* from further responsibilities and duties.

02/10/03 **Receiver Park filed her FINAL MOTION FOR INSTRUCTIONS.** Specifically, she requested, *inter alia:* (1) an award of $99,453.44 in fees and costs for herself and her professionals for services rendered *between June 2002 and November 2002;* (2) permission to pay $40,533.79 in additional fees and costs requested by the Special Master; (3) her discharge as the receiver and commissioner; and (4) entry of final judgment.
- 03/10/03 Hawaii Ventures opposed certain recommendations made by Receiver Park.
- 05/12/03 The circuit court **GRANTED** the motion, allowing (1) $84,935.71 in fees and costs to Receiver Park and her professionals and $35,804.84 to the Special Master, (2) a reserve of $150,000.00 to be held in an interest-bearing account for further fees and costs, and (3) the balance to HWB Kalakaua. The circuit court also indicated that Receiver Park would be deemed discharged from her duties and responsibilities as a receiver and commissioner upon the filing of the final accounting and distribution statement, *see* 06/09/03 entry *infra.*

02/12/03 **Hawaii Ventures' MOTION FOR DEFICIENCY JUDGMENT.** Therein, Hawaii Ventures sought: (1) a deficiency judgment against the Otaka Defendants in the sum of $13,144,020.18; (2) an order declaring that HWB Kalakaua "is the assignee of all right, title and interest" in

(a) the $394,787.00 designated as a receivable by the Special Master and (b) the $964,826.00 deemed as justifiably paid by the Receiver during her receivership; (3) an order in favor of HWB Kalakaua, as assignee, for surcharge against Receiver Park in the amount of $1,390,167.00 that she had allegedly expended for liabilities of the Otaka Defendants during her receivership; and (4) an order that all remaining assets, records, and other things of value be delivered to HWB Kalakaua.

- 03/10/03 The Otaka Defendants opposed the motion.
- 03/10/03 ILWU opposed the motion.
- 03/10/03 Receiver Park opposed the motion.
- 05/12/03 The circuit court **GRANTED IN PART AND DENIED IN PART** the motion. The circuit court granted a deficiency judgment in the requested amount and denied all other requests, with the exception to issues relating to the distribution of assets, which would be determined in the Receiver's final motion for instructions. *See* 02/10/03 entry *supra.* The deficiency judgment thereafter was entered on May 14, 2003. *See* 05/14/03 entry *infra.*

03/20/03 Trustee Smyth sought to **SUBSTITUTE** Karl V. Willig in Willig's fiduciary capacity as the Special Litigation Trustee of the Trusts (Trustee Willig) as a party in place of himself.
- 04/07/03 Hawaii Ventures opposed the motion.
- 05/12/03 The circuit court **GRANTED IN PART AND DENIED IN PART** the motion. The circuit court denied Trustee Smyth's request to withdraw as a party in this case, but allowed Trustee Willig to join as a co-intervenor defendant and co-intervenor counterclaim plaintiff in the same position as Trustee Smyth [hereinafter, Trustee Smyth and Trustee Willig are collectively referred to as the Trustees, unless otherwise indicated].

03/25/03 **Hawaii Ventures filed a MOTION FOR ATTORNEYS' FEES AND COSTS against Trustee Smyth,** requesting $142,174.87 in fees and $2,118.92 in costs.
- 04/07/03 Trustee Smyth opposed the motion.
- 04/15/03 The circuit court held a hearing, at which time the court indicated that it would allow costs in the amount of $2,082.02, but denied without prejudice as to fees due to insufficient information to allocate fees between assumpsit and non-assumpsit.
- 05/12/03 Order **GRANTING IN PART AND DENYING IN PART** the motion was entered.

03/28/03 ILWU sought **TO STAY DISTRIBUTION** of assets remaining in the Estate pending appeal No. 25344.
- 04/07/03 Hawaii Ventures objected to the stay.
- 05/12/03 The circuit court **DENIED** the motion.

04/17/03 **Hawaii Ventures filed a SECOND MOTION FOR ATTORNEYS' FEES,** requesting $140,180.35 incurred in defending the non-assumpsit claims in the counterclaim.
- 05/05/03 Trustees Smyth opposed the motion.
- 05/22/03 The circuit court **GRANTED IN PART AND DENIED IN PART** the second motion. The circuit court reduced the sum to *$63,169.13.* The circuit court indicated that it believed only half of Trustee Smyth's counterclaim causes of action were in the nature of assumpsit.

05/14/03 The circuit court *entered a deficiency judgment.* On the same day, the circuit court *entered a final judgment.*

05/16/03 Trustee Smyth sought a stay of the execution of final judgment pending appeal.
- 06/02/03 Hawaii Ventures opposed the stay.
- 07/30/03 The circuit court granted the motion, provided that Trustee Smyth file a supersedeas bond in the amount of $85,000.00; the record does not indicate whether such bond was posted.

06/09/03 Receiver Park filed a final accounting and distribution statement, which effectively discharged her from her duties and responsibilities as the receiver and the commissioner. Therein, she revealed that $518,505.64 was distributed to HWB Kalakaua, and *the only cash remaining was the $150,000.00 held in an interest-bearing account by the clerk of the court.*

| | |
|---|---|
| 12/17/03 | The circuit court entered a first amended final judgment.[9] |
| 08/24/04 | The circuit court entered a **second amended final judgment.**[10] |
| 09/15/04 | Hawaii Ventures filed a notice of appeal. <br> • 09/21/04 The Trustees filed their notice of cross-appeal. <br> • 09/22/04 ILWU filed its notice of cross-appeal. <br> • 09/23/04 The Former Employees filed their notice of cross-appeal. <br> • 09/24/04 The Otaka Defendants filed their notice of cross-appeal. <br> This court docketed the appeal as supreme court **case No. 26820.** |

## II. STANDARDS OF REVIEW

### A. Receivership

 A receivership is equitable in nature and the court's extraordinary broad remedial powers and wide discretion to appoint receivers derive from its inherent powers of equity to fashion relief. In other words, a court of law without equity jurisdiction or statutory authority generally has no power to appoint a receiver. The power is a branch of equity jurisdiction not dependent upon any statute.

65 Am.Jur.2d *Receivers* § 7 at 658–59 (2001) (footnotes omitted).

One of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life. The principles upon which it proceeds are eternal; but their application in a changing world will necessarily change to meet changed situations.

*Fleming v. Napili Kai, Ltd.*, 50 Haw. 66, 70, 430 P.2d 316, 319 (1967) (internal quotation marks and citation omitted). As such, "[c]ourts of equity have the power to mold their decrees to conserve the equities of the parties under the circumstances of the case." *Honolulu, Ltd. v. Blackwell*, 7 Haw.App. 210, 219, 750 P.2d 942, 948 (1988) (citation omitted); *Jenkins v. Wise*, 58 Haw. 592, 598, 574 P.2d 1337, 1342 (1978) (A court sitting in equity on a foreclosure case "has the plenary power to fashion a decree to conform to the equitable requirements of the situation." (Citation omitted.)). It follows that, "whether and to what extent relief should be granted rests within the sound discretion of the [circuit] court," *id.* at 597, 574 P.2d at 1341

(citations omitted), and will not be disturbed absent an abuse of such discretion. In other words, a circuit court's decisions involving its supervision of an equitable receivership are viewed for abuse of discretion. *See Sec. & Exch. Comm'n v. Hardy*, 803 F.2d 1034, 1037 (9th Cir.1986). Under this rule,

> [t]he [circuit] court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Stated differently, an abuse of discretion occurs where the [circuit] court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Office of Hawaiian Affairs v. State*, 110 Hawai'i 338, 351, 133 P.3d 767, 780 (2006) (citation omitted) (format altered).

### B. Special Master's Findings and Conclusions of Law

 "The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court." Hawai'i Rules of Civil Procedure (HRCP) Rule 52(a) (2007). Consequently, this court reviews the special master's factual findings under the "clearly erroneous" standard, with particular deference to the "superior position" of the Special Master "to consider credibility and to draw inferences from the testimonial evidence." *Nat'l Labor Relations Bd. v. Sequoia Dist. Council of Carpenters, AFL–CIO*, 568 F.2d 628, 631–32 (9th Cir. 1977); HRCP Rule 52(a) ("Findings of fact shall not be set aside unless clearly erroneous[.]").

A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the

---

9. The first amended final judgment was entered as a result of this court's dismissal of the parties' appeals and cross-appeals from the May 14, 2003 final judgment as premature.

10. As a result of this court's dismissal (for the second time) as premature the parties' appeals and cross-appeals from the first amended final judgment, the second amended final judgment was entered.

definite and firm conviction in reviewing the entire evidence that a mistake has been committed. A finding of fact is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Bremer v. Weeks,* 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (citation omitted) (format altered).

 The Special Master's conclusions of law, however, are not entitled to any special weight. *Nat'l Labor Relations Bd. v. FMG Indus.,* 820 F.2d 289, 291 (9th Cir. 1987). The special master's conclusions of law which are adopted by the circuit court are treated as the conclusions of the circuit court. We, thus, freely review the circuit court's conclusions of law for their correctness. *Aluminum Shake Roofing, Inc. v. Hirayasu,* 110 Hawai'i 248, 252, 131 P.3d 1230, 1234 (2006).

This court ordinarily reviews [conclusions of law] under the right/wrong standard. Thus, a [conclusion of law] that is supported by the [circuit] court's [findings of fact] and that reflects an application of the correct rule of law will not be overturned. However, a [conclusion of law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

*Id.* (internal quotation marks, citations, and original brackets omitted) (format altered).

C. *Summary Judgment*

 "We review the circuit court's grant or denial of summary judgment *de novo.*" *Yamagata v. State Farm Mut. Auto. Ins. Co.,* 107 Hawai'i 227, 229, 112 P.3d 713, 715 (2005) (citation omitted). Under the *de novo* standard, "we examine the facts and answer the question without being required to give any weight to the [circuit] court's answer to it." *Chun v. Bd. of Trs. of Employees' Ret. Sys.,* 92 Hawai'i 432, 438–39, 992 P.2d 127, 133–34 (2000) (internal quotation marks and citations omitted).

D. *Attorneys' Fees and Costs*

 "This court reviews the denial and granting of attorney's fees under the abuse of discretion standard." *Stanford Carr Dev. Corp. v. Unity House, Inc.,* 111 Hawai'i 286, 297, 141 P.3d 459, 470 (2006) (internal quotation marks and citation omitted).

E. *Motion for Leave to Sue Receiver*

 A circuit court's decision to grant or deny leave to sue a receiver is reviewed for abuse of discretion. *McChesney v. Kona Sugar Co.,* 14 Haw. 680, 682 (1903) ("it is within the judicial discretion of [the circuit] court to grant or to withhold [the] permission [to sue the receiver]").

### III. *DISCUSSION*

As previously stated, Hawaii Ventures' appeal and ILWU's and the Otaka Defendants' cross-appeals essentially challenge the circuit court's handling of the Hotel's foreclosure proceedings and, in particular, its oversight of Receiver Park's various operational decisions that were substantially approved by the Special Master and/or affirmed by the circuit court. The Former Employees' cross-appeal contests the circuit court's refusal to grant them leave to sue the Receiver.

Preliminarily, a review of the general principles of receivership and, in particular, the powers of (1) the court presiding over a receivership and (2) the court-appointed receiver is necessary to the understanding of the resolution of this case. We, therefore, begin our discussion by reviewing the principles of receivership relevant to the instant consolidated appeal.

A. *Principles of Receivership*

1. **The Powers of the Presiding Courts**

 It is well-established that

[t]he ultimate purpose of a receivership is to enable the court to accomplish, so far as practicable, complete justice between the parties before it[,] which includes the preservation and proper disposition of the subject of litigation. This goal includes the providing of full protection to the parties' rights to the property until a final disposition of the issues[,] and it is essentially a question of whether the appointment of a receiver would serve a useful purpose. Thus, a receivership seeks to prevent injury to the thing in controversy and to preserve it, *pendente lite* or after judgment, for the security of all parties in interest, to be finally disposed of as the court may

direct and to ensure that the rights of parties are more secure.

65 Am.Jur.2d *Receivers* § 6 at 657 (footnotes omitted). The United States Court of Appeals for the Ninth Circuit [hereinafter, the Ninth Circuit] has enunciated two basic principles in dealing with receiverships. The first principle is that the court—here, the circuit court—"has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *Sec. & Exch. Comm'n v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir.1978) (citations omitted). In *Lincoln Thrift Association*, the Ninth Circuit, in reviewing the federal district court's denial of a creditor's motion to appoint additional trustees-receivers or, in the alternative, to appoint a creditor's committee to elect new trustee-receivers, concluded that "it would be a cumbersome situation at best were this [c]ourt to actively intervene in the operation of the receivership, a position which should be avoided." 577 F.2d at 608–09. The Ninth Circuit further stated that it

> should not place itself in the position of second-guessing a district court judge who had an opportunity to acquire substantial knowledge of the facts and to evaluate the various legal positions after hearing their merits put forth by the various parties, particularly when there appears to be no clear abuse of discretion.

*Id.* at 609; *see also Sec. & Exch. Comm'n v. An–Car Oil Co.*, 604 F.2d 114, 119 (1st Cir. 1979) (same).

The second principle is that "a primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *Sec. & Exch. Comm'n v. Hardy*, 803 F.2d 1034, 1038 (9th Cir.1986) (citations omitted). Again, the Ninth Circuit emphasized that:

> A district judge supervising an equity receivership faces a myriad of complicated problems in dealing with the various parties and issues involved in administering the receivership. Reasonable administrative procedures, crafted to deal with the complex circumstances of each case, will be upheld. A district judge simply cannot effectively and successfully supervise a receivership and protect the interests of its

beneficiaries absent broad discretionary power. We would be remiss were we to interfere with a district court's supervision of an equity receivership absent a clear abuse of discretion.

*Id.*

## 2. The Powers of Court–Appointed Receivers

▮ Because "it is not practical for the court to do the physical work in connection with taking the possession [of] and preserving the property, the court appoints its officer or receiver to act." 2 Ralph Ewing Clark, *A Treatise on the Law and Practice of Receivers* § 384, at 645 (3d ed.1959); *see also* 4 Richard R. Powell, *Powell on Real Property* § 37.26[3][b], at 37–174 (2006) ("A court may exercise its equity jurisdiction in appointing a receiver if there is danger that the property will be insufficient security for the debt or if waste is occurring on the property, or if the property is depreciating in value[.]" (Footnotes omitted.)). The United States Supreme Court has defined a receiver as

> an indifferent person between parties, appointed by the court to receive the rents, issues, or profits of land, or other thing in question in th[e] court, pending the suit, where it does not seem reasonable to the court that either party should do it. *[She] is an officer of the court;* [her] appointment is provisional. [She] is appointed [o]n behalf of all parties, and not of the complainant or of the defendant only. [She] is appointed for the benefit of all parties who may establish rights in the cause. The money in [her] hands is in *custodia legis* for whoever can make out a title to it. It is the court itself which has the care of the property in dispute. *The receiver is but the creature of the court; [she] has no powers except such as are conferred upon [her] by the order of [her] appointment and the course and practice of the court[.]*

*Booth v. Clark*, 58 U.S. 322, 331, 17 How. 322, 15 L.Ed. 164 (1854) (citations omitted) (emphases added); *Unna v. Brown*, 7 Haw. 190, 191 (1887) ("The power given to the receiver is limited to the terms expressed in the order."). Stated differently, the receiver, as an officer of the court, derives her authority wholly from the orders of the appointing court.

In the instant case, the circuit court's order appointing Receiver Park [hereinafter,

the appointment order]—drafted by Hawaii Ventures and issued by the circuit court on August 24, 2000—specifically provided in relevant part:

### 3. POWERS AND DUTIES OF RECEIVER

*The Receiver* shall have all the powers and duties provided by this [o]rder and any further [o]rders of th[e] [circuit c]ourt and *shall have the authority to take such other actions as is reasonable to effectuate these powers and duties.* Specifically:

a. The Receiver shall use the Receiver's *best efforts to manage, protect, care for, preserve, and maintain the Estate Property,* [11] including, in the Receiver's discretion, ceasing business operations.

. . . .

f. The Receiver shall maintain control and possession of funds in all accounts and deposit accounts related to the Estate Property. Such funds are Estate Property, and may be used, as limited by this [o]rder, *to pay for such expenses as are necessary or appropriate for the care, preservation and maintenance of the Estate,* including ceasing business operations. The Receiver may open new bank accounts if the Receiver deems it appropriate to do so.

g. To the extent funds are available, and *with a priority to be determined in the Receiver's sole discretion, the Receiver shall pay any expenses* (including for example, rent, utilities, taxes, payroll and debts to vendors) *which arise during the period of the [r]eceivership and which are necessary or appropriate for the care, preservation and maintenance of the Estate.* In connection herewith, the Receiver is authorized to enter into contracts, to elect to engage or not to engage for [the] Receiver's account any or all of the current

employees, to employ and discharge employees, property managers and accountants, to terminate, negotiate, execute and deliver leases for space, to purchase materials, supplies and services, and to enter into loans with the consent of [the] Lender. . . .

. . . .

i. [Amended by the circuit court on April 30, 2001.] The Receiver shall accept from Otaka the amount of $550,000 plus interest . . . in satisfaction of the duty of [the Otaka Defendants] to account to the Receiver from sums paid to Otaka's affiliates from December 4, 1994 to the date of appointment of the Receiver, which duty was the original subject of this paragraph 3(i), and in satisfaction of the receivables shown on the balance sheets of the Hotel and HWB as of May 31, 2000 as "due from Otaka" and "due from [the] Kona Surf [Resort Hotel." [12]] Notwithstanding the preceding sentence, the Receiver shall retain any rights she may have to recover assets which are part of the Estate . . . and are subject to the pending foreclosure of the Kona Surf Resort Hotel in which she has granted the right to intervene, which rights, if any, shall be satisfied solely from said assets in said foreclosure. But for the prosecution of such intervention and recovery of assets, no further actions by the Receiver shall be required or undertaken to recover the sums paid to Otaka's affiliates pursuant to the original paragraph 3(i) of this [o]rder.

. . . .

k. *The Receiver may,* to the extent funds are available from the [Estate] or are made available by [the] Lender, *undertake to expend revenues for maintenance or enhancement of the ability of the [m]ortgaged [p]roperty to operate, including marketing and refurbishing expenditures.*

. . . .

m. The Receiver may grant access for inspection of the [m]ortgaged [p]roperty or

11. The "Estate Property," as used in the appointment order, included but was not limited to the fee simple and leasehold interests in the real property on which the Hotel was situated, the main and mauka tower buildings and improvements thereof, equipments and inventories, revenues generated from the operation of the Hotel, accounts and contract rights, intangibles, and "any other rights, benefits and collateral covered by the [l]oan [d]ocuments."

12. Otaka was also the owner of the Kona Surf Resort Hotel, as well as the general partner in Otaka Limited Partnership, which owned the Hawaiian Regent Hotel. At the outset of the instant foreclosure action, the Kona Surf Resort Hotel and the Hawaiian Regent Hotel were under contract of sale and were eventually sold to third-parties.

books or records relating thereto to any party with such right.

n. The Receiver is authorized and instructed to inform truthfully employees, vendors, tour agents and other interested parties of the status of the [Estate] and the receivership.

o. [The] Receiver may assume and perform under any contract relating to the [Estate] or may refrain from assuming or performing under any contract.

. . . .

t. The Receiver may employ counsel, accountants and other professionals with respect to the Receiver's powers, duties and authority herein.

u. The Receiver may institute, prosecute and defend, compromise, adjust, intervene in or become a party to such actions or proceedings in state or federal court as the Receiver may in the Receiver's reasonable judgment deem necessary or proper for the management, protection, care, maintenance or preservation of the Estate or the carrying out of the Receiver's duties under the terms of this [o]rder, including summary possession actions instituted against tenants of the Improvements and Real Property.

. . . .

#### 4. COMPENSATION OF RECEIVER

*The fees and costs of the Receiver and the Receiver's attorneys, accountants and other professionals, if any, shall be submitted to the [c]ourt for its approval, in the form of either a request(s) for fees* upon which a hearing is held and/or a stipulation(s) among all parties. *Such fees and costs shall be deemed to be secured by a superpriority lien against the Estate.*

. . . .

#### 8. RECEIVER'S NON–LIABILITY

The Receiver is an officer of the [c]ourt and, as such, *[the] Receiver shall not be liable, in [the] Receiver's individual capacity, for any claims or demands for loss or damage, arising out of or in connection with this lawsuit and [o]rder,* including any acts or omissions in connection with the management and operation of the property of the Estate, whether such claims or demands arise during the pendency of or after the completion of this lawsuit, *except in the event that [the] Receiver's acts or omissions constitute bad faith or fraud.*

(Capitalization in original.) (Emphases added.)

Bearing the foregoing principles in mind, including the discretionary powers of the circuit court presiding over the receivership, as well as the authority conferred upon Receiver Park as set forth in the appointment order, we turn first to the contentions advanced by Hawaii Ventures relating to Receiver Park's final report. Second, we examine those contentions made by Hawaii Ventures and the Otaka Defendants relating to the Special Master's report. Finally, we address: (1) Hawaii Ventures' remaining contentions; (2) ILWU's cross-appeal; and (3) the Former Employees' cross-appeal.

### B. *Hawaii Ventures' Contentions Regarding Receiver Park's Final Report*

In appeal Nos. 25344 and 26820, Hawaii Ventures maintains that the circuit court erred in approving Receiver Park's final report. Specifically, Hawaii Ventures argues that the circuit court: (1) should not have allowed pre-receivership obligations to be paid out of the Estate monies; and (2) should have permitted Hawaii Ventures to have access to the Hotel's accounting books and records in order to conduct an independent review prior to the circuit court's approval of the final report.

#### 1. Additional Background Information

On August 9, 2000, Hawaii Ventures filed a complaint against, *inter alia,* the Otaka Defendants to foreclose a mortgage upon the Hotel. The next day, August 10, 2000, Hawaii Ventures moved for the appointment of receiver. On August 24, 2000, the circuit court appointed Park as the receiver "to manage, protect, care for, preserve, and maintain" the Hotel pending the foreclosure sale. Consequently, Otaka turned over possession and control of the Hotel to Receiver Park on or about August 24, 2000. Receiver Park operated the Hotel for approximately ten months before it was sold at a public

auction on May 16, 2001. She, however, remained in possession of the Hotel until June 30, 2001, when title was transferred to the foreclosure purchaser.

On August 14, 2001, Receiver Park filed her final report. Therein, the Receiver indicated that:

> At the commencement of her administration almost twelve months ago, the Receiver found the Hotel to be marginal both operationally and financially, for a number of reasons. The Hotel's physical plant suffered from deferred maintenance, particularly, with the poor condition of the rooms (*i.e.*, furniture, carpets, drapes, antiquated bathrooms with seedy-looking tiles), hallway carpeting, restaurant facilities, pool bar and other hotel common areas; room rates had been reduced substantially below market for a beachfront hotel; finally, the Hotel had to rely heavily (for its guest base) on a handful of Japanese tour operators and wholesalers specializing in the "budget conscious" Japanese visitor market to help fill the Hotel.

> In addition, although [HWB] had managed the Hotel, it was a captive of the owner; it did not manage the Hotel independently of the owner's interests in other hotels, such as the Hawaiian Regent [Hotel] and [the] Kona Surf [Resort Hotel]. There were, therefore, less-than-armslength transactions involving the owner and its affiliates.

(Footnote omitted.) Receiver Park explained that one of her first decisions concerned her management team:

> [Hawaii Ventures'] New York counsel suggested that the Receiver consider the use of a "brand" manager. The Receiver decided against it because (1) it was impractical to undertake such a contract given the then uncertainty about the length of the receivership, and the possibility that the Hotel might have to close relatively quickly, (2) the costs was a consideration in view of the shaky finances and (3) a brand manager would have replaced all existing management personnel and possibly the [u]nion, which was contrary to the goal of maintaining stability.

> Instead, the Receiver decided to allow [HWB]'s existing management employees to remain in place[.] Although [HWB] did lose some management personnel ..., the rest of [HWB]'s core management team remained and contributed significantly to the success of the receivership.

> The Receiver also retained, as part of her own independent oversight and support services, two key individuals—Ronald Tom, President of Ron Tom Realty, LLC, and Ernest Watari, Chairman and CEO of PKF Hawaii, LLP. Mr. Tom has substantial experience in foreclosures and receiverships, has developed and built hotels for Dillingham Land Corporation (including the Ala Moana Hotel), and is a consultant in the development of condominiums, land acquisitions and commercial and industrial properties. Mr. Watari is a [certified public accountant] and [c]ertified [m]anagement [c]onsultant and is a recognized expert in Hawaii's hospitality industry. Mr. Tom primarily focused upon the Hotel's maintenance, cash management and collections, and Mr. Watari focused upon [a]ccounting, [s]ales .and [m]arketing, [f]ood and [b]everage and [f]ront [d]esk/[r]ooms [m]anagement. Their efforts produced a marked difference in the Hotel's physical appearance, employee morale, customer satisfaction, sales, and cash flow during the receivership.

By retaining "existing management employees," as opposed to a "brand manager," Receiver Park believed that the Hotel saved, "conservatively, in the range of $400,000 to $900,000."

Among the various actions taken by Receiver Park during the receivership and as discussed in more detail below, she asserted that she "improved communications with, and the morale of, the employees." As a result, only twenty-eight employees-out of a work force of 270 employees (which included bargaining and non-bargaining full time, part time and on call employees)—resigned between August 24, 2000 and June 30, 2001. Consequently, the Receiver acknowledged that,

> [b]ecause of the efforts of the management team and the workforce, which unified and

collectively put their "best foot forward" under straitened conditions, the Receiver was able to sustain an average monthly occupancy rate of 72.19% for the period from September 2000 through June 30, 2001. This rate represents an improvement from the 69.95% average from the previous year (September 1999 through June 2000), and is very much in line with other comparable Waikiki hotels (such as the Waikiki Beach Marriott, Waikiki Circle Hotel, Pacific Beach Hotel, Prince Kuhio Hotel and others) which averaged a 75.06% monthly occupancy rate. In other words, despite the negative perceptions, uncertainties and obstacles, the Receiver was able to keep the Hotel's occupancy rate in line with the market. To keep rooms rented and revenues coming in, management exerted all of its skill, emphasizing established relationships with tour operators, wholesalers and travel agents.

Cash in hand as of the date of appointment was about $406,000. As of the end of July 2001, it was $3.77 million.

Specifically, the Receiver: (1) increased cash in bank by $3,900,000 (from $406,000 as of August 24, 2000, to $4,300,000 as of June 30, 2001, the date title was transferred and the Hotel turned over to the new owner's manager); (2) reduced accounts receivables by $1,525,000 (from $3,508,000 as of August 24, 2000, to $1,983,000 as of June 30, 2001); and (3) generated operating profits of $2,724,000 in ten months, before depreciation ($1,027,-000 after depreciation of $1,697,000).

At the conclusion of her report, Receiver Park proposed a number of recommendations for the resolution of outstanding claims, including the payment of $310,713.58 to union and non-union Hotel employees for severance and vacation pay (calculated on ten months of service), and the final discharge of her duties and responsibilities.

On August 29, 2001, Hawaii Ventures filed its objections to the final report, disputing numerous portions of the report. Hawaii Ventures generally maintained that the report was "inadequate" to understand what payments were made by the Receiver and how they were justified, and, thus, an independent accounting was necessary. The Otaka Defendants and ILWU also responded to the final report, opposing the discharge of the Receiver as premature inasmuch as there were pending matters requiring Receiver Park's participation—such as, the unfair labor practice charges before the NLRB and several union grievances.

In light of the parties' objections and at the request of Receiver Park, the circuit court, on September 21, 2001, appointed the Special Master to review the final report. Thereafter, the Special Master filed his report on March 19, 2002 and an addendum to his report on May 24, 2002, generally supporting the final report (with some recommended modifications). As discussed more fully *infra*, the Special Master's report provided detailed explanations as to his recommendation that $964,826.00 should be approved as necessary for the maintenance and preservation of the Estate and that $394,787.00 should be shown as a receivable from Otaka and HWB and assigned to Hawaii Ventures.

On April 8, 2002, the Receiver filed her response to the Special Master's report. Specifically, Receiver Park asserted that her appointment order

show[ed] that the Receiver not only had broad powers but was also expected to use them. It had to be so, because it was creating an operating receivership, not a passive or a custodial one. It was not the purpose of the [appointment order] to make the [c]ourt itself do the receivership work through constant motions. Through the ten months of operations, daily and immediate decisions had to be made, without the luxury of constant consultations with, and returning to, the [c]ourt. At the same time, the Receiver was bound by the principle of prudence, which did not permit her to take risks which might jeopardize Hotel operations.

(Footnotes omitted.) Receiver Park believed that the Special Master's disagreement with some of her decisions reflected "a reasonable difference of opinion in business judgment." Nonetheless, Receiver Park indicated that she was "gratified that, after conducting his thorough and extensive review, the Special

Master ha[d] validated the vast majority of [her] decisions." On July 11, 2002, the circuit court approved the Special Master's report and adopted his recommendations. Consequently, the Receiver filed a supplemental final report on June 21, 2002 and a supplement to the supplemental final report on July 15, 2002. Receiver Park's August 14, 2001 final report, as amended by the Special Master's report, and the June 21, 2002 supplemental final report, as amended, were approved by the circuit court on August 22, 2002 [as previously stated, hereinafter, reference to the approval of the final report includes the approval of the supplemental report].

## 2. Pre–Receivership Obligations

Hawaii Ventures argues that:

The circuit court erred in retroactively blessing the use of Estate's assets to pay Otaka['s] debts. The Receiver could not properly use the collateral to pay Otaka['s] liabilities unless there is a finding, based on an adequate record, of necessity for the preservation of the Estate....

... [T]he Receiver was required to respect [the] Lender's first lien rights in the collateral and could not choose to pay other and junior creditors....

Here, the circuit court erroneously approved a wide variety of payments and erroneously permitted distributions to junior creditors prior to any determination of priority.

(Citations omitted.) Hawaii Ventures also asserts that:

The Special Master appears to have concluded that in excess of $1.3 million of Estate assets were expended to discharge liabilities of the borrower that arose prereceivership. These were in some cases payments for goods, services and labor provided to Otaka for Hotel operations prior to appointment of the Receiver. Other payments were compensation or expense account reimbursement of Otaka executives, tax withholding obligations of Otaka, entertainment bills run up at other Otaka properties, and long overdue vendor bills and contracts entered into by Otaka. These are expenses incurred by Otaka and

owed by Otaka. Nothing in the record shows that the expenditures were necessary to keep the Hotel open, *i.e.*, necessary to preserve the Estate. None were claimed by the creditors in the foreclosure proceeding to give rise to interests senior to [the] Lender....

There is no basis for using proceeds of collateral or revenues collected by the Receiver during the receivership period to pay these old bills.

(Citations omitted.) Hawaii Ventures identifies several specific payments that it believes should not have been paid by Receiver Park from the Estate's funds, which, for purposes of discussion, are categorized as (1) pre-receivership employees' wages and benefits and (2) Otaka's other pre-receivership debts. Keeping in mind the general principles of receivership and the parameters of the appointment order previously discussed, we examine Hawaii Ventures' arguments regarding the aforementioned specific payments made by the Receiver.

### a. *pre-receivership employees' wages and benefits*

Focusing solely on *pre-receivership* wages, vacation pay or employment taxes paid during the receivership period, Hawaii Ventures specifically argues that:

*The circuit court erroneously and retroactively approved payment of Otaka debts to Otaka employees for services rendered to Otaka prior to the receivership of approximately $156,220 in wages, $60,122 in payroll taxes withholding, and $99,486 in vacation benefits[, totaling $316,188.00].*

... There is no record to support that payment for, or use of, benefits such as vacation accrued during the pre-receivership period was a reasonable or necessary expense during the [r]eceivership period[.]

(Emphases added.) The contested payments represent (1) wages earned the week immediately preceding the circuit court's appointment of the receiver and (2) vacation benefits taken during the receivership that were drawn in part from unused vacation credits accrued pre-receivership.

In response, Receiver Park maintains that the appointment order

gave [her] the authority, power, and discretion to pay wages and other obligations that *may have had their inception before her appointment, but which arose during the receivership*. To prohibit her from maintaining the Hotel's work force, by funding essential perquisites of employment, would contradict her ultimate duty to care for, preserve, and maintain the property.

(Emphasis added.) ILWU similarly argues that, "[b]ecause the circuit court's order appointing the Receiver gave her the necessary authority, the Receiver acted properly in paying the disputed employee benefits from [the Estate's] assets." ILWU also contends that the payments were appropriately approved by the circuit court as administrative expenses chargeable to the Estate because, *inter alia*, "[t]he Receiver paid wages and vacation in question knowing that continued labor throughout the receivership period was essential to protecting the operation of the [H]otel and making it profitable."

■■■ Generally, "the costs and expenses of a receivership incurred in *preserving* its assets are administrative expenses, chargeable to the assets of the receivership." *Miller v. Leadership Hous. Sys., Inc.*, 57 Haw. 321, 327, 555 P.2d 864, 869 (1976) (citations omitted) (emphasis added). This court, however, has warned against construing the word "preserve" too literally. *Id.* at 328, 555 P.2d at 869. In *Miller*, this court held that expenses for improvements to a property in receivership may be paid from the receivership assets "if they are necessary to preserve the property in the hands of the receiver." *Id.* at 327–28, 555 P.2d at 869 (citations omitted). The *Miller* court explained that improvements to the property in the receiver's hands can result in the property being "figuratively 'preserved' in its intended final condition and a greater sum realized for distribution to creditors, general and special, than if the receiver were forced to leave it in its incomplete less salable condition." *Id.* at 328–29, 555 P.2d at 869–70 (internal quotation marks and citation omitted).

■■■ With respect to the specific pre-receivership payments at issue here, other courts have recognized that it may be proper for receivers to pay wages and vacation benefits earned by employees prior to the imposition of a receivership. For example, in *United States v. Wisconsin Valley Trust Co.*, 233 F.Supp. 73 (W.D.Wis.1964), the United States sued Receiver Wisconsin Valley Trust Company in federal court, arguing that the receiver should not have paid pre-receivership wages and vacation in a previous state court corporation receivership and that such sums should have instead been paid towards federal taxes. *Id.* at 74. The federal court, in dismissing the United States' lawsuit, held, *inter alia*, that the payments were necessary and explained:

> Here is a Receiver that was confronted with the duty of running a business[—*i.e.*, a trucking company—] and the record shows that he was dealing with some 250 to 300 employees belonging to approximately 12 or 15 [l]abor [o]rganizations. It was his duty to keep the business running and he could not do so unless he had truck drivers and maintenance men.
>
> This [c]ourt takes notice of the facts of business life in that these employees would not continue working had they not been paid the wages due them.

*Id.* at 79. The court further explained that the business could not have been sold so lucratively had it not been for the receiver's decisions that kept it operational. *Id.* Accordingly, the court held that

> these payments[, *i.e.*, wages and vacation pay,] to the employees had to be made to preserve the business. *It is the [c]ourt's opinion that the Receiver would have been derelict in his duty had he not pursued the course he had for the purpose of preserving the assets which eventually were sold as a going business.*

*Id.* at 81 (emphases added). In reaching its conclusion, the court recognized, one, that

> [w]ages earned prior to the appointment of a receiver have likewise been held to be a first charge upon net earnings during the receivership, upon grounds which would entitle them to a preference out of the corpus, namely, that there has been, prior to the receivership, a diversion of the current earnings out of which such wages

should have been paid, or that payment was necessary in order to retain the services of employees needed by the receiver, or that the mortgagees have received a benefit from the continuance of the business as a "going concern" for which they are bound in equity to pay[,]

*id.* at 80 (format altered) (some internal quotation marks, citations, and ellipses omitted), and, two, that

[i]t cannot be affirmed that no items which accrued before the appointment of a receiver can be allowed in any case. *Many circumstances may exist which may make it necessary and indispensable to the business ... and the preservation of the property, for the receiver to pay pre-existing debts of certain classes, out of the earnings of the receivership, or even the corpus of the property ....* Yet the discretion to do so should be exercised with very great care.

*Id.* (emphasis added) (format altered) (quoting *Miltenberger v. Logansport, C. & S. W.R. Co.*, 106 U.S. 286, 311, 1 S.Ct. 140, 27 L.Ed. 117 (1882)).[13]

Here, the appointment order expressly authorized the Receiver "to use [her] best efforts to manage, protect, care for, preserve, and maintain" the Estate, "to pay for such expenses as are necessary or appropriate for the care, preservation and maintenance of the Estate," and to "undertake to expend revenues for maintenance or enhancement of the ability of the [m]ortgaged [p]roperty to operate, including marketing and refurbishing expenditures." The circuit court also granted the Receiver the broad authority to "take such other actions as is reasonable to effectuate [her enumerated] powers and duties." These provisions empowered Receiver Park to pay any expenses, including payroll, that were appropriate to maintain or enhance the value of the Hotel during the receivership. In fact, the appointment order specifically permitted Receiver Park to pay

expenses that were incurred or arose during the receivership and that were necessary and appropriate for the preservation of the Estate.

Receiver Park's decisions to pay to the Hotel employees wages earned the week before her appointment and allow the employees to use vacation benefits earned prior to her receivership were clearly "necessary [and] appropriate for the care, preservation and maintenance of the Estate." Had she not done so, the Hotel may not have been an asset, but a liability. Receiver Park took over the Hotel with $406,000.00 in the operating account; by the time of the foreclosure sale, she had increased the Hotel's cash-on-hand over tenfold to $4,300,000.00 as of June 30, 2001. Nevertheless, it would not be unreasonable to expect that the Receiver's refusal to pay the pre-receivership wages and benefits could have resulted in a loss· of employees or a refusal to work. Moreover, the ILWU could have called for a strike, set up picket lines, and filed charges of unfair labor practices.

From her perspective as the manager of an ongoing business and the discretionary authority granted to her in the appointment order, Receiver Park's decision to pay employee expenses to prevent any potential breakdown in the Hotel's labor relations that might have impaired the property's value was reasonable. *See Coy v. Title Guarantee & Trust Co.*, 198 F. 275, 280 (D.Or.1912) (a receiver "exercises, in matters of management and manner of disposition of the estate, a large discretion, which he ... must do, as the court cannot attend to details of administration."). As demonstrated in her final report, Receiver Park commended the efforts of the management team and the workforce in maintaining an average monthly occupancy rate of 72.19% for the period from September 2000 through June 30, 2001, which rate "represent[ed] an improvement from the 69.95% average from the previous year (Sep-

---

13. Both Receiver Park and ILWU rely upon *Wisconsin Valley* to support their positions that the payments were appropriate. Hawaii Ventures, without explanation, maintains that *Wisconsin Valley* is inapplicable because "railroads or public utilities cases are a special context and do not provide authority for this hotel context." Hawaii

Ventures fails to provide any reason or support that would indicate to this court that receivership of railroad or public utilities are so different from a hotel receivership as to render the principles and rationale of the *Wisconsin Valley* court inapplicable.

tember 1999 through June 2000), and is very much in line with other comparable Waikiki hotels[.]" Receiver Park also indicated that, "[o]ut of a work force of 270 employees (which included bargaining and non-bargaining, full-time, part-time and on call employees), from August 24, 2000 to June 30, 2001, only 28 resigned (with 11 of them resigning in June 2001)." [14] Accordingly, we hold that the circuit court did not abuse its discretion in approving Receiver Park's payment of employees' wages and benefits earned pre-receivership when such payment was clearly appropriate to maintain and enhance the value of the Estate.[15]

### b. *Otaka's other pre-receivership debts*

Hawaii Ventures contends that Receiver Park paid and discharged certain pre-receivership obligations without any indication that the payments for services and/or expenses were beneficial to the Estate. Specifically, Hawaii Ventures identifies, as examples, payments for the following:

"travel agents" including an Otaka officer ($9,492), vendors of food and beverages ($48,438), maintenance services ($13,782), supplies ($23,271), advertising ($32,906), equipment ($1,105), public relations services ($462), cleaning supplies ($2,420), "miscellaneous" ($2,460), uniforms ($456), unsecured lease payments ($4,075), office supplies ($1,312), travel/entertainment by Otaka officers ($7,110), sundry ($3,247), and obligations under Otaka equipment leases ($48,862). These categories represent a total of $199,398.

(Citations to the record omitted.) The above payments for services and/or expenses challenged by Hawaii Ventures were the exact amounts that the Special Master deemed justified. The Special Master expressly indicated that, "[w]here the non-payment of a pre-receivership liability threatens the [Estate], or the corresponding goods and/or services creating the liability directly benefitted the Hotel during the [r]eceivership period, the Receiver may be justified in satisfying that liability." In finding these payments justified for the most part, the Special Master provided the following explanations for each category of payments, which are quoted verbatim from his report:

(1) *Travel agent commissions of $9,492 (Justified)*

Travel agents were vital to preserving and maintaining the existing guest revenues of the Hotel. Payment of the outstanding commissions was necessary to assure that agents would continue to refer their clients to the Hotel during the [r]eceivership period.

(2) *Food & Beverages of $60,304 ($48,438 Justified and $11,866 Estate Receivable)*

The Receiver's position is that the Estate rightfully paid the $60,304 in food and beverage costs since the items purchased were used during the [r]eceivership period. The food and beverage inventory on hand [on] August 24, 2000 . . . amount[ed to] $48,438 [and] appears to be a justifiable payment by the Es-

**14.** Indeed, as discussed *infra*, the Special Master also deemed the disputed payments of $156,220.00 in wages, $99,486.00 in vacation benefits, and $60,122.00 in payroll taxes withholding to be justifiably paid by Receiver Park. The Special Master specifically explained that "[e]stablishing and maintaining a harmonious relationship with the employees and union was critical to preserving and maintaining the Hotel operation without disruption during the [r]eceivership period."

**15.** Hawaii Ventures also contends that pre-receivership payments to the employees were not necessary because

[t]he staffing and expenses of the Hotel were above industry standards in cost and far above what was necessary to the preservation of the

collateral. The Receiver and her consultants confirmed to [the] Lender that they did not believe retention of employees to be a concern. However, the fact that the employment-related expenses were higher than was typical in the industry, even if true, does not compel the conclusion that the Receiver erred in paying them—or that the circuit court erred in approving these payments. The fact that there were no employee retention problems may well reflect the prudence of the Receiver's decision to continue paying the employees' wages and benefits owed to them. Thus, Hawaii Ventures' contention does not lend support to its already failed proposition that the circuit court erred in approving Receiver Park's payments to the employees, as demonstrated above.

tate[;] the remaining $11,866 should be treated as a receivable of the Estate.

(3) *Maintenance of $37,290 ($13,782 Justified and $23,508 Estate Receivable )*

The amount of $13,782 were for parts and supplies acquired in August and used to maintain and repair Hotel furniture, fixtures and equipments, or subsequently reimbursed to the Hotel. The remaining $23,508 was attributable to maintenance service contracts, which were replaceable if these service providers required the Receiver to assume the pre-receivership liability along with the contracts. Accordingly, the $23,508 maintenance service contract payments should be classified as a receivable of the Estate.

(4) *Supplies of $23,271 (Justified )*

These purchases consist of bulk operating supplies such as copy paper, pens, rubbish liners, napkins, toilet tissue, Kleenex, shower caps[,] and toiletries that were purchased in August 2000 and subsequently used by [the] Estate.

(5) *Advertising of $32,906 (Justified )*

These costs were for print and advertising material, including services that were used [for] or benefitted the Hotel after the Receiver took possession.

(6) *Equipment of $1,105 (Justified )*

The[se] payments were for the purchase of kitchenware supplies and shower curtains in August for use in the operations of the Estate.

(7) *Public relations of $462 (Justified )*

The payment was for public relations services for the Hotel.

(8) *Cleaning supplies of $2,420 (Justified )*

The[se] payments were for the purchase of cleaning supplies in August 2000, which were used by the Estate.

. . . .

(10) *Miscellaneous of $2,460 (Justified )*

These payments were for miscellaneous supplies and services benefitting the Estate, including rent of offsite records storage space.

(11) *Uniforms of $456 (Justified )*

Uniforms purchased were available for use during the [r]eceivership period, and the payments therefore benefitted the [E]state.

. . . .

(14) *Lease of $10,367 ($4,075 Justified and $6,292 Estate Receivable )*

The [payment] of $4,075 of the pre-receivership liability ... had no impact on the Estate since it was a one time payment to HWB[,] which account was in the Receiver's possession (essentially an intra-account transfer). The remaining $6,292 should be reclassified as an Estate receivable since these payments were made in connection with the Hotel's telephone system, fax machine[,] and copier equipment leases for which the Receiver had the authority to assume and pay obligations arising during the [r]eceivership, but [did not have the authority to] pay the related pre-receivership payable unless she was able to demonstrate that the non-payment would have threatened the Estate.

. . . .

(16) *Office supplies of $1,312 (Justified )*

Office supplies were in inventory and used in part by the Hotel after the Receiver took possession.

(17) *Travel/Entertainment of $12,738 ($7,110 Justified and $5,628 Estate Receivable )*

The payments amounting to $7,110 were for travel and entertainment expense reimbursements to the Hotel marketing and sales executives, which provided future benefits to the Hotel. The remaining payments amounting to $5,628 should be treated as an Estate receivable since they were for services rendered by an entertainer prior to the [r]eceivership and other unidentified expenditures

. . . .

(19) *Sundry of $3,247 (Justified )*

The purchases related to Hotel logo items (polo shirts, golf caps) that were either sold or given to Hotel guests after the Receiver was appointed, and there-

fore[,] benefitted the Estate during the [r]eceivership period.

. . . .

(28) *Obligations Under Capital Lease of $48,862 (Justified )*

The $48,862 consists of a $44,760 telephone system lease contract and $4,102 trash compactor lease contract, which were assumed by the Estate. The assumption of these contracts and payments of lease contract obligations during the [r]eceivership period were appropriate since the telephone system and trash compactor were used by the Estate and essential to the operation of the Hotel.

(Emphases in original.) Hawaii Ventures, nonetheless, asserts that the circuit court's approval of these payments for pre-receivership obligations "should be reversed[.]"

■■■ Although "a receiver need not have prior court approval for every single detail of receivership, a receiver has some duty—given [her] very limited powers—to apply to the court for advice and directions." 65 Am.Jur.2d *Receivers* § 131 at 748 (footnotes omitted); *see, e.g., Interlake Co. v. Von Hake*, 697 P.2d 238, 240 (Utah 1985) (The receiver "has only very limited powers and should apply to the court for advice and directions. If [she] acts without court authority, [she] assumes the risk of liability for costs and expenses incurred." (Citations omitted.)).

Where [her] judgment is likely to be questioned by creditors, prudence will dictate recourse to the court for a decree authorizing particular action which will afford protection against later claim that the action was disadvantageous to the estate or beyond [her] authority. However, it is not to be expected that a receiver authorized to operate a business will apply to the court for specific approval of [her] decision on every business problem which comes before [her].

*Fauci v. Mulready*, 337 Mass. 532, 150 N.E.2d 286, 290 (1958). In matters of "management and manner of disposition of the estate," a receiver exercises "a large discretion, which [she] . . . must do, as the court cannot attend to details of administration.

The court will act, and the receiver will exercise [her] discretion, at all times to best subserve the estate and those concerned in its due administration." *Coy*, 198 F. at 280. Moreover, where a receiver is appointed to perform a specific function such as preserving value by running a hotel business, as in this case, she "must have freedom of action to do those acts most beneficial to [the] estate which are authorized by the court. Within such sphere[, she] may affirm or reject the rights and obligations of the interest [she] is caretaking[.]" *Riker v. Browne*, 204 N.Y.S.2d 60, 62 (N.Y.Sup.Ct.1960) (citations omitted).

■■■ Consistent with the foregoing, the appointment order explicitly granted Receiver Park the authority and discretion to, *inter alia*, (1) "pay for such expenses as are necessary or appropriate for the care, preservation and maintenance of the Estate[;]" (2) "with a priority to be determined in the Receiver's sole discretion," "pay any expenses (including for example, rent, utilities, taxes, payroll and debts to vendors) which arise during the period of the [r]eceivership;" and (3) "assume and perform under any contract relating to the [m]ortgaged [p]roperty." Aside from these expressed powers, the appointment order conferred a broad residual power on Receiver Park "to take such other actions as is reasonable to effectuate the[ ] powers and duties" defined in the appointment order. Accordingly, it was well within Receiver Park's discretion, pursuant to the express terms of the appointment order, to pay the necessary business expenses of the Hotel (although they may have been incurred earlier) from the revenues of the Hotel. *See Hancock–Nelson Mercantile Co. v. Weisman*, 340 N.W.2d 866, 869 (Minn.Ct.App.1983) ("A receiver's powers are defined by the orders of the court and include authority as may reasonably or necessarily be implied for such orders." (Citation omitted.)).

However, Hawaii Ventures contends that "there [was] no evidence of any evaluation of the necessity and the costs before payment, no substantive explanations from the Receiver, and no evidence that the Receiver's conclusions were credible." According to Hawaii Ventures,

[n]othing in the record shows that the Receiver or the Special Master considered whether any expenditure on Otaka['s] liabilities was necessary to keep the Hotel open, *i.e.*, necessary to preserve the Estate. There is no evidence that the Receiver or her advisers even recognized that any limitation on their payments existed, and there is no evidence that they consulted with the Lender, or sought direction from the court.

We disagree.

■ In the Receiver's final report, in her response to the objections to her report, and in her response to the Special Master's report, Receiver Park pointed to the discretionary provisions contained in the appointment order as the guiding authority for her to pay certain expenses as she did. Attached to the final report were (1) a balance sheet as of the closing date including backup reconciliations and schedules (*e.g.*, bank reconciliations, inventory counts, fixed asset details, account receivable listings, accounts payable listings, and accrued vacation schedule), (2) a statement of income from August 24, 2000 to closing date, and (3) a post-closing cash balance report, listing the cash balances as of closing and details of the post-closing payments made on outstanding liabilities. Also, in her reply to objections to the final report, Receiver Park addressed each of Hawaii Ventures' concerns and enclosed numerous documents to further support her final report. Moreover, as discussed *infra*, the Special Master's report provided additional documentation of Receiver Park's payments. The Receiver's payment of the above challenged amounts for services and/or expenses was clearly consistent with her duty to preserve and maintain the Estate; it kept the Hotel

operating and resulted in her delivery of a multi-million dollar profit to Hawaii Ventures. Inasmuch as Hawaii Ventures has failed to demonstrate that the circuit court abused its discretion in approving payment of Otaka's other pre-receivership debts, we hold it did not.[16]

### 3. Access to Books and Records

As previously stated, Hawaii Ventures asserts that the circuit court erred in approving the Receiver's final report without permitting Hawaii Ventures to have access to the Hotel's books and records. Hawaii Ventures' first request for access to books and records was made in its May 9, 2001 motion for instructions to the Receiver requiring compliance with the receivership orders. Hawaii Ventures specifically urged the circuit court to, *inter alia:*

2. Requir[e] the Receiver to immediately identify [sic] and/or provide to [Hawaii Ventures] the following information[:]

a. a statement of all [p]re-[r]eceivership [o]bligations and all [Otaka] Defendant [o]bligations paid from assets in the hands of the Receiver from and after August 24, 2000[;]

b. a statement, whether in the form of a ledger record or an annotated balance sheet, showing assets and liabilities accrued during the period of the [r]eceivership, including such detail as is necessary to identify which of the accrued liabilities have been discharged, which accrued assets are in fact pre-paid expenses, and which accrued liabilities remain unpaid[;] and

---

16. Hawaii Ventures further argues that:

Many of the invoices paid from [the] Lender's collateral [were] dated from 1994, 1995, 1996, 1997, 1998 and 1999. Payments such as those for compensation, expense account reimbursement or cell phone usage of Otaka executives, tax withholding obligations of Otaka, entertainment bills run up at other Otaka properties, and long over due vendor bills and contracts entered into by Otaka are expenses incurred by Otaka and owed by Otaka. Nothing in the record shows that the expenditures were in the least measure necessary to keep the Hotel open or otherwise needed to preserve the Estate.

However, Hawaii Ventures fails to support such representation, citing only to the Receiver's accounts payable listing attached to her final report. Without more, this court has no way of assessing the validity of Hawaii Ventures' contention that the expenditures were not "in the least measure necessary." As this court indicated in *Kienker v. Bauer*, 110 Hawai'i 97, 129 P.3d 1125 (2006), "[t]he appellate courts are not obligated to search the record to crystalize the parties' arguments," *id.* at 104 n. 12, 129 P.3d at 1132 n. 12 (citation omitted), especially where, as here, the record contains fifty-one volumes of court documents and nine transcripts.

c. a statement of the sources and uses of cash flow during the term of the [r]eceivership showing the current cash balances.

3. Permit[ ] access to the Receiver's financial and operational information to allow independent accountants designated by [Hawaii Ventures] to undertake an immediate review and/or audit of the [Hotel's] books and records[.]

Hawaii Ventures believed that the information should

be readily available in the accounts of the Receiver and should be available to [Hawaii Ventures] upon request. [Hawaii Ventures] claims a first mortgage lien on the Estate far in excess of the value of the Estate. This information directly relates to the amount of collateral remaining in the Estate to be sold in foreclosure and to be available to repay at least a part of [Hawaii Ventures'] first mortgage lien.

Further, Hawaii Ventures argued that an audit is appropriate "to ascertain the propriety of payments, to ascertain the extent of and responsibility for improper payments, and to avoid any further deterioration of the Estate[.]"

On May 25, 2001, Receiver Park filed a memorandum in opposition to Hawaii Ventures' motion for instructions, wherein Receiver Park contended that she

offered to give Hawaii Ventures, from the very beginning, every type of report generated by the Hotel, and placed no limits on anything [Hawaii Ventures] wished to see. It did want to, and did, meet with financial officers, on August 29, 2000, immediately upon the Receiver's appointment. It has had countless communications and meetings with the Receiver. [Hawaii Ventures], until very recently, has had regular lengthy telephone conferences with the Receiver, with unlimited email and phone access at all other times. Now, as always, [Hawaii Ventures] is welcome to visit and review financial records, with reasonably short notice of what it desires to see.

(Citations omitted.) In support of her contention, Receiver Park attached her own declaration as well as the declaration of her accounting advisor, Ronald Tom. Moreover, Receiver Park maintained that Hawaii Ventures' requests "would be impractical and enormously expensive" and "does not benefit the [r]eceivership's assets." Receiver Park also stated that:

[I]t is the usual accounting practice to prepare a statement of assets and liabilities only as of a point in time. [The] Receiver is already planning to prepare such a report as of the closing date.…

[Hawaii Ventures] also requests a statement of the sources and uses of cash flow during the [r]eceivership term. [The] Receiver is already planning to prepare such a statement, and this will be provided with the balance sheet which will be prepared as of the closing date.

(Citations omitted.)

On July 26, 2001, the circuit court, among other things, granted Hawaii Ventures' motion for instructions

insofar as the Receiver shall provide a statement of payments made during the [r]eceivership period of any obligation or liabilities which did not accrue during the [r]eceivership period, including payments for vacation, wages and sick leave.

The circuit court, however, denied Hawaii Ventures' other requests relating to access to information and an independent audit.

Hawaii Ventures again requested access to the Hotel's books and records in its August 29, 2001 memorandum in opposition to Receiver Park's final report, wherein it alleged that

the essential task of accounting for the receivership has been mishandled at a very basic level, and appears never to have been performed properly at either the beginning or ending of the receivership. The cost to the Estate of the accountants has been very substantial, but they seem to have done nothing more than keep Otaka's books. The errors are so basic, and the job so badly done, that the accounts can now only be resolved by independent accountants under adequate supervision. The Receiver's persistent refusal to cooperate in admitting qualified accountants, while claiming to have given full access and

having been responsive to [Hawaii Ventures], is additionally troubling.

Consequently, Hawaii Ventures contended that, without access to the Hotel's books and records for an independent accounting, it was "unable to evaluate" the final report further. In response, Receiver Park attached—as exhibits—numerous correspondence between her and her professionals and Hawaii Ventures' counsel concerning various requests for documents and site visitations. On September 21, 2001, the circuit court appointed the Special Master to review and address Hawaii Ventures' and other parties' concerns regarding the final report.

Finally, Hawaii Ventures' third request for access was made in its February 12, 2003 motion for deficiency judgment. Therein, Hawaii Ventures requested, *inter alia,* the delivery of all records, assets, and other property relating to the Estate to its assignee, that is, HWB Kalakaua. The circuit court awarded Hawaii Ventures a deficiency judgment against the Otaka Defendants and additionally ruled that,

> [i]nasmuch as the *copies of records,* filing cabinets and computer equipment are no longer in controversy because they *are ready to be picked up by the foreclosure purchaser,* the only asset which remains in the custody of the Receiver is the monetary amount held in reserve.

(Emphases added.)

> On appeal, Hawaii Ventures argues that it tried and was denied every avenue to discovery and an accounting. The required listing of payments came as part of the purported [f]inal [r]eport and admitted that $767,276.06 was paid for Otaka. [The] Lender emphasized to the circuit court the necessity for access to the [Hotel's] books and records in order to evaluate the new disclosures and matters set forth in the [f]inal [r]eport. [Consequently, d]enial of information has tainted this entire [r]eceivership process. Approval of an accounting cannot be sustained where there is no record to support the findings.

Hawaii Ventures also argues that it "made repeated requests for information" from Receiver Park, but "the Receiver refused access to books and records."

In response, Receiver Park maintains that: [Hawaii Ventures] had full access to the Receiver's information and records, was formally permitted by the Receiver to have more access, failed to take advantage of that permission, and demanded a unilateral "audit" in May and August of 2001, without ever any showing of necessity or reliance on legal authority. The court appointed [the Special] Master to investigate and review all the issues about which [Hawaii Ventures] wanted information. In this, as in all other issues below, [Hawaii Ventures] fails to meet the standard of review—that the [circuit] court's decision to approve the [final] report and deny [Hawaii Ventures'] requests for its own audit was an abuse of discretion, such that the [circuit] court based its rulings on an erroneous view of the law or on a clearly erroneous assessment of the evidence or that it clearly exceeded the bounds of reason or disregarded rules or principles of law or practice.

(Citation omitted.)

 As previously quoted, the appointment order—drafted by Hawaii Ventures—specifically authorized that "[t]he Receiver may grant access for inspection of the [Estate] or books or records relating thereto to any party with such right." (Emphasis added.) Also, HRCP Rule 26(b) (2007) provides in relevant part that:

> Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

> (1) *IN GENERAL.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the

472

trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. . . .

(Emphasis and capitalization in original.) Thus, "[t]he extent to which discovery is permitted under HRCP Rule 26 . . . is subject to considerable latitude and discretion of the [circuit] court. The exercise of such discretion will not be disturbed in the absence of a clear abuse of discretion that results in substantial prejudice to a party." *Acoba v. Gen. Tire, Inc.*, 92 Hawai'i 1, 9, 986 P.2d 288, 296 (1999) (citations omitted); *Wakabayashi v. Hertz Corp.*, 66 Haw. 265, 275, 660 P.2d 1309, 1315–16 (1983) (observing that the exercise of the trial court's discretion regarding discovery matters "will not be disturbed in the absence of a clear abuse of discretion that results in substantial prejudice to a party").

■■■ Based on our review of the record, it is unclear upon what factual basis Hawaii Ventures claims that it sought, and was denied, access to reports or information from the Receiver. In fact, Receiver Park indicated in her final report that she sent Hawaii Ventures the following regular reports, which Hawaii Ventures did not deny receiving:

1. Monthly comparative financial report, showing a balance sheet and detailed statements of income with comparisons to budget and prior periods for both the Hotel and [HWB;]
2. Weekly occupancy reports, showing hotel statistics[;]
3. Daily cash flow reports[;]
4. Daily "flash reports" which estimated daily revenues[; and]
5. Various other information requested by [Hawaii Ventures, including, for exam-

ple, accounts receivable aging summaries, balance sheets and statements of operations].

(Footnote omitted.)

Additionally, although the circuit court did not grant all of the requests for discovery in Hawaii Ventures' motion for instructions, the court did require Receiver Park to provide a statement concerning payments made during the receivership period—which was a concern to Hawaii Ventures inasmuch as it sought access to books and records to confirm and assure that all payments made by the Receiver were appropriately made. And, although Hawaii Ventures had indicated that an independent audit was necessary, it did not formally file a motion requesting such an audit. Nonetheless, the circuit court appointed the Special Master, who essentially conducted an independent accounting and audit of the final report. *See* section III.C., *infra.* Lastly, nowhere in Hawaii Ventures' briefs nor in the record on appeal does Hawaii Ventures dispute the basis for the circuit court's denial of its request for books and records—that is, that "the copies of records, filing cabinets and computer equipment are no longer in controversy because they are ready to be picked up by the foreclosure purchaser."

■■■ In light of the foregoing, we conclude that Hawaii Ventures has not sustained its burden on appeal to show the requisite abuse of discretion. Accordingly, we believe the circuit court did not abuse its discretion in denying Hawaii Ventures' requests for access to the Hotel's books and records and for an independent audit prior to approving the Receiver's final report.[17]

17. In appeal No. 26820, Hawaii Ventures included in its points of error that the circuit court erred in denying discovery relating to Otaka's sale of the Hawaiian Regent Hotel and granting the Otaka Defendants' motion for protective order. As previously indicated, the Hawaiian Regent Hotel was owned by Otaka Limited Partnership, of which Otaka was the general partner. The Hawaiian Regent Hotel, along with the Kona Surf Resort Hotel—which was also owned by Otaka—were sold earlier in this foreclosure action. Hawaii Ventures attempted to prevent Otaka from diverting the funds of those sales via its motion for a temporary restraining order, which the circuit court denied. Subsequently, Hawaii

Ventures sought discovery of information relating to the sale of the Hawaiian Regent Hotel. In response, the Otaka Defendants moved for a protective order, arguing that the discovery request was not relevant to the instant case and "the information is subject to a confidentiality agreement between the parties to the sale of the Hawaiian Regent Hotel[.]" The motion for protective order was eventually granted.

On appeal, Hawaii Ventures included the above orders concerning the Hawaiian Regent Hotel as a point of error; however, as pointed out by the Otaka Defendants, Hawaii Ventures has not presented any discernable argument on

### C. *The Special Master's Report*

As previously stated, Hawaii Ventures and the Otaka Defendants—in their appeals and cross-appeals in appeal Nos. 25344 and 26820—contend that the circuit court erred in approving the Special Master's report. On the one hand, Hawaii Ventures challenges, *inter alia*, the adequacy of information for the Special Master to prepare his report. On the other hand, the Otaka Defendants challenge the Special Master's recommendation as to pre-receivership liabilities.

### 1. Additional Background Information

On September 13, 2001, in response to objections—particularly, those made by Hawaii Ventures—to her final report, Receiver Park requested that the circuit court appoint a special master, pursuant to HRCP Rule 53 (2007).[18] On September 21, 2001, the circuit court appointed Benjamin M. Matsubara as the Special Master to review, investigate, and make recommendations on the issues raised in the Receiver's final report.

On October 24, 2001, the circuit court issued its first supplemental order regarding its appointment of the Special Master, delineating therein, *inter alia*, the Special Master's duties, authority, and responsibilities:

A. The Special Master is authorized to review, investigate, and make recommendations on the issues raised in the Receiver['s final report] and pleadings filed relating to the [final report], including related issues that arise which the Special Master must necessarily address to perform his duties under this [o]rder[; and]

B. In carrying out his duties and purposes of this [o]rder, the Special Master is authorized to:

 1. Meet and confer with any participating party or the Receiver, individually or as a group, and their respective experts and/or consultants to carry out the purposes of his appointment, and to utilize any other appropriate procedures for carrying out his duties of investigation and review (*e.g.*, telephone conference, meeting, interview, memoranda, or a combination of the foregoing)[;]

 2. Obtain information and require the production of documents from the participating parties and the Receiver[;]

 3. Retain the services of such professionals as the Special Master shall deem necessary and appropriate to assist him in the performance of his duties[;] and

---

its point of appeal. Hawaii Ventures responds in its reply brief that the argument was made on page three of its opening brief "in the context that payments were incorrectly allowed to be made out of the Estate for Otaka obligations." Page three, which is part of the "Statement of the Case," contains an assertion relating to the circuit court's refusal to grant Hawaii Ventures the right to obtain discovery from Otaka or its affiliates, but does not contain any argument relating to the point of error at issue. In fact, nowhere in its opening brief does Hawaii Ventures present any accompanying argument as to why the circuit court's ruling was erroneous. It was not until after the Otaka Defendants pointed out that Hawaii Ventures failed to argue its point of error did Hawaii Ventures provide some arguments in its reply brief. Nonetheless, Hawaii Ventures' aforementioned point of error is deemed waived for failure to present any argument in its opening brief in the first instance and presenting such arguments in its reply brief to which no answer could be made. *Matter of Hawaiian Flour Mills, Inc.*, 76 Hawai'i 1, 14 n. 5, 868 P.2d 419, 432 n. 5 (1994) (holding that arguments raised for the first time in the reply briefs on appeal were deemed waived); *see also* HRAP Rule 28(b)(7) (2007) ("Points not argued may be deemed waived.").

18. HRCP Rule 53 provides in relevant part:

(a) *Appointment and compensation.* The court in which any action is pending may appoint a special master therein. As used in these rules[,] the word "master" includes a referee, an auditor, and an assessor. The compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties or paid out of any fund or subject matter of the action, which is in the custody and control of the court as the court may direct. . . .

(b) *Reference.* A reference to a master shall be the exception and not the rule. . . .

(c) *Powers.* The order of reference to the master may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only and may fix the time and place for filing of the master's report.

(Emphases in original.)

4. Communicate the status of matters to the [circuit c]ourt.

The circuit court also mandated that, "in order to avoid unnecessary delay in the resolution of this matter, each participating party and the Receiver shall deliver to the Special Master their position statements and responses to position statements, with supporting documentation and legal authority[.]"

Consequently, the parties submitted their respective position statements and responses to position statements of others to the Special Master; however, the statements and responses have not been made part of the record. The Special Master retained Horwath, Kam & Company, an accounting firm, to assist him in performing his duties. The Special Master's investigation lasted approximately six months, at the conclusion of which the Special Master filed his report (dated March 19, 2002) and, subsequently, the addendum to his report (dated May 24, 2002).

In his report, the Special Master indicated that his review of the final report was guided principally by the following orders:

(1) the August 24, 2000 order appointing Receiver Park;

(2) the December 1, 2000 order granting Receiver Park's motion to establish procedure for monthly interim allowances;

(3) the April 30, 2001 amended order granting the motion for appointment;

(4) the July 26, 2001 order granting in part and denying in part Hawaii Ventures' motion for instructions to the Receiver requiring compliance with the receivership orders;

(5) the September 17, 2001 order granting Receiver Park's motion for instructions that she not arbitrate ILWU's grievance pertaining to severance pay;

(6) the September 17, 2001 order on the Receiver's motion for instructions as to ILWU's severance and vacation claims;

(7) the September 28, 2001 order granting in part and denying in part ILWU's motion to treat severance and vacation pay as administrative expenses; and

(8) the order appointing the Special Master, filed on September 21, 2001, and the first supplemental order, filed on October 24, 2001.

The Special Master further maintained that, in carrying out his duties and the purposes of his appointment orders, he

initially reviewed the Receiver['s f]inal [r]eport, filed on August 14, 2001, the [p]osition [s]tatements of the participating parties dated November 8, 2001, and their respective [r]esponse to [p]ositions [s]tatements dated November 16, 2001 and others dated November 29, 2001.

Based on this initial review and various legal and accounting treatises, [the] Special Master met and/or telephonically communicated with the participating parties and requested additional information from them. Portions of the additional information requested and provided by the Receiver and her consultants which expands the [a]ccounting [r]eport attached to the Receiver's [f]inal [r]eport are attached hereto[.]

At the outset, the Special Master opined that,

[u]nder the [appointment order], the Receiver is clearly authorized to pay any expenses arising during the [r]eceivership which are necessary or appropriate for the care, preservation and maintenance of the Estate. The payment of [p]re-[r]eceivership liabilities are not specifically provided for, however, the payment of [p]re-[r]eceivership liabilities may fall under the [circuit c]ourt's directive to the Receiver of using the Receiver's best effort to manage, protect, care for, preserve and maintain the Estate Property. *See Thompson v. Phoenix[Phenix] Ins. Co.*, 136 U.S. 287, 295[, 10 S.Ct. 1019, 34 L.Ed. 408 (1890) ] (it is the general rule that the receiver will not be permitted to lay out more than a small sum at his own discretion in the preservation or improvement of the property, but this general rule should not be rigidly and sternly enforced as to work a wrong and injustice where the receiver has acted in good faith, and under such circumstances as will enable the court to see that if prior authority had been applied for, it would have been granted). Where the non-payment of a pre-receivership liability threat-

ens the ... Estate, or the corresponding goods and/or services creating the liability directly benefitted the Hotel during the [r]eceivership period, the Receiver may be justified in satisfying that liability.

The Special Master, having "considered all of the issues raised by the parties' position papers and respective responses[,]" chose "to address only those outstanding issues he deem[ed] relevant in regard to resolving this [r]eceivership" and recommended that "issues which would reduce the ... Estate without commensurate return be denied for purposes of preventing further erosion of the ... Estate." (Footnote omitted.) Accordingly, the Special Master found that Receiver Park had paid out of the Estate a total of $1,359,613.00 in pre-receivership obligations. Out of that sum, the Special Master recommended, *inter alia*, and, as amended by his addendum, that $964,826.00 be "approved as payments necessary for the maintenance and preservation of the ... Estate" and that the remaining amount—that is, $394,787.00—"be shown as a receivable from [Otaka and HWB] at June 30, 2001 and be assigned to [Hawaii Ventures]."

The pre-receivership liabilities of $394,787.00 that the Special Master recommended be shown as a receivable from Otaka and HWB consisted of:

| | |
|---|---|
| Accounts Payable | $189,560.00 |
| Accrued general excise tax (GET) and Transient Accommodations tax (TAT) | $174,832.00 |
| Employer Payroll Taxes | $ 30,395.00 |
| TOTAL | $394,787.00 |

As demonstrated above (and with respect to additional challenges discussed more *infra* ), the Special Master explained in his report why certain payments were considered "justified"—that is, necessary for the maintenance and preservation of the Estate—and why other payments were deemed "receivables" from Otaka and HWB.

Notwithstanding his disagreement with Receiver Park's payments of certain pre-receivership liabilities, the Special Master found "that such disputed payments [did] not rise to the level of 'bad faith' or 'fraud.' " (Footnote omitted.) On July 11, 2002, the circuit court approved the Special Master's report and adopted his recommendations.

The Receiver's final report was approved by the circuit court on August 22, 2002.

### 2. Hawaii Ventures' Contentions

Hawaii Ventures argues that the Special Master (1) did not have sufficient information to submit a proper report or to address all issues and (2) failed to address numerous allegations of Receiver Park's breaches of the appointment order. In addition, Hawaii Ventures challenges various payments that the Special Master deemed "justified." In short, Hawaii Ventures believes that the circuit court's adoption of the Special Master's report under these circumstances was error.

As previously stated, the Special Master's findings of facts—which, as in this case, were adopted by the circuit court—are considered to be the findings of the circuit court and are reviewed for clear error. HRCP Rule 52(a). The Special Master's conclusions of law are not binding on the circuit court and, thus, are freely reviewable for their correctness. *See Aluminum Shake Roofing, Inc. v. Hirayasu*, 110 Hawai'i 248, 252, 131 P.3d 1230, 1234 (2006). However, we are mindful that the Special Master has broad discretion to weigh evidence and to assess witnesses' credibility. *Nat'l Labor Relations Bd. v. Sequoia Dist. Council of Carpenters, AFL–CIO*, 568 F.2d 628, 631 (9th Cir.1977) [hereinafter, *Sequoia Dist. Council* ]. We

do not substitute the court's own judgment for that of the special master absent extraordinary circumstances. *See, e.g., Hines on Behalf of Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed.Cir.1991) ("[R]eversible error [is] extremely difficult to demonstrate."); *see also Finley ex rel. v. Sec'y of Health & Human Servs.*, 55 Fed.Cl. 355, 360 (2003) ("[T]his court will not reverse the decision of a special master unless the special master failed to consider relevant evidence, drew implausible inferences, or failed to state a rational basis for the decision."). The special master's decision will be upheld so long as it rests upon a rational basis. *See Hines*, 940 F.2d at 1528.

*Nilson v. Sec'y of Health & Human Servs.,* 69 Fed.Cl. 678, 680 (2006) (brackets in original).

### a. *insufficient information to approve the Special Master's report*

■■■ Hawaii Ventures contends that the circuit court "could not properly evaluate the Special Master's conclusion" "[b]ased on the lack of record supporting his report." Therefore, Hawaii Ventures believes that the circuit court abused its discretion in approving the report "without a detailed record."

As indicated above, the supplemental order instructed the parties, including Receiver Park to "deliver to the Special Master their position statements and responses to position statements, with supporting documentation and legal authority[.]" Thus, Hawaii Ventures was given an opportunity to address all of its concerns relating to the final report and submit any information it wished the Special Master to consider. The Special Master indicated that he reviewed (1) the final report and the orders (such as the appointment order) issued by the circuit court that might concern Receiver Park's authority and duties in managing the Hotel and (2) the parties' position statements and respective responses thereto. The Special Master further stated that he "met and/or telephonically communicated with the participating parties and requested additional information from them." With the assistance of Horwath Kam & Company, the Special Master used the information he obtained from the parties and expanded upon the Receiver's final report. Attached to his report were (1) the statement of assets, liabilities and estate's equity and related statements of income and cash flows for the period of August 25, 2000 to June 30, 2001 (compiled by the Receiver's professionals), (2) a supplemental schedule for assets and liabilities as of August 24, 2000, and (3) a supplemental schedule for cash and liabilities as of June 30, 2001. Moreover, as illustrated above, the Special Master provided explanations for his recommendations—which explanations took into account the authority and power vested upon Receiver Park via her appointment order. Therefore, the Special Master had suf-

ficient information to properly review the Receiver's final report.

Nevertheless, Hawaii Ventures argues that the Special Master was not provided with sufficient information, but does not explain what documents or other information, if any, were not submitted to or were not considered by the Special Master. *Lanai Co. v. Land Use Comm'n,* 105 Hawai'i 296, 309 n. 31, 97 P.3d 372, 385 n. 31 (2004) ("This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions." (Citations omitted.)). In support of its position, Hawaii Ventures relies on two cases—*Campbell v. Campbell,* 198 Kan. 181, 422 P.2d 932 (1967), and *Childs v. Sammons,* 271 Ga. 161, 516 S.E.2d 779 (1999)—for the proposition that conclusory findings made by the special master are alone insufficient. However, such is not the case here. As demonstrated above, the Special Master provided an explanation for each of his recommendations. Indeed, lacking from Hawaii Ventures' opening briefs is any showing—other than its bald assertion—that the Special Master did not have adequate information to form his opinions as set forth in his report. Accordingly, without more, Hawaii Ventures' contention regarding insufficient information is unavailing.

### b. *failure to address the Receiver's alleged misconduct*

■■■ Hawaii Ventures argues that the Special Master failed to address numerous allegations of breaches of the appointment order and waste of the Estate's assets by the Receiver and her professionals. As such, Hawaii Ventures contends that the circuit court erred in approving and adopting the Special Master's report without conducting its own inquiry.

The Special Master was specifically appointed to "review, investigate, and make recommendations on the issues raised in the Receiver['s final report]," including any related issues that "must necessarily [be] addressed to perform his duties" as the Special Master. The Special Master was informed of Hawaii Ventures' concern regarding Receiver Park's conduct, as Hawaii Ventures concedes that it "detailed for the Special Master

the many breaches" of the appointment order in its position statement. Although the Special Master did not specifically address all of the allegations of breaches asserted by Hawaii Ventures, he indicated that he had

> considered all of the issues raised by the parties' position papers and respective responses and ha[d] chosen to address only those outstanding issues he deem[ed] relevant in regard to resolving this [r]eceivership. The [Special Master] recommend[ed] that issues which would reduce the ... Estate without commensurate return be denied for purposes of preventing further erosion of the ... Estate.

(Emphasis added.) Thus, based upon his examination of the payments made by Receiver Park, the Special Master concluded that, "[a]lthough your Special Master disagrees with the payment of certain pre-receivership liabilities by the Receiver, *the [Special] Master finds that such disputed payments do not rise to the level of 'bad faith' or 'fraud.' "* (Emphasis added.) (Footnote omitted.)

Accordingly, the Special Master did not fail to address issues concerning Receiver Park's misconduct. Moreover, there was no reason for the circuit court to conduct its own inquiry concerning the Receiver's conduct, particularly when (1) the issue had been considered by the Special Master and (2) Hawaii Ventures did not provide the circuit court with any reason to disregard the Special Master's finding and initiate its own inquiry into the Receiver's conduct. *See Taomae v. Lingle,* 108 Hawai'i 245, 257, 118 P.3d 1188, 1200 (2005) (stating that the court may disregard points of error when the appellant fails to present discernible arguments supporting those assignments of error).

Nonetheless, Hawaii Ventures maintains that, "[b]y accepting the Special Master's contention that "bad faith" is the only standard by which the Receiver is bound, the circuit court surrendered control of its receivers and any requirement of compliance with its [a]ppoint[ment o]rder." Such a contention, however, ignores the fact that the appointment order specifically provided that

the Receiver "shall not be liable, in the Receiver's individual capacity, *for any claims* or demands for loss or damages, arising out of or in connection with this lawsuit ... *except* in the event that Receiver's acts or omissions constitute *bad faith* or *fraud.*" (Emphases added.) The Special Master clearly acknowledged the standard dictated by the appointment order—which Hawaii Ventures itself drafted—in determining Receiver Park's conduct.[19] Accordingly, Hawaii Ventures' assertion that the circuit court erred in approving the Special Master's report without conducting its own inquiry into the Receiver's conduct is without merit.

### c. challenges to certain "justified" payments

█ Hawaii Ventures contests a number of specific payments that the Special Master found "justified," arguing that the Special Master improperly determined that these payments were permissible based on "trust" and "fiduciary" obligations senior to the Lender's adjudicated first lien. Specifically, Hawaii Ventures argues that:

> The Special Master justified [the] payment[s] reasoning that the cash or proceeds in these amounts were not an asset of the Estate. This includes, for example, safe fees ($18,643), in-room movies ($9,219) and advance deposits ($151,450). This category represents a total of $179,312. But these amounts correspond to fees and services used by Otaka during the pre-receivership period, not by the Receiver. The cash was not segregated and there is no record of what gave rise to the conclusion that the Estate had obligations to those creditors. [The] Lender's first lien covered cash transferred to the Estate and all revenues from the Hotel. Any payment made by the Receiver for safe fees and for in-room movies were taken from [the] Lender's collateral. Similarly, any advance deposits were paid to Otaka, not the Receiver. Thus, the Receiver did not hold "advance deposits" in trust[,] she did not hold advance deposits at all. She held cash subject to the Lender's lien.

---

19. The Special Master's conclusion of no bad faith was followed by a footnote, which cited the aforementioned specific language of the appointment order concerning liability of the Receiver.

... The Special Master concluded that the Receiver was to pay amounts equal to taxes withheld from the employees by Otaka and not remitted. These amount[s] included, for example, employee withholding taxes ($60,122) and other payroll related withholding ($24,895). This category represents a total of $84,017. These sums were received and held by Otaka, not the Receiver. Yet any payment made for these liabilities were taken from [the] Lender's collateral. The Receiver did not receive or hold these amounts and cannot be considered a fiduciary of these unsecured creditors.

With respect to payments made because the amounts were held "in trust," the Special Master reasoned as follows:

(13) *Safe fees of $18,643 (Justified )*

The payment was ... for hotel room safes for July 2000 under a shared revenue arrangement. Accordingly, under the shared revenue arrangement[,] this amount was justifiably held in trust and rightfully due to Elsafe[, *i.e.*, the company providing the safes].

. . . .

(15) *In-room movies of $9,219 (Justified )*

The payments were for in-room movie services in August under a revenue sharing arrangement between the Hotel and On Command. Accordingly, under the shared revenue arrangement[,] this amount was justifiably held in trust and rightfully due to On Command.

. . . .

(29) *Advance Deposits of $151,387 (Justified )*

The advance deposits consists primarily of $117,450 in rooms, food and beverage deposits and $33,937 in tenant security deposits which were held in trust and were not an asset of the Estate.

(Emphases in original.) With respect to payments made by the Receiver as a "fiduciary," the Special Master explained:

(26) *Payroll Taxes Withholdings of $90,517 ($60,122 Justified and $30,395 Estate Receivable )*

The $90,517 of payroll taxes withheld consists of $60,122 in income and payroll

taxes withheld from employees and $30,395 of employer assessed payroll taxes.

The $60,122 employee withholding taxes paid are appropriate. The Receiver was only acting as a fiduciary to remit the taxes withheld from employees' salaries. The payment of the taxes withheld did not create any additional economic burden on the Estate.

The $30,395 of employers' payroll taxes should not have been paid and should be treated as a pre-receivership liability paid receivable, since it was an obligation junior to that of [Hawaii Ventures] and not necessary to maintain or preserve the Estate.

(27) *Other Payroll Related Withholding of $24,894 (Justified )*

These payroll accruals are predominantly withholdings from employees' wages for union dues, 401k plan contributions, etc. and represent the payment of a fiduciary obligation of the Estate.

(Emphases in original.)

■ Other than its conclusory statements that (1) these payments were made from Hawaii Ventures' collateral, (2) the Receiver did not hold these amounts "in trust," and (3) Receiver Park cannot be considered a fiduciary, Hawaii Ventures provides no support or explanation contrary to the Special Master's findings that: (1) the above payments were justified because the amounts were held in trust and *not* an asset of the Estate; and (2) the payments for payroll taxes withholdings were justified as a fiduciary obligation of the Estate. In other words, Hawaii Ventures fails to provide any discernible arguments in support of its position. As such, an appellate court is not obliged to address matters for which the appellant has failed to present discernible arguments. HRAP Rule 28(b)(7) (the opening brief must exhibit "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities ... relied on"); *Norton v. Admin. Dir. of the Court,* 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (observing that this court may "disregard [a] particular contention" if the

appellant "makes no discernible argument in support of that position") (citation and footnote omitted). Thus, we decline to address this matter further. Moreover, as we concluded *supra,* the Special Master was provided with sufficient information to reach his conclusions and make his recommendations, and Hawaii Ventures fails to demonstrate otherwise.

### 3. The Otaka Defendants' Contentions

■■■ The Otaka Defendants—in their cross-appeals in appeal Nos. 25344 and 26820—advance a single point of error, namely, that the Special Master erred in recommending that $394,787.00 (consisting of $189,560.00 accounts payable, $174,832.00 GET and TAT, and $30,395.00 employer payroll taxes) should be deemed a receivable from Otaka and HWB. According to the Otaka Defendants, the Special Master's recommendation "ignores the express provisions of the [appointment] order," which authorized the Receiver to pay expenses that "arose during the [r]eceivership period (although they may have been incurred earlier), and [that were] ordinarily incurred by owners, managers and operators of similar properties, business and enterprises."

In his report, the Special Master reviewed the authority given to the Receiver in the appointment order and acknowledged that Receiver Park was instructed in relevant part to:

1. Manage, protect, care for, preserve, and maintain the Estate Property;

2. Pay taxes and assessments for the Estate incurred during the period of the [r]eceivership;

3. Pay for such expenses as are necessary or appropriate for the care, preservation and maintenance of the Estate within the limitations of the appoint[ment o]rder; [and]

4. Pay any expenses (including for example, rent, utilities, taxes, payroll and debts to vendors) which arise during the [r]eceivership and which are necessary or appropriate for the care, preservation and maintenance of the Estate[.]

As previously demonstrated, the Special Master, in finding certain payments for services and/or expenses "justified," explained that they were used by or benefitted the Estate; conversely, certain payments for services and/or expenses were deemed "receivable" because they were not essential to maintaining or preserving the Hotel. For example, the Special Master found that payment for laundry in the amount of $3,474.00 should be considered a "receivable" because "[t]hese services were consumed prior to the [r]eceivership period, and therefore did not benefit the Estate." The Special Master also specifically found that $30,395 of employer payroll taxes should not have been paid because "it was an obligation junior to that of [Hawaii Ventures] and not necessary to maintain or preserve the Estate." With respect to the GET and TAT in the amount of $174,832.00, the Special Master considered the sum to be a receivable because Hawaii Ventures

> held a senior lien on the Hotel, and therefore had priority over the State of Hawai'i for the outstanding general excise and transient accommodations taxes assessed against [Otaka]. The non-payment of the taxes could result in the State of Hawai'i filing a tax lien on the Hotel pursuant to HRS [§ ]231–45, however, the tax lien would be junior to [Hawaii Ventures'] lien and [Otaka] would remain responsible for taxes attributable to the pre-receivership period. The [c]ourt authorized the Receiver to pay taxes and assessments that were incurred during the period of the [r]eceivership.

Besides their bald assertion that the payments totaling $394,787.00 were appropriately paid by the Receiver inasmuch as they arose during the receivership period, the Otaka Defendants fail to provide any support or documentation that these payments were for expenses and/or services incurred or utilized by the Estate during the receivership. They merely identify in the record where the Special Master explained the reason for his recommendation. The Otaka Defendants, however, argue with respect to the GET and TAT portion of the $394,787.00 that,

[a]lthough the [appointment order] specifically directed the Receiver to pay taxes arising during the period of the [r]eceivership [p]eriod [sic], the Special Master concluded that payment of $174,832 in [GET] and [TAT] was not justified because [Hawaii Ventures'] lien had priority over any tax lien. As the Receiver pointed out, however, the liability for GET and TAT arose September 1, 2000, after the Receiver's appointment.

The Special Master's conclusions appear to be based on assumptions or analyses which are not apparent from the [r]eport, and draw arbitrary distinctions with respect to certain categories of operating expenses of the Hotel. Ultimately, it was well within the Receiver's discretion, pursuant to the express terms of the [appointment order], to pay for the ordinary business expenses of the Hotel from the revenues of the Hotel.

(Citations to the record and internal quotation marks omitted.) Nonetheless, the Otaka Defendants fail to substantiate that argument, citing only to where Receiver Park stated in her response to the Special Master's report that the amounts were incurred during the receivership. The Otaka Defendants do not point to anything in the record or provide any analysis that would guide this court in determining the validity of their contention. As previously stated, "this court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions." *Lanai Co.*, 105 Hawai'i at 309 n. 31, 97 P.3d at 385 n. 31 (citations omitted); *see also Miyamoto v. Lum*, 104 Hawai'i 1, 11 n. 14, 84 P.3d 509,

519 n. 14 (2004) (stating that this court is not required to sift through the record for documentation of a party's contention). Therefore, the Otaka Defendants have failed to demonstrate that the Special Master erred in recommending or that the circuit court erred in adopting the recommendation that $394,787.00 of the payments made by Receiver Park be shown as a receivable from Otaka and HWB.[20]

In sum, giving deference to the "superior position" of the Special Master "to consider credibility and to draw inferences from the testimonial evidence," *Sequoia Dist. Council*, 568 F.2d at 632, and Hawaii Ventures' and the Otaka Defendants' failures to demonstrate how the circuit court erred in adopting the Special Master's report or how the Special Master erred in making his recommendations, we can see no error committed by the circuit court in approving the Special Master's report.

D. *Hawaii Ventures' Remaining Contentions*

In addition to its assertions concerning the Receiver's final report and the Special Master's report, Hawaii Ventures argues that the circuit court erred in: (1) failing to award Hawaii Ventures' full subrogation rights and judgment against the Otaka Defendants for the amount of Otaka's pre-receivership obligations paid from the Estate; (2) denying Hawaii Ventures' request to surcharge Receiver Park based on her alleged misconduct; (3) authorizing the payment of Receiver Park's fees from the Estate; and (4) authorizing Receiver Park to use the Estate's

---

**20.** The Otaka Defendants also assert that "creating a receivable from Otaka and HWB is patently arbitrary and inequitable, and results in a windfall to Hawaii Ventures." However, the Otaka Defendants provide no discernible argument or cite to any authority with respect to their position. To support their contention, the Otaka Defendants simply speculate that:

Had the Receiver been appointed early in the month, those expenses would have been paid and the operating accounts turned over to the Receiver would have been empty. Adopting the Special Master's recommendation leads to the patently arbitrary and inequitable result that, simply because the Receiver was appointed in the last week of the month, [Hawaii

Ventures] benefits from a windfall and the operating expenses become a liability of Otaka and HWB, rather than the Hotel liability.

The pre-receivership expenses incurred or services rendered were the debts of the Otaka Defendants. Thus, it is unclear how Hawaii Ventures would benefit from "a windfall" when the Special Master found that the $394,787.00 should *not* have been paid by the Receiver. Nevertheless, inasmuch as the Otaka Defendants fail to present a discernible argument or otherwise support their contention, we need not address this argument. *See Taomae*, 108 Hawai'i at 257, 118 P.3d at 1200 (disregarding the defendants' contention when they failed to present discernible arguments).

money to pay for the Special Master's fees.[21] Each of Hawaii Ventures' contentions is addressed in turn.

### 1. Judgment Against the Otaka Defendants

In appeal No. 25344, Hawaii Ventures contends that the circuit court erred by failing to enter judgment against the Otaka Defendants and in favor of Hawaii Ventures—not only for the $394,787.00 found by the Special Master to be "a receivable," but also for the $964,826.00 deemed "justified" by the Special Master, totaling over $1.3 million. Hawaii Ventures asserts that,

> [i]f the asset of the Estate was used to pay a liability, that asset either paid the Estate's own liability or that of another. If an asset of the Estate was used to pay a liability not its own, that payment—even if permitted by the [a]ppoint[ment o]rder for the preservation of the Estate—created rights in the Estate. At a minimum, the Estate is entitled to recover against the person whose liability was discharged. The circuit court should have awarded full subrogation rights and judgment in favor of [the] Lender and against the Otaka [Defendants] for discharge obligations.

Hawaii Ventures further states that:

> There is no basis for assets of the Estate to be used to pay Otaka['s] obligations without a corresponding asset of the Estate being created. Thus, the conclusion that $1.3 million of Estate assets was used

to pay Otaka['s] liabilities *requires* a finding that the Estate is owed $1.3 million. If said $944,205.00 [sic] and $394,787.00 had not been paid to discharge debts using assets of, or due to, ... Estate, [p]urchaser HWB 2507 Kalakaua LLC would have received those proceeds.

(Emphasis in original.) Moreover, Hawaii Ventures asserts that rights of subrogation and equitable principles of quantum meruit and unjust enrichment dictate its entitlement to the aforementioned amount, chargeable to the Otaka Defendants.[22] We first turn to the issue whether Hawaii Ventures was entitled to a judgment in the amount that the Special Master deemed a receivable for the Estate, *i.e.*, $394,787.00.

#### a. *pre-receivership payment of $394,787.00*

Hawaii Ventures believes that, because Receiver Park should not have paid $394,787.00 in pre-receivership obligations as the Special Master concluded, the circuit court erred in failing to enter judgment in that sum in favor of Hawaii Ventures. The Otaka Defendants, however, urge this court not to consider Hawaii Ventures' argument made for the first time on appeal because Hawaii Ventures "did not request judgment against the Otaka [Defendants] (or any of them) on the receivable or any other pre-receivership expenses prior to raising the issue on appeal." Further, the Otaka Defendants argue that the $394,787.00 receivable,

---

21. In appeal No. 26820, Hawaii Ventures also challenges the order granting in part and denying in part its second motion for attorneys' fees against the Trustees. The Trustees filed their answering brief on April 6, 2005. However, on July 12, 2005, Hawaii Ventures filed an adjusted opening brief, wherein it struck the aforementioned challenge from its appeal.

22. In appeal No. 26280, the Otaka Defendants assert in their answering brief that, although Hawaii Ventures requests in its "Conclusion" section that the Otaka Defendants should "be ordered to pay over to [the] Lender, forthwith and as additional payments may be discovered, the full amount of Otaka['s] obligations discharged and payments made for its or HWB['s] benefit with assets of the Estate[,]" it has not supported the request with arguments. The Otaka Defendants, therefore, state that they "assume that this paragraph is a remnant from Hawaii

Ventures' Opening Brief in [appeal No. 25344] and was inadvertently included through a 'cut and paste' error." In response, Hawaii Ventures states that its request for a judgment against the Otaka Defendants "is addressed through [the] Lender's Opening Brief [in appeal No. 25344]. Throughout its Opening Brief, [the] Lender argues that it is entitled to be repaid for Otaka['s] obligations paid out of the Estate." We agree with the Otaka Defendants that Hawaii Ventures does not present entitlement to repayment as a point of error nor provide analysis as to this issue in appeal No. 26820. Hawaii Ventures merely mentions throughout its discussion relating to other issues that it should be reimbursed by the Otaka Defendants for the pre-receivership payments made on behalf of the Otaka Defendants. Nonetheless, we address the issue inasmuch as the same is raised and argued in appeal No. 25344.

"even if it is affirmed on appeal, gives Hawaii Ventures nothing more than the basis for a potential *claim* against Otaka and HWB. Until that claim and the defenses thereto are actually pled and litigated, no judgment can enter." (Emphasis in original.)

Hawaii Ventures retorts that it expressly raised the issue with the circuit court via its response to the Special Master's report:

[The] Lender objected to aspects of th[e Special Master's] report, including ... the limited designation of $394,787.00 as a "receivable". At the May 28, 2002 hearing on the Special Master's [r]eport, the circuit court adopted the Special Master's recommendations, as amended, reserving only specified matters for determination at the hearing on the Receiver's [f]inal [r]eport. The issue of the "receivable" was not one of the matters reserved.

Thus, [the] Lender only had a single memorandum opportunity to respond to the Special Master's [r]eport recommending that a receivable be granted. In responding, [the] Lender sought reimbursement from Otaka, including a discussion at length in its Response to the Special Master's [r]eport captioned "Who is Liable?".

Under the section captioned "Who is Liable[,]" Hawaii Ventures argued, *inter alia,* that:

The Special Master concludes that[,] if the discharge of an Otaka liability by the Receiver is deemed "justified," then there is no recourse for the Estate, even from Otaka or [HWB]. There is no basis in law for the Estate to be further stripped of its assets in this manner. The discharge of the debt of another carried with it inherent rights of subrogation and recovery of unjust enrichment, at the very least.

(Citation omitted.) Hawaii Ventures essentially concluded that, at a minimum, "the Estate is entitled to recover against the person whose liability was discharged [by Receiver Park's pre-receivership payments]. There is no basis in law or the [o]rder for assets of the Estate to be used to pay non-receivership obligations without a corresponding receivable of the Estate being created." Hawaii Ventures suggested that "Otaka and [HWB] should be ordered to reimburse the Estate for the full amount of pre-receivership liabilities of any type paid by the Receiver[.]"

Significantly, in approving the Special Master's report on July 11, 2002, the circuit court specifically stated that:

As to the pre-receivership liabilities which are determined receivables on June 30, 2001, from [Otaka and HWB to Hawaii Ventures, *i.e.,* $394,787.00,] the [c]ourt's adoption of the Special Master's recommendation in this regard *does not preclude the Plaintiff[, i.e., Hawaii Ventures,] from pursuing a claim against other defendants for these receivables to the extent that [Hawaii Ventures] is able to demonstrate its entitlement to prevail on these claims against other defendants.*

(Emphasis added.) On February 12, 2003, Hawaii Ventures filed a motion for deficiency judgment, wherein it sought a deficiency judgment against the Otaka Defendants in the amount of $13,144,020.18. In addition, Hawaii Ventures requested, *inter alia,* an order declaring HWB Kalakaua as "the assignee of all right, title and interest" in the "$394,787.00 designated as a receivable arising during the receivership due to 'Plaintiff' in the Special Master's report filed on March 19, 2000, and for a judgment in favor of [HWB Kalakaua] and against [Otaka] in that regard."

On May 12, 2003, the circuit court granted Hawaii Ventures' motion for deficiency judgment in the amount of $13,144,020.18. The circuit court reserved certain issues, none of which are relevant here, to be addressed in connection with the Receiver's final motion for instructions and denied the motion in all other respects. In other words, Hawaii Ventures' request for a judgment against the Otaka Defendants regarding the receivable was denied. Based on the foregoing, the Otaka Defendants' contention regarding Hawaii Ventures' failure to raise the argument before the circuit court is without merit.

■ Moreover, Black's Law Dictionary defines the term "receivable" in the context of this case as "[a]n amount owed[.]" Black's Law Dictionary 1296 (8th ed.2004). It is undisputed that the circuit court adopted the

Special Master' recommendation that $394,787.00 in pre-receivership payments be deemed a receivable, *i.e.*, an amount owed to Hawaii Ventures from Otaka and HWB. In other words, because Receiver Park had used $394,787.00 from the Estate to pay liabilities of Otaka (and not those of the Estate), those payments created rights in the Estate, entitling it to recover against the person whose liability was discharged. In turn, that amount would become an asset of the Estate to be distributed to Hawaii Ventures, as the lender. Consequently, Hawaii Ventures' request for a judgment in the amount of $394,787.00 against Otaka and HWB should have been granted. We, therefore, hold that the circuit court erred in failing to do so. Accordingly, we vacate that portion of the May 12, 2003 order granting in part Hawaii Ventures' motion for deficiency judgment and denying in part its request regarding the $394,787.00. We also vacate the May 14, 2003 deficiency judgment. We remand with instructions that the circuit court amend the May 12, 2003 order to include a grant of Hawaii Ventures' aforementioned request and for entry of an amended deficiency judgment that includes the amount of $394,787.00 in favor of Hawaii Ventures as against Otaka and HWB.

### b. *pre-receivership payment of $964,826.00*

Hawaii Ventures also argues that the circuit court erred in failing to issue a similar judgment for the remaining pre-receivership payments of $964,826.00. Hawaii Ventures believes that, if said amount had not been paid to discharge Otaka's debts using Estate monies, it would have received the proceeds. The Otaka Defendants, however, argue that "[t]here is no basis, and certainly no equitable basis, for judgment against any of the Otaka [Defendants] with respect to the $964,826 in trade receivables that the Receiver was determined to have justifiably paid for the benefit of the Estate." We agree with the Otaka Defendants.

■■■ As discussed in section III.B.2., Hawaii Ventures challenged several specific payments it believed should not have been paid by Receiver Park with Estate monies.

Those payments represent $515,226.00 of the $964,826.00 deemed justified by the Special Master and approved by the circuit court, which we have upheld. *See supra* section III.B.2.a (regarding $316,188.00 for wages and vacation pay) and section III.B.2.b. (regarding $199,398.00 for Otaka's pre-receivership debts). Hawaii Ventures, however, does not provide any argument disputing the remaining $449,600.00 that was (1) paid out of the Estate by Receiver Park, (2) deemed justified by the Special Master, and (3) approved by the circuit court. Accordingly, we decline to determine the propriety of the remaining $449,600.00 that was paid out of the Estate. *See, e.g., Norton*, 80 Hawai'i at 200, 908 P.2d at 548 (disregarding an appellant's contention where he failed to provide any discernible argument).

■■■ Nevertheless, Hawaii Ventures argues that it is entitled to the entire $1.3 million of pre-receivership payments based upon its rights of subrogation and equitable principles of quantum meruit and unjust enrichment. This court has defined subrogation as "the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." *Peters v. Weatherwax*, 69 Haw. 21, 27, 731 P.2d 157, 161 (1987) (internal quotation marks omitted) (quoting *Kapena v. Kaleleonalani*, 6 Haw. 579, 583 (1885)). "When subrogation occurs, the substitute is put in all respects in the place of the party to whose rights he is subrogated. In effect, he 'steps into the shoes' of the party." *Peters*, 69 Haw. at 27, 731 P.2d at 161 (citations, internal quotation marks, and brackets omitted); *see also Beneficial Hawai'i, Inc. v. Kida*, 96 Hawai'i 289, 313–14, 30 P.3d 895, 919–20 (2001). Subrogation "is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which, in equity and good conscience, should have been discharged by the latter." *Peters*, 69 Haw. at 27, 731 P.2d at 161 (internal quotation marks, citation and brackets omitted).

■■■ With respect to the principles of quantum meruit and unjust enrichment, this court has stated that:

The basis of recovery on quantum meruit is that a party has received a benefit from another which it is unjust for him to retain without paying therefor. In *Bouterie v. Carre*, 6 So.2d 218, 220 (La.App.1942), it is stated that "if a party derives any benefit from services rendered by another, the law reasonably implies a promise to pay on the part of the one who has received such benefit, such amount as it is reasonably worth."

*Maui Aggregates, Inc. v. Reeder*, 50 Haw. 608, 610, 446 P.2d 174, 176 (1968). As such, a court "may give restitution" and "prevent the unjust enrichment of the defendant, where the plaintiff's property has been used in discharging an obligation owed by the defendant." *Grain Dealers Mut. Ins. Co. v. Pac. Ins. Co.*, 70 Haw. 211, 217, 768 P.2d 226, 229 (1989) (citation, internal quotation marks, and brackets omitted).

As discussed *supra*, we held that the circuit court erred in denying Hawaii Ventures' request for a judgment in the amount of $394,787.00 that the Special Master deemed a receivable in favor of Hawaii Ventures. *See* section III.D.1 (regarding judgment of pre-receivership payments against the Otaka Defendants). Therefore, as to that amount of pre-receivership payments, we obviously need not determine whether subrogation or equitable principles warrants reimbursement of said amount to Hawaii Ventures. Nevertheless, as to the remaining $964,826.00 of pre-receivership payments, Hawaii Ventures fails to explain how the aforementioned equitable doctrines apply to the circumstances of this case, thereby entitling Hawaii Ventures to such sum. For example, Hawaii Ventures merely sets forth the law of subrogation and unjust enrichment without providing any corresponding analysis. *Norton*, 80 Hawai'i at 200, 908 P.2d at 548 (disregarding an appellant's contention where he failed to present discernible arguments).

Hawaii Ventures, however, did provide this court with a two sentence argument in support of its quantum meruit argument, to wit: "The[se pre-receivership payments] were for services rendered for and utilized by Otaka while it still possessed the [H]otel property. It would be unjust to allow Otaka to receive those benefits without paying for them." We previously concluded that the challenged $515,226.00 of the $964,826.00 pre-receivership payments were justifiably paid out of the Estate. In other words, the benefits from the payments of goods and services inured to the operation of the Hotel to generate revenues and accounts receivables. The Otaka Defendants, thus, did not receive any benefit from such payments of services and expenses that could be considered "unjust for [them] to retain without paying therefor." *Maui Aggregates*, 50 Haw. at 610, 446 P.2d at 176. Additionally, we earlier declined to address the remaining $449,600.00 because of Hawaii Ventures' failure to specifically challenge it. For the same reason, we believe that Hawaii Ventures has not established that it is entitled to reimbursement of the pre-receivership payments based upon rights of subrogation and equitable principles of quantum meruit and unjust enrichment.

### 2. Surcharge Against Receiver Park

Hawaii Ventures attempts to impose personal liability on Receiver Park, arguing that the circuit court erred in denying its request for a surcharge of approximately $1.3 million, *i.e.*, the total pre-receivership amount paid by Receiver Park. Although recognizing that the Special Master found only $394,787.00 to be a "receivable," Hawaii Ventures nonetheless maintains that the entire sum ($394,787.00 receivable and $964,826.00 justifiable) "discharged Otaka of its obligations to third parties" and the Receiver "had both the obligation and power under principals [sic] of subrogation to undertake to recover those sums from Otaka for the Estate. Failure to do so renders her subject to surcharge."

In response, Receiver Park contends that the appointment order set the standard for the Receiver's personal liability and that the Special Master and the circuit court properly rejected allegations to impose such liability. She argues that Hawaii Ventures

had the burden and obligation of showing to the [circuit] court and [the] Special Master in what particular manner the Receiver's actions "constitute *bad faith or fraud.*" [Hawaii Ventures] did not supply a scintilla

of such showing, did not relate any of its "facts" to the bad faith or fraud standard, in any way commensurate with the seriousness of the charges[.]

(Emphasis in original.)

As previously stated, the appointment order specifically contained a provision, entitled "Receiver's Non–Liability," which read as follows:

> The Receiver is an officer of the [c]ourt and, as such, Receiver shall not be liable, in Receiver's individual capacity, for any claims or demands for loss or damage, arising out of or in connection with this lawsuit and [o]rder, including any acts or omissions in connection with the management and operation of the property of the Estate, whether such claims or demands arise during the pendency of or after the completion of this lawsuit, *except in the event that Receiver's acts or omissions constitute bad faith or fraud.*

(Emphases added.) Hawaii Ventures, however, first argues that the exculpatory language of the appointment order "cannot protect the Receiver from scrutiny" in light of her misconduct. Specifically, Hawaii Ventures argues that

> the Receiver never provided the detailed accounting information required in the first instances of a Receiver, and sought by [the] Lender. The circuit court did not have such information in approving the Receiver's reports. The Special Master did not have such information in reviewing the Receiver's activities. The circuit court did not have such information in reviewing the Special Master's report.

Hawaii Ventures' bald assertion is without merit.

As discussed *supra*, Hawaii Ventures has not sustained its burden on appeal to show that the circuit court abused its discretion in denying Hawaii Ventures' requests for access to the Hotel's books and records. *See supra* section III.B.3. We also concluded that, in providing a detailed explanation of his recommendations, the Special Master had sufficient information to properly review the Receiver's final report. *See supra* section III.C.2.a. And, finally, we held that the Special Master did not, as Hawaii Ventures contends, fail to

address issues concerning Receiver Park's misconduct when he specifically determined that Receiver Park's actions did not amount to "bad faith or fraud." *See supra* section III.C.2.b. Thus, we concluded that, without providing any reason for the circuit court to disregard the Special Master's conclusion, the circuit court did not err in approving the Special Master's report. *See supra* section III.C.2.b. Consequently, we do not believe the circuit court abused its discretion in declining to surcharge Receiver Park.

■ Nevertheless, in apparent recognition that this court may agree with the circuit court's decision, Hawaii Ventures next contends that the existence of "bad faith or fraud" is not required in order to find a receiver liable for *negligently* administering an estate. Specifically, Hawaii Ventures explains:

> [The] Lender sought a surcharge here because the Receiver did not, even with professional accounting advice, exercise proper stewardship in preserving Estate assets. Although the Receiver may have not profited directly in paying Otaka['s] debts, *she was at the least negligent in, e.g., ... paying more than a million dollars for those [debts], ... failing to disclose and detail these payments in the face of demands and ... comprehensively failing to pursue reimbursement to the Estate.*

(Emphasis added.) Thus, the issue before this court is whether—regardless of the directive contained in the appointment order— Receiver Park can be held personally liable for negligent violations of duties imposed upon her by law. We conclude she cannot.

This court has held that:

> There is no doubt of the inherent power of a circuit [court] sitting in equity or in probate to call to [its] aid special masters, auditors, examiners or even translators for the purpose of assisting the court, in other words, the inherent power to provide [itself] with the appropriate instruments required for the performance of [its] duties.... [Thus,] a circuit court may designate a person to aid it in the performance of specific judicial duties as they arise in the progress of the cause, to clarify

issues and make tentative findings when occasion arises[.]

*In re the Estate of Lee Chuck,* 33 Haw. 220, 223 (1934). In this case, the circuit court appointed Park as the receiver to assist the court in managing the Estate during the pendency of the foreclosure action, and, thus, Park became "an officer of the court." *Booth,* 58 U.S. at 331; *see also* HRCP Rule 66 (2007) ("The practice in the administration of estates by *receivers or by other similar officers appointed by the court* shall be in accordance with the practice heretofore followed." (Emphasis added.)); *Hawai'i Nat'l Bank v. Cook,* 99 Hawai'i 334, 347, 55 P.3d 827, 840 (App.2000) (holding that "a commissioner is a neutral party appointed by the court and acts as an arm of the court") (internal quotation marks and citation omitted), *rev'd on other grounds,* 100 Hawai'i 2, 58 P.3d 60 (2002).

Although this court has yet to declare a receiver's entitlement to absolute judicial immunity based on her status as an officer of the court, we have held that court-appointed psychiatrists are entitled to such immunity, even if negligent. *Seibel v. Kemble,* 63 Haw. 516, 631 P.2d 173 (1981). In *Seibel,* this court acknowledged the "overriding public policy" reason for the immunity, *i.e.,* "that judges should be at liberty to exercise their functions with independence and without fear of consequences[,]" *id.* (internal quotation marks and citations omitted), and concluded that such policy should "apply equally to court-appointed officials." *Id.* As such, this court extended the immunity afforded to judges to court-appointed psychiatrists acting in their official capacity. *Id.* at 524, 631 P.2d at 178.

In so holding, the *Seibel* court relied on a line of cases from other jurisdictions for the proposition that court-appointed officials acting as arms of the court and performing functions integral to the judicial process are entitled to absolute immunity. *Id.* at 523–27, 631 P.2d at 178–80. Of particular relevance

is *Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno,* 547 F.2d 1 (1st Cir.1976), of which we stated:

> In that case, the [First Circuit] held that court-appointed receivers were entitled to absolute immunity. In reaching this conclusion, the [First Circuit] stated[:]
>
>> At the least, a receiver who faithfully and carefully carries out the orders of his appointing judge must share the judge's absolute immunity. To deny him this immunity would seriously encroach on the judicial immunity already recognized by the Supreme Court. It would make the receiver a lightning rod for harassing litigation aimed at judicial orders. In addition to the unfairness of sparing the judge who gives an order while punishing the receiver who obeys it, a fear of bringing down litigation on the receiver might color a court's judgment in some cases, and if the court ignores the danger of harassing suits, tensions between the receiver and judge seem inevitable.

*Seibel,* 63 Haw. at 527, 631 P.2d at 180 (quoting *Kermit Constr. Corp.,* 547 F.2d at 3). For the same reason, this court recognized that failure to extend absolute immunity to court-appointed psychiatrists "would produce a chilling effect upon acceptances of future court appointments" because "[c]ourt appointees would not want to be exposed to litigation and be forced to spend time and money defending themselves in court." *Id.; see also Hulsman v. Hemmeter Dev. Corp.,* 65 Haw. 58, 64, 647 P.2d 713, 719 (1982) (holding, *inter alia,* that a probation officer, as a functionary of the court, was absolutely immune, pursuant to the doctrine of judicial immunity, from liability for negligence in the "preparation, investigation[,] and presentation of a pre-sentence report"). The rationale underlying our decision in *Seibel* is, therefore, equally applicable in the instant case to court-appointed Receiver Park.[23] Ac-

---

**23.** The Supreme Court of North Dakota also indicated that:

> Because receivers are court officers, it has been uniformly held a court-appointed receiver is entitled to absolute derivative judicial immunity. *See, e.g., New Alaska Development Corp. v. Guetschow,* 869 F.2d 1298, 1303 (9th Cir.

1989); *Property Management & Investments, Inc. v. Lewis,* 752 F.2d 599, 602 (11th Cir. 1985); *Kermit Const. v. Banco Credito Y Ahorro Ponceno,* 547 F.2d 1, 2 (1st Cir.1976). The rationale for this immunity precludes receivers from becoming "a lightning rod for harassing litigation aimed at judicial orders." *Kermit*[,

cordingly, Hawaii Ventures' argument that Receiver Park should be held personally accountable for the $1.3 million that it claims she had negligently expended in her management of the Hotel is unavailing. Consequently, we hold that the circuit court did not abuse its discretion in denying Hawaii Ventures' request to surcharge Receiver Park.[24]

### 3. The Receiver's and Her Professionals' Fees

Hawaii Ventures maintains that the circuit court abused its discretion in approving fees exceeding $1 million to the Receiver and her professionals. As discussed more fully *infra*, Hawaii Ventures challenges as excessive and unreasonable the fees paid to both the Receiver and her retained professionals.

### a. *additional background information*

The appointment order specifically provided that the fees and costs

> of the Receiver and the Receiver's attorneys, accountants and other professionals, [25] if any, shall be submitted to the [c]ourt for its approval, in the form of either a request(s) for fees upon which a hearing is held and/or a stipulation(s) among all parties. Such fees and costs shall be deemed to be secured by a superpriority lien against the Estate.

At the outset of the receivership, Receiver Park retained the services of various professionals to assist her in the operation and management of the Hotel, to wit: (1) Keching Ning (from the law firm of Ning, Lilly & Jones), as the Receiver's general legal counsel; (2) Ronald Tom (of Ron Tom Realty, LLC), as general agent and accounting advisor; (3) Lorraine H. Akiba, as special counsel for environmental issues; (4) Robert S. Katz (of Torkildson, Katz, Fonseca, Moore & Hetherington), as special counsel for labor issues; and (5) Ernest Watari and his accounting firm—PKF Hawaii, LLP (PKF), as consultant and accountant.

Two months after her appointment, Receiver Park, on October 24, 2000, filed a motion for an order establishing the procedure for monthly interim allowances and payment of compensation and reimbursement to the Receiver and her professionals. Therein, Receiver Park also requested fees and costs incurred from August 24, 2000 through September 31, 2000, totaling $47,904.03. However, on November 8, 2000, Receiver Park amended her motion to include fees and costs for the month of October 2000. As such, the fees and costs incurred from August 24, 2000 through October 31, 2000 amounted to $83,632.90. Hawaii Ventures filed its statement of no objection to the motion. Consequently, on December 1, 2000, the circuit court granted Receiver Park's motion, awarded the interim fees and costs requested, and established the procedures for interim payments. Those procedures specifically required the professionals to

> provide to the Receiver, by the 15th of each month, monthly time and service statements for professional services. Such statements shall set forth the date for each service, the general nature of the services rendered, and the time expended for each service. The Receiver shall, after review and approval, send copies of such monthly bills, as well as her own, to all parties, through counsel[.] *Counsel will then have ten (10) days within which to object. If no objection is received, the Receiver may pay such fees. If any party objects, and the*

---

547 F.2d] at 3. Receivers are therefore entitled to share the broad immunity from suit conferred upon judges when receivers are acting in the scope of their authority and in accordance with court order. *See Bennett v. Williams,* 892 F.2d 822, 823 (9th Cir.1989). *Perry Center, Inc. v. Heitkamp,* 576 N.W.2d 505, 511 (N.D.1998).

**24.** Hawaii Ventures also argues that the Receiver's professionals and legal advisers should be held liable to the Estate. As previously stated, the appointment order permitted Receiver Park to "employ counsel, accountants and other pro-

fessionals with respect to the Receiver's powers, duties and authority herein." In other words, the professionals provided services to assist Receiver Park with her duties and responsibilities enumerated in the appointment order. Thus, in light of the above holding, we need not address whether the Receiver's professionals should be surcharged as well.

**25.** The appointment order permitted Receiver Park to "employ counsel, accountants and other professionals with respect to the Receiver's powers, duties and authority herein."

*matter cannot be resolved, the Receiver will place the matter before the [circuit c]ourt by way of a fee application.*

(Emphasis added.)

On October 2, 2001, Receiver Park filed a memorandum with the court and submitted a summary schedule of all fees and costs incurred during the previous year, *i.e.*, from August 24, 2000 through August 31, 2001, totaling $717,221.16. Receiver Park also indicated that, pursuant to the established procedures, she had submitted monthly time and service statements to the parties, which she appended as exhibits, and that none of the parties made any objections thereto. Consequently, inasmuch as no objections were received, it appears that Receiver Park paid the monthly fees and costs once the objection period had expired. On October 9, 2001, Hawaii Ventures filed a reply, essentially asserting that, inasmuch as the appointment order specifically required that fees and costs be submitted to the court for approval, the court could disapprove any payment already made by the Receiver to herself or her professionals and that, therefore, Hawaii Ventures was not required to comply with the interim payment procedures.

On November 28, 2001, Receiver Park filed an interim fee application with the circuit court, requesting a total of $55,777.24 incurred in September 2001 (in August 2001 for Katz), which amount was later reduced to $54,021.76. Receiver Park indicated that she had, consistent with her past practice, sent detailed fee and cost statements for the month of September 2001 to the parties. By letter dated October 17, 2001 (within the ten-day objection period), Hawaii Ventures—via its counsel—objected to the fees and costs, stating that:

With respect to request for payment of the Receiver's and [the] Receiver's [c]onsultants [f]ees which were submitted with your letter of October 10, [2001], our client

has objected to and continues to object to the payment of all further fee requests until completion of review with the Special Master and determination by this [c]ourt.

... With in excess of $717,000 in fees already advanced, our client will not acquiesce to further advances to the Receiver or [the] Receiver's consultants[.]

On December 11, 2001, Hawaii Ventures filed its objection to the requested fees and costs as being excessive. On January 15, 2002, the circuit court granted Receiver Park's fee application in the amount of $51,609.22 (as opposed to the requested $54,021.76).

Thereafter, Receiver Park filed two additional interim fee applications. The second fee application (filed on January 9, 2002) sought a total of $32,540.32 in fees and costs for October 2001, and the third fee application (filed on January 23, 2002) sought a total of $51,178.86 for November 2001. Before the circuit court had a chance to rule on the second and third fee applications, Receiver Park filed a cumulative interim fee application on June 26, 2002. Therein, she requested $231,358.63 in fees and costs from October 2001 through May 2002. Hawaii Ventures opposed the cumulative fee application. The circuit court ultimately granted the cumulative fee application, but in the amount of $175,939.00.

In her final motion for instructions, the Receiver requested an additional $99,453.44 in fees and costs for herself and her professionals for the period of June 2002 through November 2002, which the circuit court granted, but in the amount of $84,935.71. The circuit court also permitted a reserve of $150,000.00 to be held in an interest-bearing account for further fees and costs.

In sum, the circuit court granted Receiver Park and her professionals fees and costs, totaling $312,483.93, over the objections of Hawaii Ventures as follows:

| DATE | FEE APPLICATIONS | REQUESTED AMOUNT | AMOUNT AWARDED |
| --- | --- | --- | --- |
| 11/28/01 | The first fee application (September 2001) | $54,021.76 * | $51,609.22 |
| 01/09/02 | The second fee application (October 2001) | $32,540.32 | No ruling |
| 01/23/02 | The third fee application | $51,178.86 | No ruling |

(November 2001)

| | | | |
|---|---|---|---|
| 06/26/02 | The cumulative fee applications (October 2001-May 2002) | $231,358.63 * | $175,939.00 |
| 02/10/03 | Final motion for instructions (June-November 2002) | $99,453.44 * | $84,935.71 |
| | **TOTAL** | $384,833.83 * | $312,483.93 |

### b. *Hawaii Ventures' contentions*

On appeal, Hawaii Ventures maintains that the circuit court abused its discretion in approving over $1 million in fees (*i.e.*, $717,221.26 (August 2000–August 2001) plus $312,483.93 (*i.e.*, per the various interim fee applications) equals $1,029,705.10) to Receiver Park and her professionals. Hawaii Ventures argues that the sum was "lavish and abusive" and "exceeded the net income of the Estate and [was] unreasonable by any standard of applicable fees properly incurred by a fiduciary in the administration of an estate." According to Hawaii Ventures,

[t]he actions of the Receiver and her professionals were unworthy of the compensation awarded. To the knowledge of [the] Lender, not a single misapplied asset of the Estate was retrieved and no improper payment was halted without the direct involvement of [the] Lender and [the] Lender's advisers....

By any measure, this was a disastrous and failed receivership. Where more than $1.3 million of improper payments were misrepresented and repeatedly denied with the full support and advocacy of advisers, no fees were due to any of them.

Specifically, Hawaii Ventures argues that: (1) there should be no compensation for activities not benefitting the Estate; (2) there should be no fees where there was willful neglect or misconduct; and (3) there should be no fees for defending fee applications.

 As an initial matter, we note that Hawaii Ventures purports to challenge *all* of the fees and costs approved and paid to Receiver Park and her professionals. However, as previously stated, Hawaii Ventures did not object to Receiver Park's October 24, 2000 request for $83,632.90 in fees and costs incurred from August 24, 2000 through October 31, 2000. In fact, Hawaii Ventures filed a statement of no opposition to the request on November 6, 2000. As to the fees and

costs for November 2000 through August 2001 in the amount of $633,588.36 ($717,-221.26 minus $83,632.90), there is no dispute that Hawaii Ventures failed to object to the fees and costs in the proper manner provided for in the circuit court's order establishing procedure for interim allowances. In fact, Hawaii Ventures concedes in its opening brief that "[e]arly awards of fees may have been allowed *without opposition,* but continued and final payment was abusive[.]" (Emphasis added.) Because "failure to raise or properly reserve issues at the [circuit court] level would be deemed waived[,]" *Enoka v. AIG Hawai'i Ins. Co.,* 109 Hawai'i 537, 546, 128 P.3d 850, 859 (2006) (internal quotation marks and citation omitted), we hold that, in light of Hawaii Ventures' failure to object to fees paid through August 31, 2001, its challenge to the $717, 221, 26 in fees and costs is waived. *See also In re Tax Appeal of Subway Real Estate Corp. v. Dir. of Taxation, State of Hawai'i,* 110 Hawai'i 25, 30, 129 P.3d 528, 533 (2006) ("as a general rule, if à party does not raise an argument at trial, that argument will be deemed to have been waived on appeal") (brackets, citation, and internal quotation marks omitted). Accordingly, the only contested fees on appeal are those additional fees awarded pursuant to the Receiver's fee applications and the final motion for instructions, totaling $312,483.93 (the disputed amounts). We, therefore, examine Hawaii Ventures' specific objections only as they relate to the disputed amounts.

### i. activities not benefitting the Estate

 Generally, "[r]eceivers have a right to compensation for their services and expenses. Even though a receiver may not have increased or prevented a decrease in [the] value of the collateral, if a receiver reasonably and diligently discharges [her] duties, [she] is entitled to compensation." 65 Am.Jur.2d *Receivers* § 219 at 809 (footnotes omitted); *see also Gaskill v. Gordon,* 27 F.3d

248, 253 (7th Cir.1994) (same). The receiver bears the burden of proof to show entitlement to payment in the amount claimed, 2 Clark, *A Treatise on the Law and Practice of Receivers* § 641(f) at 1097, and the amount of the award lies within the sound discretion of the circuit court. *Id.* at 1089 ("Allowances of fees to masters, receivers[,] and their counsel are largely discretionary with the trial judge[.]"); *see also Drilling & Exploration Corp. v. Webster,* 69 F.2d 416, 418 (9th Cir. 1934).

> This is because the receiver acts under the authority of the court and is considered to be an officer of the court. The court supervises [her], knows [her] circumstances, the services rendered by [her], the amount of time [she] has expended, what is reasonable, and can judge the value of those services.

*Krist v. Aetna Cas. & Sur.,* 667 P.2d 665, 670 (Wyo.1983) (citation omitted). Thus,

> [w]hile the court is vested with discretion in the matter, and its action is presumptively correct, nevertheless its discretion must be properly exercised and not abused, and the matter is discretionary only in the sense that there are no fixed rules for determining the proper amount, and not in the sense that the court is at liberty to award more than fair and reasonable compensation, nor less than such compensation.

*King v. Premo & King, Inc.,* 258 N.C. 701, 129 S.E.2d 493, 500 (1963) (citation omitted). Thus, the allowance of fees to a receiver will not be reversed by a reviewing court except upon a showing of abuse of discretion.

 Moreover, compensation for the receiver is to be determined by the circumstances of the particular case. *Stuart v. Boulware,* 133 U.S. 78, 82, 10 S.Ct. 242, 33 L.Ed. 568 (1890) (holding that the receiver's salary "is left entirely to the determination of the court from which [she] derives [her] appointment. The compensation is usually determined according to the circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs [e]ntrusted to [her], and the perplexity and difficulty involved in that management").

> Generally, the applicable considerations are the time and labor required, but not necessarily that actually expended, in the proper performance of the duties imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained. And in this process[,] vicarious generosity should receive no countenance.

*United States v. Larchwood Gardens, Inc.,* 404 F.2d 1108, 1110 (3d Cir.1968) (citations omitted).

Here, Hawaii Ventures contends that Receiver Park and her professionals should not have been compensated for certain activities not benefitting the Estate, such as activities relating to the Receiver's work in: (1) correcting the wrongful payments; (2) defending HWB in a federal action; (3) responding to ILWU's various motions and the Former Employees' motion; and (4) participating in the Kona Surf Resort Hotel foreclosure case. We address each of these activities in turn.

### (1) *activities to correct wrongful payments*

 Hawaii Ventures' argument, in its entirety, with respect to the correction of wrongful payments is that,

> [u]nder the supervision of the Receiver, with advice from the Receiver's highly-paid accountants, the Estate was severely damaged by many wrongful and misrepresented payments. *A substantial amount of fees* approved to be paid to the Receiver and her professionals *were incurred to correct their initial and misleading accountings* in the face of growing indications of false statements and denials of payment of pre-receivership obligations.

(Emphases added.) In support of its contention, Hawaii Ventures points to an affidavit of its New York counsel, K.C. McDaniel, and to the Special Master's report. Specifically, the affidavit was attached to Hawaii Ventures' memorandum in opposition to Receiver Park's motion for order approving settlement with one of the Estate's creditors, intervenor-defendant/appellee/cross-appellee Argo-

naut Insurance Company (Argonaut).[26] Therein, McDaniel provided, *inter alia,* her view concerning workers' compensation insurance policies.[27] Hawaii Ventures also points to those sections within the Special Master's report wherein he explained each payment as being justified or a receivable.

 However, neither McDaniel's affidavit nor the identified sections of the Special Master's report provide any assistance in clarifying Hawaii Ventures' contention.

A party opposing a fee application must carry the burden of explaining what therein is unreasonable or, at least, what would be reasonable under the circumstances. Absent such evidence by the objectant, the opposition fails. It is not for the [c]ourt to supply such evidence or the detail required to support the objectant's overly general pleading. Thus, just as the court should not justify a fee for the applicant, it should not have to fashion an objection for a complaining party.

*In re Blackwood Assocs., L.P.,* 165 B.R. 108, 112 (Bankr.E.D.N.Y.1994) (internal quotation marks, citations, brackets, and ellipsis omitted); *In re Hunt's Health Care, Inc.,* 161 B.R. 971, 982 (Bankr.N.D.Ind.1993) ("[T]his court should not heed a creditor's unexplained dissatisfaction.... The objector must, at some point, identify any allegedly improper, insufficient, or excessive entries and direct the court's attention to them."). Thus, Hawaii Ventures' general opposition, without more, must fail.

#### (2) *actions in defense of HWB*

 Hawaii Ventures argues that a substantial amount of fees and costs charged by Receiver Park and her professionals were for the specific defense of pre-receivership claims against HWB. Hawaii Ventures specifically contends that:

Only in the January 9, 2002 fee application[, i.e., the second fee application,] were thousands of dollars of charges revealed for defending a federal action against HWB.... The legal bills contain repeated references to HWB['s] matters and assistance to Otaka. Denied any accounting from the attorneys, [the] Lender cannot know what they actually defended.

(Emphasis added.) (Citations to the record omitted.) In other words, Hawaii Ventures appears to maintain that, because Receiver Park was not the receiver for the Otaka's affiliate, *i.e.,* HWB, fees for any work performed by the Receiver and her professionals on behalf and in defense of HWB should not have been "at the cost to the Estate" and, therefore, should have been disallowed.

Hawaii Ventures, however, did not point to any portion of the January 9, 2002 fee application (the second fee application) to support its contention. Rather, Hawaii Ventures cites to several portions of the third fee application—namely, the invoices from the law firm of Ning, Lilly & Jones, the real estate firm of Ron Tom Realty LLC, and the accounting firm of PKF. Those portions, however, do not appear to contain any entries relating to the federal action against HWB, except for one entry in PKF's December 10, 2001 invoice:

| DATE | DESCRIPTION | HOURS |
|---|---|---|
| 11/08/01 | *Analyze* November 7, 2001 letter from Anna Elento Sneed and *October 5, 2001 complaint in ILWU v. HWB* (.25); investigate electronic docket (.25); e-mail to Ke-Ching Ning about Pat Park about same (.25); telephone call from Ning about | 1.25 |

26. Argonaut, who is not a party to the instant consolidated appeal, provided workers' compensation coverage to the Hotel for a one-year period from April 1, 1998 to April 1, 1999. During the receivership, Argonaut requested, and was granted, intervention for the purpose of determining and enforcing its priority right to payment. Argonaut's claim was eventually settled with *the Receiver paying from the Estate* $100,000.00 to Argonaut.

27. We note that Hawaii Ventures also submitted papers signed by McDaniel to the Special Master, which resulted in Receiver Park's filing of a motion for an order enjoining McDaniel from the unauthorized practice of law and requiring Hawaii Ventures to submit papers signed by an attorney of record. The circuit court ultimately granted the Receiver's motion and indicated that, "if K.C. McDaniel intends to engage in any conduct which constitutes the practice of law in this jurisdiction, she shall first apply for *pro hac vice* status."

same; e-mails from Park about same; analyze ILWU statement of position (.50).

(Emphases added.) Nonetheless, an examination of the cumulative fee application reveals additional related entries. For example, Receiver Park's invoice, dated January 8, 2002, contained the entry numbered 1. below and an invoice from Torkildson, Katz, Fonseca, Moore & Hetherington, dated February 13, 2002, contained the entries numbered 2. through 4. below:

| DATE | DESCRIPTION | HOURS |
|---|---|---|
| 1. 12/20/01 | Telephone call to Ms. Ning on billings to court; status; status of sale of KSR equipment and *federal court action re. [HWB]*. | 0.30 |
| 2. 01/09/02 | Outline and draft motion for instructions that Receiver not defend complaint in Civil No. 01–00653 DAE LEK (D.Haw.) on behalf of [HWB] (1.0); update research about same (.75); revise and finalize same (.5); telephone call from Ke-Ching Ning about same (.25); e-mail and phone mail from Jeanne Jang about October 12, 2001 letter from Michael Murata (.25); analyze jurisdictional statement by plaintiff (.25). | 3.25 |
| 3. 01/30/02 | Further analyze Otaka's opposition to motion for instructions that [Receiver] not defend [HWB] (.25); draft reply memorandum in support of motion (.65); e-mail to Pat Park and Ke-Ching Ning about same (.10). | 1.00 |
| 4. 01/30/02 | Work on response to Otaka['s] memo[randum] in opp[osition] to Receiver's motion not to defend complaint to compel arbitration. | 1.00 |

As previously stated, Receiver Park, as a precautionary measure, filed a motion for instructions, on August 3, 2001, that she not defend HWB against the complaint to compel arbitration in the federal action. Receiver Park indicated that she did not represent HWB and, thus, was not the proper party to defend HWB. The circuit court granted the motion. *See also* section I.B., Procedural History, 08/03/01 entry.

The appointment order expressly authorized Receiver Park to

institute, prosecute and *defend*, compromise, adjust, intervene in or become a party to *such actions or proceedings in state or federal court as the Receiver may in the Receiver's reasonable judgment* *deem necessary or proper for the management, protection, care, maintenance or preservation of the Estate or the carrying out the Receiver's duties*[.]

(Emphases added.) Consequently, had Receiver Park not expended her time to obtain guidance from the circuit court regarding the scope of her duty to defend, she risked being found in breach of her duties to maintain and preserve the Estate, as well as potentially exposing the Estate to additional burdens. Accordingly, we do not believe the circuit court abused its discretion in granting the fees incurred as a result of Receiver Park's efforts to secure such guidance from the court.[28]

28. Hawaii Ventures also contends that, "[o]nly after the charges were incurred did the Receiver apply to the circuit court for instructions *not* to defend HWB ... in that action." However, it is unclear what "charges" Hawaii Ventures is referring to that were billed before the Receiver sought instructions from the circuit court not to defend HWB. Hawaii Ventures provides no explanation in support of its contention nor directs this court to any portion of the record—particularly, the fee applications, that would clarify its argument. In fact, our review of the fee applications indicates that charges relating to the federal action were not for services in defending HWB, but rather were for work rendered in determining whether Receiver Park was obligated to defend HWB. Accordingly, Hawaii Ventures' contention, without more, must fail.

Additionally, Hawaii Ventures argues that "[e]vidence put forth by the ILWU noted six outstanding grievances against Otaka and its affiliates not disclosed by the Receiver in her report. These appear to have been defended or settled at cost to the Estate[ ] and are in addition to the $1.3 million found spent for Otaka by the Special Master." However, it is unclear whether the fee applications contained charges for these services, and Hawaii Ventures fails to point to anywhere in the record that would substantiate its contention. Without more, Hawaii Ventures' argument in this regard also fails. *Lanai Co.*, 105 Hawai'i at 309 n. 31, 97 P.3d at 385 n. 31 (declining to sift through the voluminous record to verify an appellant's contention).

(3) *efforts as to ILWU and the Former Employees*

██ Hawaii Ventures maintains that the Receiver should not have "charged for contacts with the ILWU and its counsel" because

[t]hese contacts were completely inconsistent with the responsibilities of an asset receiver. As other examples:

(1) the Receiver charged for work on the ILWU's motion for interlocutory appeal. But the Receiver had no interest and in fact took no substantive position before the circuit court with respect to those claims[;]

(2) the Receiver voluntarily participated as to the [F]ormer [E]mployees' motion for leave to sue receiver, but this did not benefit the Estate[;]

(3) a motion regarding separation and vacation benefits for Letitia Pauso[, a former Hotel employee,] was filed only because of the Receiver's mistake in determining Pauso's entitlement[; and]

(4) the Receiver and her consultants charged for time in responding to requests for information in the ILWU's federal action against Otaka and to prepare for and defend the deposition of Debra Lee, a former Otaka/HWB employee and officer[,] sought as a witness in an Otaka litigation. This was purely for Otaka's benefit. Lender noted these should be at the expenses of Otaka or the Receiver.

(Numbering added.)

Preliminarily, we briefly summarize the relevant background information pertaining to the above motions in the table below:

| DATE | PROCEEDINGS |
| --- | --- |
| 10/12/01 | After the circuit court issued its order granting in part and denying in part ILWU's motion to treat severance and vacation pay as administrative expenses on September 28, 2001, ILWU filed a *motion for leave to file an interlocutory appeal.*<br>• 10/29/01 Receiver Park filed a memorandum in opposition to the motion.<br>• 12/05/01 The circuit court denied the motion. |
| 06/17/02 | The Former Employees sought *leave to file* a class action complaint against, *inter alia,* Receiver Park in her official capacity as the receiver of the Estate for wages and benefits in the form of vacation and severance pay owed to all Hotel employees who were terminated effective June 30, 2001.<br>• 07/01/02 Receiver Park filed a memorandum in opposition.<br>• 07/22/02 The circuit court denied the motion. |
| 08/09/02 | After the filing of her supplemental final report on June 21, 2002, Receiver Park filed *a motion to correct* her recommendation that the court offset sick leave benefits previously received by Letitia Pauso against the separation and vacation benefits ordered by the court. In support of her motion to correct, the Receiver indicated that her recommendation "was based on the ground that Pauso received workers' compensation benefits for the same period of time that she previously received sick leave benefits." However, subsequent to making that recommendation, the Receiver learned that Pauso received a $15,000.00 settlement payment in exchange for withdrawal of her claim for workers' compensation benefits and $2,665.69 in temporary disability benefits for the period after she received sick leave benefits. As a result, the Receiver learned that Pauso did not receive workers' compensation benefits or temporary disability benefits for the same period of time that she received sick leave benefits. Therefore, Receiver Park requested to amend her recommendation that the sick leave benefits previously received by Pauso not be offset against the separation and vacation benefits.<br>• 09/17/02 The circuit court granted the motion. |
| 10/01/02 | Receiver Park filed *a motion for instructions,* suggesting that she was not authorized to provide the information requested by ILWU regarding employees' severance and vacation pay claims in connection with ILWU's federal action. ILWU also served subpoenas upon the Receiver, seeking such information.<br>• 10/22/02 The motion was apparently denied. Consequently, Receiver Park and her labor counsel "have had to field and/or respond to various requests for information in connection with the ILWU's federal action, retrieve, review and assemble documents in response to subpoenas on the Receiver, as well as prepare for and defend the deposition of Debra Lee. Such discovery has required labor counsel to research and analyze various relevant issues, including work product doctrine, protective orders, res judicata, injunctions against collateral attack, and judicial immunity of court-appointed receivers.... Receiver's labor counsel prepared a |

motion for protective order, analyzed documents in response to the ILWU's subpoena, and conferred with [her professionals] regarding ILWU's inspection of documents."

As previously quoted, the appointment order expressly authorized Receiver Park to "defend ... such actions or proceedings in state or federal court as [she deemed] necessary or proper for the ... protection ... of the Estate[.]" Thus, the receiver was doing the very thing that the appointment order mandated her to do when she opposed ILWU's motion for interlocutory appeal and the Former Employees' motion for leave. Had she not done so, the Receiver could very well have exposed the Estate to additional liability. Thus, Receiver Park's participation in opposing both motions was reasonable and necessary to fulfill the broad mandates of the appointment order.

With respect to Receiver Park's services rendered in filing the motion to correct her recommendation regarding Pauso's benefits, we likewise believe them to be reasonable and, in fact, necessary to protect the Estate from further litigation by Pauso. As an officer of the court, Receiver Park has a duty to correct the information submitted to the court once she became aware of Pauso's changed circumstances regarding her benefits, which she promptly did in seeking a revision of her recommendation. Thus, it would be unfair to deprive the Receiver of her right to compensation for amending her recommendation based on those changed circumstances.

■ Lastly, as to fees charged in connection with work on the various ILWU's requests for information that the circuit court apparently required Receiver Park respond to via its denial of her motion for instructions that she not provide the information, we believe those fees are reasonable and appropriate.

A receiver is an officer of the court who must obey the orders of the court so long as they are unimpeached.... *Obedience to the orders of the court in [her] management of property under [her] control is [her] sufficient protection.* This is true even if the order of the court is erroneous and subsequently reversed.

*First Nat'l Bank of Vandalia v. Trail Ridge Farm, Inc.,* 143 Ill.App.3d 244, 97 Ill.Dec. 371, 492 N.E.2d 1030, 1035 (1986) (emphasis added) (citations omitted). To deny the Receiver compensation under these circumstances would be to penalize her for obeying the court's order. Accordingly, the circuit court did not abuse its discretion in allowing fees for the aforementioned services. In sum, we conclude that the circuit court was within the bound of its discretion to award fees associated with Receiver Parks' and her professionals' work with regard to ILWU and the Former Employees.

### (4) *the foreclosure of the Kona Surf Resort Hotel*

■ Hawaii Ventures objects to those fees incurred in connection with Receiver Park's participation in the foreclosure of the Kona Surf Resort Hotel, which, as previously stated, was owned by Otaka and under a contract of sale at the commencement of the instant foreclosure action. Specifically, Hawaii Ventures asserts that:

The Receiver claims to have "prevailed" in the Kona Surf [Resort Hotel] foreclosure case, in establishing a first lien position on equipments. However, the claimed first lien was of no realizable value. The Receiver admitted that the tens of thousands of dollar spent on pursuing the lien on equipment was in vain. Yet the Receiver totally failed to pursue *the genuinely valuable claims* against the Kona Surf [Resort Hotel] collateral that were the basis of her appointment—that there was a diversion of funds from the Estate collateral to operate and maintain that hotel.

(Emphasis added.) (Citations to the record and footnote omitted.)

Subparagraph 3(i) of the August 24, 2000 appointment order expressly mandated Receiver Park to, *inter alia,* "seek an accounting from [the] Otaka [Defendants] of all sums paid to Otaka's affiliates from December 4, 1994 and shall undertake reasonable efforts to recover such amounts paid to Otaka's affiliates." However, on March 30, 2001, the Otaka Defendants filed a motion to modify

the aforementioned provision on the basis of an agreement reached between Hawaii Ventures and the Otaka Defendants. The Otaka Defendants requested the following modification to subparagraph 3(i):

*The Receiver shall accept from Otaka the amount of $550,000 plus interest* ... in satisfaction of the duty of [the Otaka Defendants] to account to the Receiver from sums paid to Otaka's affiliates from December 4, 1994 to the date of appointment of the Receiver, which duty was the original subject of this paragraph 3(i), and *in satisfaction of the receivables shown on the balance sheets of the Hotel and HWB as of May 31, 2000 as* "due from Otaka" and "*due from Kona Surf [Resort Hotel]*". *Notwithstanding the preceding sentence, the Receiver shall retain any rights she may have to recover assets which are part of the Estate ... and are subject to the pending foreclosure of the Kona Surf Resort Hotel* in which she has been granted the right to intervene, which rights, if any, shall be satisfied solely from said assets in said foreclosure. But for the prosecution of such intervention and recovery of assets, no further actions by the Receiver shall be required or undertaken to recover the sums paid to Otaka's affiliates pursuant to the original paragraph 3(i) of this Order.

(Emphases added.) Through its counsel, Hawaii Ventures indicated no objection to the motion and the amendment. Accordingly, on April 30, 2001, the circuit court granted the motion to modify and amended the appointment order as suggested by the Otaka Defendants. In other words, the aforementioned settlement left the Receiver with only the duty and power "to recover assets which are part of the Estate ... and are subject to the pending foreclosure of the Kona Surf Resort Hotel." Consequently, inasmuch as Hawaii Ventures voluntarily abandoned those "genuinely valuable claims" by settling with the Otaka Defendants, it cannot now assert that Receiver Park "totally failed to pursue the genuinely valuable claims against the Kona Surf [Resort Hotel] collateral" based on the diversion of hotel funds.

Moreover, Receiver Park was within the power conferred upon her in the appointment order to pursue the claim for equipment against the Kona Surf Resort Hotel.[29] In fact, in a letter written to one of the Receiver's professionals, Hawaii Ventures' counsel pressed the Receiver to pursue the claim as it would be "extremely important to avoid prejudice to the value of the Kona claim." As such, Hawaii Ventures cannot now complain about fees incurred with respect to a claim which it insisted Receiver Park pursue.[30]

29. The Receiver indicated in her final report that:
On February 17, 1998 and August 28, 1997, the Hotel, through [HWB], leased to Kona Surf [Resort Hotel] a chiller system and a fire alarm system. Kona Surf [Resort Hotel] defaulted. On December 22, 2000, KSR Mortgage LLC filed a complaint to foreclose its mortgage on the Kona Surf [Resort Hotel]. The Receiver filed for, and was granted, intervention to assert her claim to the sums due and the value of the leased equipment.

30. Hawaii Ventures also attempts to reduce fees paid to PKF for professional accounting service and advice. Hawaii Ventures baldly asserts that:
Having been retained without compliance with the terms of the [appointment order], the conduct of PKF, its work in maintaining records and its defective version of a final accounting led directly to the issues that triggers the use of a Special Master. Each of the conclusions of the Special Master as to improper payments goes directly to the merits of PKF's work. That substantial additional sums were paid, to the benefit of Otaka, for pre-receivership debts is also PKF's responsibility, as is the failure to disclose such payments in the financial reports they prepared. Moreover, the Estate was improperly charged fees and expenses by PKF and others in defending their conduct and in correcting the highly-defective accounting. All improperly paid amounts should be recoverable from the professionals who contributed to, concealed or facilitated such unauthorized payment, and all costs of their defense should be borne by them.
Inasmuch as the appointment order specifically permitted the Receiver to "employ counsel, accountants and other professionals," it was within her power to retain PKF's services. Further, the Special Master did not determine that PKF rendered improper accounting services. Rather, the Special Master rejected all of Hawaii Ventures' objections, except for a single issue concerning pre-receivership liabilities, and, in any event, the Special Master approved the majority of Receiver Park's payments of the pre-receivership liabilities. Accordingly, Hawaii Ventures' contention to the extent that it asserted one-against PKF is without merit.

### ii. willful neglect or misconduct

Hawaii Ventures contends that:

Where expenses have been caused by the **negligence** of the receiver, the receiver cannot maintain a claim for compensation. *See Reardon v. Youngquist,* 189 Ill.App. 3[, 7, 1914 WL 2783 (Ill.App.Ct.) ] (1914) ("The reckless and negligent manner in which the receiver conducted the affairs of the trust estate and the consequent loss to the creditors legally deprived the receiver of the right to commissions. The law does not compensate an officer for inefficiency and willful neglect of duty." [ (Internal quotation marks and citation omitted.) ] ); *Fed[.] Deposit Ins[.] Corp[.] v. 65 Lenox Road Owners Corp[.],* 270 A.D.2d 303[, 704 N.Y.S.2d 613, (N.Y.App.Div.) ] (2000) (well settled that compensation may be denied to a receiver who had grossly mismanaged the property). Where professional advisers have been complicit in the Receiver's actions, they must share the consequences.

(Emphasis added.) Although stating that the Receiver should not be compensated for her *negligence,* Hawaii Ventures, in relying upon the aforementioned authorities, apparently asserts that Receiver Park and her professionals should not have been awarded their fees because of their *willful neglect and misconduct.*

 As previously discussed in section III.D.2 *supra,* Receiver Park, as a court-appointed official, is entitled to absolute judicial immunity when "acting in the scope of [her] authority and in accordance with court order." *Perry Center, Inc.,* 576 N.W.2d at 511 (citation omitted). However, "[i]t is well settled that compensation may be denied a receiver who has grossly mismanaged" the property in her possession, "resulting in great loss to the estate." *Title Guar. & Trust Co. v. Adlake Corp.,* 161 Misc. 27, 290 N.Y.S. 1007, 1010 (N.Y.Sup.1936) (citations omitted). As previously quoted, the appointment order specifically provided that the Receiver "shall not be liable, in the Receiver's individual capacity, for any claims or demands for loss or damages, arising out of or in connection with this lawsuit ... except in the event that Receiver's acts or omission constitute bad faith or fraud." The Special Master, in reviewing Receiver Park's final report, concluded that, "[a]lthough [he] disagrees with the payment of certain pre-receivership liabilities by the Receiver, ... such disputed payments do not rise to the level of 'bad faith' or 'fraud.' " The aforementioned conclusion was ultimately adopted by the circuit court via its July 11, 2002 order approving the Special Master's report. However, as stated *supra,* Hawaii Ventures has not provided this court with any reason to suggest that the Special Master's conclusion and the circuit court's adoption thereof were erroneous. Accordingly, Hawaii Ventures' argument that Receiver Park's willful neglect and misconduct should preclude her from receiving fees for her services must fail.

### iii. work to defend the Receiver's fee applications

Hawaii Ventures argues that Receiver Park's and her professionals' work "in defending a fee application are not chargeable to the Estate." In support of its contention, Hawaii Ventures points to certain entries in Ning, Lilly & Jones' invoice (dated November 7, 2001), attached to the cumulative interim fee application:

| DATE | DESCRIPTION | HOURS | AMOUNT |
| --- | --- | --- | --- |
| 10/01/01 | Review emails from Receiver; email Receiver; review redraft of supplemental order; confer with Ke-ching Ning regarding supplemental order and cover letter; draft summary of [Hawaii Ventures'] and Receiver's form of orders Fees & Costs pleadings; confer with Ke-ching Ning; *conduct further research regarding receiver's compensation;* make revisions Kona Surf: confer Ke-ching Ning regarding our draft msj. | 4.70 | $587.50 |
| 10/17/01 | *Draft letter to our parties informing* them of [Hawaii Ventures'] *objection to our October fees; pull documents in preparation to fee application.* | 1.10 | $ 71.50 |

| Date | Description | Hours | Amount |
|---|---|---|---|
| 10/17/01 | *Conference with Ke-ching Ning regarding [Hawaii Ventures']* objection to fees; review emails regarding ILWU['s] motion; *review [Hawaii Ventures'] objection to fees* and Ke-ching Ning's email; *review [Hawaii Ventures'] reply to Rec'r memorandum regarding procedure for interim allowances and payment of compensation and reimbursement of costs; research regarding* burden of objecting party 2 telephone calls with Ron Tom regarding removal of equipment and *fees objection;* telephone message to S. Mau[, *i.e.,* Hawaii Ventures' counsel,] regarding equipment removal Kona Surf: Review draft of objection to Koa Hotel's submission. | 5.70 | $712.50 |
| 10/17/01 | *Objection from [Hawaii Ventures'] on everyone's fees and costs; discuss need to file fee application.* Letter to parties regarding statute of fund deposits. Communications on ILWU['s] interim appeal motion. Follow-up on transfer of equipment to [Hawaii Ventures]. | 1.20 | $270.00 |
| 10/19/01 | Review email from S. Mau and Receiver; *draft fee application.* | 8.90 | $1,112.50 |
| 10/22/01 | 2 brief conferences with Ke-ching Ning regarding equipment removal; draft letter to S. Mau regarding equipment removal; telephone call with Ron Tom regarding equipment removal; *telephone message to Receiver regarding fee application;* review research regarding and continue drafting opposition to ILWU['s] motion to file interlocutory appeal; *telephone call with received regarding fee app; review Ke-ching Ning's comments to fee app draft; confer with Elsonne regarding fees memorandum; longer conference with Ke–Ching Ning regarding her comments to draft.* | 4.40 | $550.00 |

(Emphases added.) Moreover, a brief review of the Receiver's final motion for instructions—particularly, the portion discussing her request for fees and costs, appears to indicate that work relating to fee applications were also charged:

| DATE | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|
| 07/21/02 | Summarize the objections to fees for Receiver. | 1.40 | $175.00 |
| 07/22/02 | Review draft billing to be sent to Receiver. Draft fee app[lication] replies. | 2.30 | $287.50 |
| 07/22/02 | Review/comment [Hawaii Ventures]'s objections to fee app[lications]. | 0.50 | $112.50 |
| 07/25/02 | Begin pulling exhibits for fee application reply; draft declaration of JHJ for same, continue drafting declaration incorporating JHJ's revisions. | 1.50 | $97.50 |

▮ A receiver is generally entitled to compensation from the estate for services rendered in protecting the estate. *See, e.g., Sec. & Exch. Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir.1992) ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges [her] duties, [she] is entitled to compensation." (Citations omitted.)). However, several courts have held that receivers are not entitled to recover fees and expenses associated with litigation involving the propriety of the fees to be awarded to them because, as the United States Court of Appeals for the Third Circuit explained, "the law imposes on a party the duty to pay [her] own fees and expenses in vindicating [her] personal interests.... It is our understanding that services necessarily involved in preparing [fee] application to the district court and defending them there are not compensable." *Larchwood Gardens*, 420 F.2d at 534; *In re Imperial ÷400' Nat'l, Inc.*, 432 F.2d 232, 239 (3d Cir.1970) ("time not legally compensable [includes] that spent in applying for or in defending interim fee awards") (footnote omitted); *Sec. & Exch. Comm'n v. W.L. Moody & Co., Bankers (Unincorporated )*, 374 F.Supp. 465, 490 (S.D.Tex.1974) (holding that a "[r]eceiver's preparation for and attendance at hearings on the fees will not be considered in setting [her] fee"); *In re Polycast Corp.*, 289 F.Supp. 712, 719 (D.Conn.

1968) (denying allowance for time charged for preparing the trustee's fee application); *Depositors' Comm. v. Fin. Mgmt. Task Force, Inc.*, 809 P.2d 1095, 1098 (Colo.Ct. App.1991) (concluding that the services rendered in defending the receiver's fee request were of no benefit to the estate—"the services rendered were for the sole benefit of the fiduciary and its counsel").

■ As the above tables clearly demonstrate, Receiver Park's fee applications included fees relating to the preparation and defense of the charged fees, which are not chargeable against the Estate and should not have been considered in awarding fees. Although the circuit court, in ruling on the various fee applications, reduced the amount of fees requested, it is impossible to determine whether those reductions were attributable to the preparation and/or defense of the charged fees because the court did not provide any explanation for its reductions. Absent such explanation, we cannot effectively review whether the circuit court abused its discretion in awarding fees as it did. Accordingly, we vacate the awards of fees reflected in the circuit court orders filed on January 15, 2002, October 16, 2002, and May 12, 2003 (totaling $312,483.93) and remand this matter to the circuit court for clarification and, if necessary, a redetermination of the amount to be awarded to the Receiver

and her professionals in light of the views expressed herein. *Cf. Price v. AIG Hawai'i Ins. Co.*, 107 Hawai'i 106, 113, 111 P.3d 1, 8 (2005) (reminding "all judges to specify the grounds for awards of attorneys' fees and the amounts awarded with respect to each ground. Without such an explanation, we must vacate and remand awards for redetermination and/or clarification." (Citations omitted.)).[31]

### 4. The Special Master's Fees

■ Lastly, Hawaii Ventures contends that additional fees of $35,804.84 to the Special Master and his accountant, Horwath Kam & Company, should not have been paid out of the Estate.[32] According to Hawaii Ventures,

[t]here is no basis in law for the Estate to have been singled out to bear all of the charges of the Special Master, which were in fact caused by the breaches of the Receiver and which involved other parties. No benefit flowed to the Estate from this work.... The Estate did not in fact ask for the Special Master and strongly objected to the secret record, denial of discovery and process by which his report was prepared.

As previously stated, in response to the parties' (particularly, Hawaii Ventures') ob-

---

**31.** Hawaii Ventures also argues that fees incurred in defending the Receiver should not be compensable. In support, Hawaii Ventures relies upon *Tanner v. Ledington*, 513 So.2d 255 (Fla.Dist.Ct.App.1987). In *Tanner*, the Florida District Court of Appeals reversed an award of attorney's fees and costs to a receiver because the receiver

incurred fees and costs in defending her own actions[, *i.e.*, for negligence and breach of fiduciary duty,] as the receiver. Any benefit derived from the legal services performed at [the receiver's] behest accrued to her individually and not to the estate.

*Id.* at 256 (citing *Sundale Assocs., Ltd. v. Moore*, 481 So.2d 1300 (Fla.Dist.Ct.App.1986)). In turn, the *Sundale* court held that the trial court lacked authority to award the receiver attorney's fees and expenses for the defense of ongoing actions brought by a party against her personally, concluding that the fees did not rise out of the receivership and could not in any way have benefitted the receivership estate. *Id.* at 1301. Here, Hawaii Ventures fails to indicate the action or actions in which the Receiver incurred fees and

costs in defending herself. We can only speculate that Hawaii Ventures' argument concerns the Receiver's and her professionals' work in addressing the parties' objections to her final report. Nonetheless, we indicated earlier that "[t]he cost of defending against unfounded allegations may properly be deemed receivership expenses payable out of the estate." *Ginsberg v. Katz*, [27 Wash.App. 593,] 619 P.2d 995, 998 (Wash.Ct.App.1980) (citation omitted). The Special Master did not believe Receiver Park acted in bad faith. Absent from the record is any indication that the circuit court found Receiver Park violated her appointment order, breached her duties, or negligently managed the Estate. In fact, the circuit court approved the Special Master's conclusion of no bad faith and refused to surcharge the Receiver. Accordingly, Hawaii Ventures' argument is without merit.

**32.** The circuit court had previously permitted $119,331.48 to be paid from the Estate for the Special Master's and his accountant's services, which amount is not challenged by Hawaii Ventures.

jections to the August 14, 2001 final report, Receiver Park urged the circuit court to appoint a special master. The record does not indicate that Hawaii Ventures objected to the appointment. On September 21, 2001, the circuit court appointed Matsubara as the Special Master. Thereafter, the circuit court issued its first supplemental order, wherein the court directed that the Special Master's compensation shall be "at the rate of $200.00 per hour, together with necessary and reasonable expenses, including the fees and expenses of the Special Master's retained expert(s), *to be paid out of the funds of the [r]eceivership Estate.*" (Emphasis added.)[33] Again, the record does not reveal that Hawaii Ventures objected to the circuit court's first supplemental order. Nor did Hawaii Ventures file a motion to amend the supplemental order. Hawaii Ventures, therefore, cannot now argue that fees for the Special Master and his consultant should not have been paid from the Estate because the Estate did not benefit from the Special Master's work. *Enoka,* 109 Hawai'i at 546, 128 P.3d at 859 (issues not preserved at the circuit court level are deemed waived); *see also Querubin v. Thronas,* 107 Hawai'i 48, 61 n. 5, 109 P.3d 689, 702 n. 5 (2005) ("The rule in this jurisdiction prohibits an appellant from complaining for the first time on appeal of error to which he has acquiesced or to which he failed to object." (Internal quotation marks, citations, brackets, and ellipsis omitted.)).[34] The supplemental order explicitly mandated that the Special Master's and his retained accountant's fees and costs be paid out of the Estate. The circuit court, pursuant to the unopposed supplemental order, permitted the fees and costs to be paid from the Estate. Accordingly, the circuit court did not abuse its discretion in allowing the payment of the Special Master's services out of the funds of the Estate.

### E. *ILWU's Cross–Appeals*

In appeal No. 25344, ILWU advances two points of error committed by the circuit court, the first of which is raised for the first time on appeal. Specifically, ILWU argues that (1) the circuit court's order directing Receiver Park to pay accumulated severance and vacation pay only for the period attributable to the receivership violated the Hawai'i Wage Payment Act (HRS chapter 388) and (2) the circuit court erred in its ruling concerning vacation and severance benefits where the Receiver had assumed the obligations of the existing collective bargaining agreement. ILWU essentially contends that Receiver Park should have paid *all* of the members-employees' vacation and severance benefits due and owing at the date of termination, *i.e.,* June 30, 2001, pursuant to the collective bargaining agreement.

In appeal No. 26820, ILWU contends that, if this court determines in appeal No. 25344 that all wages and compensation of members-employees were due and owing on their June 30, 2001 termination date, then the circuit court additionally erred in: (1) denying ILWU's August 3, 2001 motion for stay of the first distribution of the Estate's monies pending appeal No. 25344; (2) permitting the disbursement of a certain sum to HWB Kalakaua in its August 22, 2002 order approving the Receiver's final report; (3) denying its March 28, 2003 motion for stay of the final distribution pending appeal No. 25344; and (4) allowing the final distribution of the balance of the Estate's monies in its May 12, 2003 order granting Receiver Park's final motion for instructions. ILWU further chal-

---

33. As previously quoted, HRCP Rule 53(a) provides that "[t]he compensation to be allowed to a master shall be fixed by the court, and shall be ... paid out of any fund ..., which is in the custody and control of the court as the court may direct."

34. As previously stated, the Special Master was appointed to review the final report as a direct result of objections of the parties (particularly, Hawaii Ventures) and, in essence, to ensure that the payments made by Receiver Park were appropriate. It is clear that the Estate and the creditors—specifically, Hawaii Ventures—stood to benefit and, in fact, did benefit from the Special Master's services. His examination revealed that, although the Receiver—for the most part—properly made payments from the Estate's monies during her management of the Hotel, he found a certain payment, *i.e.,* $394,787.00, to be a receivable and should be assigned to Hawaii Ventures. Accordingly, we believe that the Special Master's services benefitted the Estate and brought the foreclosure action closer to its conclusion.

lenges the circuit court's order discharging Receiver Park because it believes that "[t]he discharge of the Receiver was premature while major issues pertaining to the receivership's obligations remained unresolved pending" appeal No. 25344.

### 1. The Hawai'i Wage Payment Act (HRS chapter 388)

■ HRS § 388–3(a) (1993) specifically mandates that,

*[w]henever an employer* [35] *discharges an employee either with or without cause, the employer shall pay the employee's wages* [36] *in full at the time of discharge or if the discharge occurs at a time and under conditions which prevent an employer from making immediate payment, then not later than the working day following discharge.*

(Emphasis added.) ILWU—for the first time on appeal—argues that, under HRS chapter 388, Receiver Park, as an employer, was required to pay the Hotel employees' their unpaid wages and accrued benefits, including those earned before the Receiver's appointment, upon their termination.

■ "As a general rule, if a party does not raise an argument [at the circuit court level], that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." *Kemp v. State of Hawai'i Child Support Enforcement Agency,* 111 Hawai'i 367, 391, 141 P.3d 1014, 1038 (2006) (internal quotation marks and citations omitted); *see also* HRAP Rule 28(b)(4)(iii) (2007) (noting that an appellant's opening brief shall state "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency"); HRS § 641–2 (Supp.2006) ("The appellate court ... need not consider a point that was not presented in the trial court in an appropriate manner.").

There are sound reasons for the rule. It is unfair to the [circuit] court to reverse on a ground that no one even suggested might be error. It is unfair to the opposing party, who might have met the argument not made below. Finally, it does not comport with the concept of an orderly and efficient method of administration of justice.

*Querubin,* 107 Hawai'i at 61 n. 5, 109 P.3d at 702 n. 5 (citation omitted) (format altered).

On cross-appeal, ILWU concedes that:

[Hawaii Ventures] is liable to argue that [ILWU] failed to argue below statutory wage payment law as a basis to pay the employees all of their vacation and severance benefits from the Receiver's Estate. The [circuit] court, however, was informed of a statutory basis on which to award the benefits from *references in both the Receiver['s] and [the Otaka Defendants'] brief[s] on the issue of severance and vacation pay.*

(Emphasis added.) However, the Receiver's memorandum in support of her motion for instructions regarding vacation and severance pay did not contain any discussion of HRS chapter 388, as ILWU so contends. Rather, it appears that ILWU is referring to a statement made by Receiver Park in her memorandum, *i.e.,* that she decided to pay employees' benefits because she believed, *inter alia,* that failure to do so would be "illegal under state law." And, with respect to the Otaka Defendants' memorandum in support of ILWU's motion to treat severance and vacation pay as administrative expenses, ILWU relies upon a single sentence contained in a footnote that noted the Receiver's above recognition of illegality under Hawai'i law. (Citing to HRS § 388–10 (Supp.2006) (regarding penalties for failure to pay wages in accordance with this chapter).)

Nonetheless, in our view, such passing references are not sufficient to preserve ILWU's argument for appeal. Clearly, the record reflects that ILWU failed to properly raise the instant argument relating to HRS

---

**35.** "Employer" is defined to include "any individual, partnership, association, joint-stock company, trust, corporation, the personal representative of the estate of a deceased individual or the receiver, trustee, or successor of any of the same, employing any person[.]" HRS § 388–1 (1993)

**36.** HRS § 388–1 defines wages to include "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation."

chapter 388 before the circuit court. Accordingly, this argument has not been preserved for appeal, and we decline to address it.

### 2. Assumption of the Collective Bargaining Agreement

■■■■ ILWU contends that, because Receiver Park assumed the obligations of the collective bargaining agreement between HWB and ILWU, the circuit court erroneously determined that the Receiver could only pay vacation and severance pay that had accrued during the ten months of the receivership (as opposed to all benefits earned pursuant to the agreement).[37] In retort, both Receiver Park and Hawaii Ventures maintain that the Receiver did not—by her conduct—assume HWB's obligation under the collective bargaining agreement.

A receiver appointed to manage or operate a business frequently finds executory contracts still subsisting between the debtor and other parties. The receiver must determine whether or not [she], with the approval of the court, will carry out these contracts on behalf of the debtor or let them go and subject the debtor and the receivership estate to the consequences of a breach of such contracts. The receiver is under no obligation to the other parties to the contract to perform such contract on behalf of the debtor.

2 Clark, *A Treatise on the Law and Practice of Receivers* § 428 at 720 (footnotes omitted); *Fauci v. Mulready*, 337 Mass. 532, 150 N.E.2d 286, 289 (1958) ("An equity receiver upon appointment is not bound to perform or adopt executory contracts and leases, unless directed to do so by the court which appointed [her]."). In other words,

[t]he mere fact of possession does not ... obligate the receiver to carry out executory contracts of the debtor; and, subject to the order of the court, [she] may have a

reasonable time after [her] appointment to elect whether to adopt any such contract or reject it. Adoption may be signified either by express agreement or by implication, and if, without declaring [herself], [she] undertakes performance, [she] assumes the obligations of the contract and adopts it subject to its burdens and to any right of offset.

*H.D. Roosen Co. v. Pac. Radio Publ'g Co.*, 123 Cal.App. 525, 11 P.2d 873, 876 (1932) (citations omitted). Further, once having elected to accept a contract, a receiver "is bound thereby. While [she] may pick which contracts [she] will honor, [she] may not pick which [p]arts of a contract [she] will honor." *Real Estate Marketers, Inc. v. Wheeler*, 298 So.2d 481, 484 (Fla.Dist.Ct.App.1974).

■■■ Specifically, ILWU argues that the conduct of Receiver Park shows that she assumed the obligations of the collective bargaining agreement:

Not only did she continue to compensate ILWU-represented hotel employees at the wage rates specified in the collective bargaining agreement, she also provided vacation time and sick leave and made contributions to the employees' collectively-bargained pension fund as set forth in the agreement. Importantly, the Receiver continued the dues check-off system that was established by the collective bargaining agreement, deducting union dues from employees' paychecks and forwarding those amounts directly to ILWU. As discussed above, complying with the dues check-off provision is strong evidence that the Receiver intended to adopt the collective bargaining agreement, because such provisions are solely creatures of contract.

Moreover, the Receiver adjusted grievances with [ILWU], and even arbitrated some grievances without raising the defense that there was no valid agreement

---

**37.** Section 24 of the collective bargaining agreement provided that:

24.a. Any regular full-time or regular part-time employee who has completed one (1) or more years of continuous service and who is permanently terminated from service by the Hotel for reason clearly beyond his own control, shall receive a separation allowance computed on the basis of eight (8) days' pay for

each completed year of his continuous service. If the last year of service is incomplete, the employee shall receiver severance for that year on a pro rata basis.

The allowance is not payable "in the event of resignation, discharge (other than for incompetence due to mental or physical condition), retirement or death."

between the parties that would compel her to arbitrate. [38]

We disagree.

In her declaration attached to her motion for instructions that she not arbitrate ILWU's grievance pertaining to severance pay, Receiver Park averred that:

> 3. After I was appointed receiver, I elected not to engage for the Receiver's account any of the then-current employees covered by [ILWU].

> 4. I allowed existing management employees of [HWB] to remain in place instead of using a "brand" manager, because (1) it was impractical to undertake such a contract given the then uncertainty about the length of the receivership, and the possibility that the hotel might have to close relatively quickly, (2) the costs was [sic] a consideration in view of the shaky finances, and (3) a "brand" manager would have replaced all existing management personnel and possibly [ILWU], which was contrary to the goal of maintaining stability.

> 5. [HWB], and not the Receiver, was the employer of record that continued to employ the employees covered by the collective bargaining agreement, pay the employees' wages, provide them vacation benefits, deduct dues from their paychecks and transmit them to [ILWU] and contribute to the pension plan.

> 6. Although I told the [c]ourt that it was not my "intent to impair or not perform under the collective bargaining agreement" during [a] hearing ..., I did

not say that I intended to assume ... the collective bargaining agreement. [39]

In a facsimile memorandum, dated September 29, 2000, directed to counsel for all parties, including ILWU's counsel, Receiver Park indicated that:

> [S]o long as [HWB] continues to be the employer, the Receiver is not a successor-employer but remains the agent of the [c]ourt. As such, the Receiver will monitor the activities of [HWB] and will make the decisions which would have been made by Otaka's and [HWB]'s officers and directors to carry out the terms of the [appointment order]. Consequently:
>
> ....
>
> 3. The Receiver proposes that [HWB] and [ILWU] sign an [agreement] extending the current [collective bargaining agreement] for the period of the receivership. Given the uncertainty relating to the length of the receivership, this would probably be a resolution that is in the best interest of [HWB] and its employees.

Consequently, on February 2, 2001, ILWU and HWB executed an extension of the collective bargaining agreement, which agreement was set to expire on January 31, 2001. The extension provided that:

> It is hereby understood and agreed that the collective bargaining [a]greement between HAWAIIAN WAIKIKI BEACH, INC. dba HAWAIIAN WAIKIKI BEACH HOTEL and ILWU Local 142, effective as of June 1, 1999 through and including May 31, 2000, as amended by the Amendment of Agreement executed on March 4, 1999 which extended the expiration date

38. ILWU also maintains that "[a] determination of whether a receiver has assumed the debtor's collective bargaining agreement through his or her conduct should be developed by the standard applied under the National Labor Relations Act" (NLRA), 29 U.S.C. §§ 151–69. However, because ILWU has not alleged that the Receiver is an employer within the NLRA, the NLRA standard is inapplicable. *See Greenblatt v. Ottley*, 106 Misc.2d 169, 430 N.Y.S.2d 958, 962 (N.Y.Sup.Ct.1980) ("In order for [NLRA] to be applicable, one of the parties involved in the proceeding must be an employer within the meaning of [section] 2(2) of the [NLRA], (29 U.S.C.A. [§ ]152(2)). Since the receiver is not an employer under [section] 2(2) ..., [NLRA] is not

applicable here. Thus, the instant matter must be decided entirely under State law.").

39. Attached to this same motion for instructions was a declaration from Debra M. Lee, the director of human resources for the Hotel, which provided in pertinent part:

> 2. After Patricia Kim Park was appointed as Receiver in August 2001, [HWB] continued to employ the employees covered by [the] collective bargaining agreement[,] operate the hotel under the terms of the agreement, pay the employees wages, to provide them vacation benefits, deduct dues from their paychecks and transmit them to [ILWU] and contribute to the pension plan.

through January 31, 2001, shall be extended [on] a day-to-day basis.

. . . .

This extension may be canceled upon receipt by either party from the other of a five (5) day written notice of cancellation.

The agreement was signed by only HWB and ILWU. At no time did ILWU ask that the Receiver be added as a party/signator to the extension agreement. It, therefore, cannot seriously be said that Receiver Park "assumed" the obligations of the collective bargaining agreement by her conduct in managing the Hotel during the receivership.[40]

Moreover, case law further supports our conclusion. In *O'Connor Co. v. Carpenters Local Union No. 1408*, 702 F.2d 824 (9th Cir.1983), the union attempted to use the doctrine of estoppel to bind the company-employer to a new collective bargaining agreement to which it was not a signatory. *Id.* at 825. The Ninth Circuit upheld the district court's conclusion that the company by its conduct did not manifest its intent to be bound by the new agreement. *Id.* at 825–26. Although the company continued making union trust fund contributions, hired carpenters at the union hiring hall, and paid increased wages and fringe benefits consistent with the new collective bargaining agreement, this conduct "did not indicate [the company's] consent to be bound by the new agreement" that it never executed. *Id.* at 826.

In *General Warehousemen & Employees Union Local 636 v. J.C. Penney Co.*, 484 F.Supp. 130 (W.D.Pa.1980), J.C. Penney (or the company) stated that, after the collective bargaining agreement expired, it would not make unilateral changes in the terms and conditions of employment during negotiations unless and until the parties' negotiations reached an impasse. *Id.* at 132. After the collective bargaining agreement expired, the union requested arbitration regarding J.C. Penny's discharge of an employee, and the company refused. *Id.* at 133. The union brought an action to compel the company to arbitrate the discharge. *Id.* at 132. The court held that the union failed to establish that there was an agreement to arbitrate, explaining that,

[e]ven though employees continue to work under the compensation arrangements of an old contract, the court cannot imply that the entire contract was extended.... Nor are the checkoff of union dues and the settlement of minor grievances in accord with the old contract, alone, sufficient for the court to infer that the parties agreed to extend the old contract in its entirety....

Nor can extension of the duty to arbitrate be found from the continuation of wages[.]

*Id.* at 134–35 (citations omitted); *see also Procter & Gamble Indep. Union of Port Ivory, N.Y. v. Proctor & Gamble Mfg. Co.*, 312 F.2d 181, 184 (2d Cir.1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963) ("The fact that the employer chose thereafter not to change many of the working conditions which had prevailed under the expired agreement does not tend in any way to establish that that agreement was, or was considered to be, or was treated as still effective." (Footnote omitted.)).

Accordingly, we hold that the circuit court did not err in directing the Receiver to pay cumulative severance and vacation pay *only* for the period attributable to the receivership.[41]

### F. Former Employees' Cross–Appeal

#### 1. Additional Background Information

On June 17, 2002, the Former Employees, consisting of seventy-eight former bargaining

---

**40.** We also note that, in January 2001, HWB and ILWU arbitrated the question whether HWB was responsible to pay employment taxes that may be owed as the result of distribution to the employees of a deposit made by HWB on or about November 1999. The arbitrator decided that HWB was responsible to pay the subject employment taxes and directed his decision to HWB. HWB paid the taxes. Receiver Park maintained that, although she oversaw HWB's handling of

the arbitration, HWB's director of human services handled the arbitration hearing itself and that the Receiver did not pay the employment taxes required by the award.

**41.** In light of our holding, we need not address the remainder of the contentions raised in ILWU's cross-appeal in appeal No. 26820.

and non-bargaining unit employees, *see supra* note 3, filed a motion for leave to sue Receiver Park in her capacity as the Receiver under the Hawai'i Wage Payment Act (HRS chapter 388) and the Dislocated Workers Act (HRS chapter 394B).[42] The Former Employees sought to file a class action complaint against, *inter alia*, the Receiver for wages and benefits in the form of vacation and severance pay owed to all Hotel employees who were effectively terminated on June 30, 2001. After a hearing on July 22, 2002, the circuit court summarily denied the motion for leave.

### 2. The Former Employees' Contentions

The Former Employees present two points of error-namely, that the circuit court erred in (1) denying their motion for leave to sue Receiver Park and (2) granting Hawaii Ventures' motion for entry of the second amended final judgment and entering the second amended final judgment. The Former Employees believe that the circuit court's denial of their motion for leave to, *inter alia*, sue Receiver Park precluded them from pursuing meritorious claims against the Receiver. The Former Employees also contend that the circuit court's entry of the second amended final judgment left them "with no claims to pursue against the Receiver."

In response, Receiver Park maintains that the circuit court properly denied the motion for leave to sue because: (1) the Former Employees should have intervened in the action; (2) their claims were barred by the rule against splitting a cause of action[43] and by the law of the case;[44] (3) the Former Employees failed to demonstrate a likelihood of success on the merits; and, (4) even if this court determines that a justiciable controversy exists and grants the cross-appeal, no relief can be sought where the Receiver has been discharged and the only remaining asset in the Estate is the $150,000.00 held by the court in reserve for further fees and costs of the Receiver.

On the other hand, Hawaii Ventures argues, *inter alia*, that this court does not have jurisdiction to hear the cross-appeal because the Former Employees' notice of cross-appeal was untimely filed. Hawaii Ventures further contends that the Former Employees failed to show that their interests were not adequately protected by ILWU.

Before this court can address the Former Employees' points challenging the circuit court's denial of their motion for leave to sue the Receiver, we must initially determine: (1) whether this court has appellate jurisdiction; and (2) whether the Former Employees have standing to appeal in the first instance. *Hawai'i Med. Ass'n v. Hawai'i Med. Serv.*

---

**42.** HRS § 394B–11 (1993) mandates
> [a]n employer in a covered establishment [to] pay on the effective date of a closing, partial closing, or relocation to each employee all wages, benefits, and other forms of compensation due and owing to said employee.

A covered establishment is defined as "any industrial, commercial, or other business entity which employs at any time in the preceding twelve-month period, fifty or more persons." HRS § 394B–2 (1993).

**43.** This court observed that:
> The rule against splitting a cause of action is an aspect of [r]es judicata and precludes the splitting of a single cause of action or an entire claim either as to the theory of recovery or the specific relief demanded. The rationale for the rule is to prevent a multiplicity of suits and provide a limit to litigation. It exists to avoid harassment of the defendant, vexatious litigation, and the costs incident to successive suits on the same cause of action.

*Bolte v. AITS, Inc.*, 60 Haw. 58, 60, 587 P.2d 810, 812 (1978) (citation omitted).

**44.** This court has indicated that the "law of the case" doctrine
> has been used in discussing, *inter alia*, the question whether a trial court judge is bound to follow a prior interlocutory decision of fact or law made in the same case by another judge of the same court. This is a rule of practice based on considerations of efficiency, courtesy, and comity.

*Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 121, 839 P.2d 10, 29 (1992) (format altered) (citations omitted). Here, Receiver Park contends that, in moving for leave to sue the Receiver, the Former Employees sought to avoid the court's ruling on the issue of vacation and severance pay and take a second bite of the apple. On September 28, 2001, the circuit court ruled that ILWU's claim (on behalf of its members-employees) for severance and vacation pay attributable to the pre-receivership period was not entitled to a preference as an administrative expense.

*Ass'n*, 113 Hawai'i 77, 94, 148 P.3d 1179, 1196 (2006) ("It is well-settled that courts must determine as a threshold matter whether they have jurisdiction to decide the issues presented. If a party is found to lack standing, the court is without subject matter jurisdiction to determine the action." (Citations omitted.)).

### a. *appellate jurisdiction*

■ As previously stated, Hawaii Ventures argues that the Former Employees' cross-appeal was untimely filed on September 24, 2004—after the second amended final judgment was entered on August 24, 2004. According to Hawaii Ventures, the Former Employees should have filed their notice of cross-appeal "immediately after the July 22, 2001 [circuit] court order denying their motion to intervene and sue the [R]eceiver" and not after the second amended final judgment.[45] Consequently, Hawaii Ventures maintains that this court does not have appellate jurisdiction to review the Former Employees' contentions. We cannot agree.

■ Generally, in a civil case, an appeal may be taken from a final judgment, order, or decree of the circuit court. HRS § 641–1(a) (Supp.2006). In a foreclosure case, however, an appeal may be taken from:

(1) A judgment entered on a decree of foreclosure[;]

(2) A judgment entered on an order confirming the sale of the foreclosed property, if the circuit court expressly finds that no just reason for delay exists, and certified the judgment as final pursuant to [HRCP R]ule 54(b) ...; and

(3) A deficiency judgment; provided that no appeal from a deficiency judgment shall raise issues relating to the judgment debtor's liability for the deficiency judgment (as opposed to the amount of the deficiency judgment), nor shall the appeal affect the finality of the transfer of title to the foreclosed property pursuant to the order confirming sale.

HRS § 667–51(a) (Supp.2006). An appeal may also be taken from a post-foreclosure order disposing of an HRCP 60(b) (2007)[46] motion relating to the final foreclosure judgment and its accompanying orders, *Beneficial Hawai'i, Inc. v. Casey*, 98 Hawai'i 159, 165, 45 P.3d 359, 365 (2002), and from an order finally determining all matters incident to enforcement of the foreclosure judgment, *Hoge v. Kane*, 4 Haw.App. 246, 247, 663 P.2d 645, 646–47 (1983).

Clearly, the July 22, 2001 order denying the Former Employees' motion for leave does not fall within any of the above categories, thereby rendering the order appealable. Indeed, the Former Employees attempted to appeal the order prior to the entry of final judgment; however, this court dismissed the appeal as premature. Consequently, the Former Employees were required to await the conclusion of the case and the entry of final judgment before filing their notice of appeal. *Ueoka v. Szymanski*, 107 Hawai'i 386, 396, 114 P.3d 892, 902 (2005) ("An appeal from a final judgment brings up for review all interlocutory orders not appealable directly as of right which deal with issues in the

**45.** Throughout its answering brief, Hawaii Ventures characterizes the Former Employees' motion for leave as a motion to intervene and relies on other jurisdictions for the issue of intervention. For example, Hawaii Ventures cites *Hutchinson v. Pfeil*, 211 F.3d 515, 518 (10th Cir.2000), and *United States v. City of Oakland*, 958 F.2d 300, 302 (9th Cir.1992), for the proposition that the denial of intervention must be appealed on an interlocutory basis. *Cf. Hoopai v. Civil Serv. Comm'n*, 106 Hawai'i 205, 215, 103 P.3d 365, 375 (2004) ("An order denying an application for intervention under HRCP Rule 24 is a final appealable order[.]" (Citation omitted.)). However, it is evident that the instant motion, entitled "Motion for Leave to Sue Receiver Patricia Kim Park in her Capacity as Receiver," is not a mo-
tion to intervene. Indeed, the Former Employees assert that they "did not seek to become a party to the foreclosure action since their case arose under statutory rights to wage payments distinguished from a foreclosure action." As such, Hawaii Ventures' reliance upon cases involving the matter of interventions is misplaced.

**46.** HRCP Rule 60(b) permits the circuit court to set aside "a final judgment, order, or proceeding" based upon, *inter alia*, "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud[; and] (4) the judgment is void."

case." (Citation and internal quotation marks omitted.)).

Moreover, even assuming *arguendo* that the order denying the motion for leave to sue the Receiver is a final appealable order, the Former Employees' appeal from the second amended final judgment does not preclude this court's review. *See Kukui Nuts of Hawai'i, Inc. v. R. Baird & Co.,* 7 Haw.App. 598, 617, 789 P.2d 501, 514 (1990) ("[W]here relief can be afforded from the terms of a collateral order upon appeal from the final judgment, the collateral order may be reviewed at that time, and the right to appeal the collateral order is not forfeited because it was not appealed from when it was entered." (Citations omitted.)); *Hoopai v. Civil Serv. Comm'n,* 106 Hawai'i at 215, 103 P.3d at 375 (holding that failure to take an immediate appeal did not preclude this court's review because the appeal from final judgment can afford relief). Accordingly, assuming the Former Employees have standing, the filing is timely.

### b. *standing*

■ Generally, the requirements of standing to appeal are:

(1) *the person must first have been a party to the action;* (2) the person seeking modification of the order or judgment must have had standing to oppose it in the [circuit] court; and (3) such person must be aggrieved by the ruling, *i.e.,* the person must be one who is affected or prejudiced by the appealable order.

*Kepo'o v. Watson,* 87 Hawai'i 91, 95, 952 P.2d 379, 383 (1998) (citation, internal quotation marks, and brackets omitted) (emphasis added); *see also Stewart Props., Inc. v. Brennan,* 8 Haw.App. 431, 433, 807 P.2d 606, 607 (1991) (stating that "[a] well-settled rule is that only parties to a lawsuit may appeal an adverse judgment") (citation, internal quotation marks, and ellipsis omitted).

■ Here, almost one year after their termination on June 17, 2001, the Former Employees, without filing a motion to intervene in the foreclosure action, filed a motion for leave to sue Receiver Park in her official capacity as the receiver for alleged unpaid wages—consisting of pre-receivership vacation and severance pay. On July 22, 2002, the circuit court denied the Former Employees' motion. Subsequently, the Former Employees appealed from the second amended final judgment, wherein they challenge the circuit court's July 22, 2002 order denying their motion, as well as the order granting Hawaii Ventures' motion for entry of the second amended final judgment and the second amended final judgment. Having failed to intervene pursuant to HRCP Rule 24 (2007),[47] the Former Employees do not meet the first prong of the standing requirements recited in *Kepo'o, i.e.,* "the person must first have been a party to the action." 87 Hawai'i at 95, 952 P.2d at 383 (citation omitted); *see also Bacerra v. MacMillan,* 111 Hawai'i 117, 119–20, 138 P.3d 749, 751–52 (2006) (holding that, by failing to properly intervene in the patient's medical malpractice action against health care providers, the employee medical benefit trust fund lacked standing to appeal the circuit court's dismissal of its "notice of lien" on settlement proceeds). Accordingly, we hold that the Former Employees lack standing to appeal. Consequently, their cross-appeal is dismissed.

### IV. *CONCLUSION*

Based on the foregoing, we affirm, in all respects, the circuit court's August 24, 2004 second amended final judgment, except as follows:

(1) we vacate (a) that portion of the May 12, 2003 order granting in part Hawaii Ventures' motion for deficiency judgment and denying in part its request regarding the $394,787.00 and (b) the May 14, 2003 deficiency judgment. We remand with instructions that the circuit

---

47. HRCP Rule 24(a) provides:

Upon timely application[,] anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

court amend the May 12, 2003 order to include a grant of Hawaii Ventures' aforementioned request and for entry of an amended deficiency judgment that includes the amount of $394,787.00 in favor of Hawaii Ventures as against Otaka and HWB;

(2) we vacate the awards of fees reflected in the circuit court orders filed on January 15, 2002, October 16, 2002, and May 12, 2003 (totaling $312,483.93) and remand this matter to the circuit court for clarification and, if necessary, a redetermination of the amount to be awarded to the Receiver and her professionals in light of the views expressed herein; and finally

(3) we dismiss the Former Employees' cross-appeal for want of standing.

